**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| STULLER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-CV-3303 |
| | ) | |
| STEAK N SHAKE | ) | |
| ENTERPRISES, INC., and | ) | |
| STEAK N SHAKE | ) | |
| OPERATIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This matter comes before the Court on Plaintiff Stuller, Inc.'s (Stuller) Renewed Motion for Preliminary Injunction (d/e 17). The Motion is fully briefed, and pursuant to Local Rule 72.1, the District Court has referred the matter to this Court for Report and Recommendation. This Court held an evidentiary hearing on the Motion on March 14 and 15, 2011. The parties thereafter submitted proposed findings. [Proposed] Report and Recommendation on Plaintiff's Renewed Motion for Preliminary Injunction (d/e 47); Defendants' Proposed Findings of Fact and Conclusions of Law (d/e 46). After carefully considering the evidence presented, the arguments of counsel, and the submissions of the parties, and pursuant to

28 U.S.C. § 636(b)(1)(B), this Court recommends that the Motion should be DENIED.

## I. STATEMENT OF FACTS

Stuller is a franchisee of five Steak n Shake restaurants. <u>Stuller Exhibit 1, Parts 1 through 5</u>.[1] Four are located in Springfield, Illinois, and one is located approximately thirty miles west of Springfield, in Jacksonville, Illinois. <u>Id.</u> Stuller, and the Stuller family before Stuller's incorporation, have operated Steak n Shake restaurant franchises in central Illinois since 1939, making it the oldest Steak n Shake franchise. <u>Transcript of Proceedings on March 14, 2011 (d/e 44) (March 14 Transcript)</u>, at 34. Defendants Steak n Shake Operations, Inc. (SNS Operations) and Steak n Shake Enterprises, Inc. (SNS Enterprises) (collectively SNS) own and operate Steak n Shake restaurants and grant franchises to others, including Stuller, to operate Steak n Shake restaurants. At the time of the hearing, SNS owned and operated 413 Steak n Shake restaurants, and franchisees operated an additional 75 Steak n Shake restaurants. <u>March 14 Transcript</u>, at 264.

For seventy years Stuller has set its own prices for menu items and maintained "custom menus" that contain products specific to this area.

---

[1]Unless otherwise indicated, all references to exhibits are to the exhibits admitted into evidence at the evidentiary hearing.

Stuller Exhibit 15, Declaration of Wilma Stuller dated November 19, 2011,

¶ 3.  Stuller could also decide whether to participate in SNS promotions.

Id.

Stuller and SNS have executed five franchise agreements currently in effect (Agreements), one for each restaurant operated by Stuller.  Stuller Exhibit 1, Parts 1-5, Agreements.  Before executing these Agreements, Defendants provided Stuller a Uniform Franchise Offering Circular (UFOC). Stuller Exhibit 2, UFOC dated July 2, 2004 (2004 UFOC); Stuller Exhibit 32, Acknowledgment of Receipt of UFOC. The UFOC contained Addenda prepared by SNS to satisfy specific legal requirements of Illinois law.  The parties sometimes referred to the amended UFOC as the Illinois Franchise Offering Circular or IFOC.  See, e.g., Stuller Exhibit 1, Addenda to Agreements ¶ 18.

Item 19 of the UFOC is entitled "Earnings Claims."  Item 19 sets forth information, both in text and in a table, about historical sales volumes and other data for Steak n Shake restaurants.    Item 19 states, in part:

> Any potential franchisee who attempts to estimate from this table his or her own costs and performance must keep in mind that the Table does not reflect the performance of Steak N Shake franchised operations.
>
> Furthermore, there are some differences between the operations of a franchised restaurant and a SNS-owned restaurant. . . . Franchisees are free to set consumer prices

different from prices on SNS-owned restaurant menus and several do so.

2004 UFOC, at 37; Stuller Exhibit 28, UFOC dated April 1, 1995, at 30; Stuller Exhibit 30, UFOC dated December 29, 2004, at 40; Stuller Exhibit 31, UFOC from 2006 (no further specific date indicated), at 36.

Stuller and SNS Operations executed three of the Agreements, one each on February 1, 1995, January 27, 2000, and January 26, 2005 (for the South Dirksen, Prairie Crossing and North Dirksen locations, respectively). Stuller Exhibit 1, Parts 3-5. Stuller and SNS Enterprises executed supplements to these three Agreements on December 22, 2005. Id. Stuller and SNS Enterprises executed the other two Agreements, as well as addenda thereto, on July 18, 2006 (for the Jacksonville and Wabash locations). Stuller Exhibit 1, Parts 1-2.

The Agreements grant Stuller franchises to operate the five restaurants. Schedule 1 of each Agreement sets forth the address of the restaurant subject to the particular Agreement and the exclusive territory granted to Stuller with respect to the particular restaurant.

The Agreements obligate Stuller to operate the five restaurants in accordance with the Steak n Shake "System":

> Franchisee acknowledges that maintaining uniformity in every component of the operation of the System is essential to the success of the entire chain of STEAK N SHAKE Restaurants, including a designated menu; uniformity of food and beverage

specifications, preparation methods, quality and appearance; and uniformity of facilities and service. Franchisee agrees to comply with the entire System, as revised from time to time by the Company.

Agreements, § 1.03.[2] The recitals to the Agreements define "System" as follows:

> The Company has created and developed a unique restaurant concept, including buildings with a distinctive architectural design, decorative color scheme and trade dress, and has standardized methods of preparing and serving certain food products and beverages for on-premises and off-premises consumption in manuals and other materials of the Company (the "Operating Standards Manual") as issued and revised from time to time (hereinafter collectively referred to as the "System").

Recitals to Agreements.[3]

The Agreements obligate SNS, as franchisors, to provide Stuller with a copy of Steak n Shake's Operating Standards Manual, and authorize SNS to modify their Operating Standards Manual and other applicable manuals and publications during the term of the franchise as follows:

> The Franchisee will receive during the term of the Franchise one copy each of the Operating Standards Manual, and other applicable manuals and publications of the Company for STEAK N SHAKE Restaurants, containing mandatory and suggested specifications, standards and operating procedures prescribed from time to time by the Company for STEAK N SHAKE Restaurants and information relative to other

---

[2]The Agreements refer to SNS as "the Company."

[3]The language defining "System" in the South Dirksen agreement is slightly different, but is not materially different in substance to that of the other four Agreements. See Stuller Exhibit 1, Part 4 of 5, Recitals to Agreement.

obligations of Franchisee hereunder for the operation of a STEAK N SHAKE Restaurant. The Company shall have the right to modify the Operating Standards Manual and other manuals and publications from time to time to reflect changes in authorized products and services, standards of product quality and services for the operation of a STEAK N SHAKE Restaurant.

Agreements, § 5.01(a).[4]  The Agreements require that all amendments or changes to the Agreements be in a writing signed by both parties:

No amendment, change or variance from this Agreement shall be binding on either party unless mutually agreed by the parties and executed in writing.

Agreements, § 14.08(d).

The Agreements authorize Defendants to terminate each franchise only for good cause.  Agreements, § 11.01.  The Agreements state that good cause to terminate exists if, inter alia, Stuller "fails to maintain and operate the Restaurant in accordance with the standards and specifications established by the Company from time to time." Agreements, §11.01(b)(vi).[5]

---

[4]This clause in the Franchise Agreements with SNS Operations begins with the phrase, "The Company will loan to Franchisee during the term of the Franchise" instead of the phrase, "The Franchisee will receive during the term of the Franchise." The remainder of the clause is identical in the five Agreements. Agreements, § 5.01(a).

[5]The clause in the 1995 and 2000 Franchise Agreements states: "fails to maintain and operate the Restaurant in accordance with the standards and specifications established by the COMPANY from time to time as to service, cleanliness, health and sanitation; knowingly sells any product on the premises which does not conform to the COMPANY'S specifications; or fails to sell products designated by the COMPANY or sells products not approved by the COMPANY[.]" Stuller Exhibit 1, Part 4, § 11.01(b)(10), and Part 5, § 11.01(b)(vi) (the word "Company" is not typed in all capital letters in the 2000 Agreement).

Before terminating the franchise, Defendants must give written notice of the default.  <u>Agreements</u>, § 11.01(b).[6]  Stuller then has thirty days to cure the default.  <u>Id.</u>  If the default is not cured within the thirty-day time period, SNS can thereafter elect to terminate the franchise.  <u>Id.</u>

The Agreements contain integration clauses.  The integration clauses state:

> The recitals to this Agreement are hereby incorporated into and made a part of this Agreement, which, together with Schedule 1 and any addendum hereto, constitute the entire agreement of the parties (and which supersedes all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter hereof, all of which are deemed to have been merged into this Agreement). The Company has made no representations inducing the execution of this Agreement that are not incorporated herein.

Agreement, §14.05 (emphasis in the original).[7] The Illinois addendum to

---

[6]The thirty-day notice and cure provision in the 1995 Agreement is in § 11.01(a). <u>Stuller Exhibit 1</u>, Part 4, <u>Agreement</u>, § 11.01(a).

[7]The clause in the 1995 Agreement states:

<u>Entire Agreement</u>. The preamble recitals are incorporated and made a part of this Agreement, which, together with the addendum hereto, if any, constitutes the entire agreement of the parties (and which supersedes all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter hereof). The COMPANY has made no representations inducing the execution of this Agreement which are not incorporated herein.

<u>Stuller Exhibit 1, Part 4, Agreement</u>, § 14.05.  The clause in the 2000 Agreement states:

<u>Entire Agreement</u>. The recitals to this Agreement are hereby incorporated into and made a part of this Agreement, which, together with any addendum hereto, if any, constitutes the entire agreement of the parties (and which supersedes all prior negations, commitments, representations and undertakings of the parties with respect to the subject matter hereof,

the UFOC and the addenda to the two Agreements executed on July 18, 2006, modify the integration clauses as follows:

> 18. The last sentence of Section 14.05 is deleted in its entirety, and in its place is added:
>
> Other than the Illinois Franchise Offering Circular (the "IFOC") that was previously provided to Franchisee, the Company has made no representations inducing the execution of this Agreement that are not incorporated herein. Notwithstanding the previous sentence, the IFOC is incorporated into this Agreement only to the extent required by law.

Stuller Exhibit 1, Parts 1-2, Addendum, ¶ 18.  The Addenda also modify the Governing Law provision in Section 14.17 to provide:

> **Section 41 of the Illinois Franchise Disclosure Act ["IFOC"] states that "any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act is void.**

Stuller Exhibit 1, Parts 1-2, Addendum, ¶ 18 (emphasis in original).

In 1972 and 1978, Stuller and SNS executed franchise agreements that expressly reserved to Stuller the right "to establish and determine in its sole discretion other prices to be charged for products sold or offered for sale in the licensed restaurant."  SNS Exhibits 19 and 21, Steak n Shake,

_____

all of which are deemed to have been merged into this Agreement). The Company has made no representations inducing the execution of this Agreement which are not incorporated herein.

Stuller Exhibit 1, Part 5, Agreement, § 14.05.

Inc., License Agreements, § 4.09.  This language was not included in the Agreements currently in effect.

Wilma Stuller, the President and sole shareholder of Stuller, testified at the hearing that in 2007, because of the high cost of printing Stuller's custom menus, Stuller decided to adopt the then-highest tier of corporate pricing.  March 14 Transcript, at 45.  At that time, corporate pricing consisted of a 5-tiered system.  Id.  Because the fifth pricing tier differed only slightly from Stuller's custom pricing, Stuller decided to adopt that tier of corporate pricing to eliminate its costs of printing custom menus. Id.

Wilma Stuller testified that Stuller started losing as a result of the switch to corporate pricing.  Id. at 46.  Within that same time frame, there was a significant increase in the price of fuel in the United States, which increased food costs for Stuller across the board.  Id.  Stuller's Profit/Loss Summary for 2008 showed that Stuller suffered a loss of $538,446.98 in 2008. Stuller Exhibit 18, Stuller, Inc. Profit/Loss Summary (2008 Summary). The 2008 Statement of Revenue and Expenses and Statement of Retained Earnings for the Wabash restaurant, however, showed that Wilma Stuller received an officer salary in 2008 of $469,126.72, and a dividend of $257,625.28.  2008 Summary, at Stuller 1686-87.  Stuller also made all of the rent payments to Wilma Stuller.  Wilma Stuller rents the land and buildings for the five restaurants to Stuller.  The rent pays the

mortgages on the properties, plus an additional $80,000 per year in net rental income to Wilma Stuller.  March 14 Transcript, at 38, 137-38.

Wilma Stuller testified that Stuller let go of some of its employees in 2008 due to the company's losses.  March 14 Transcript, at 137-38.  Derek Bruno, Stuller's Comptroller, testified that during this time frame, Wilma Stuller refinanced her personal property and made a cash infusion into Stuller. March 14 Transcript, at 195.

Wilma Stuller testified that due to the losses suffered in 2008, she considered increasing menu prices by 5 percent across the board, but later decided to increase prices by 10 percent.  Id.  Thereafter, Stuller contacted SNS to request custom menus with a 10 percent price increase.  March 14 Transcript, at 46.  SNS representatives expressed concern that such a significant price increase may cause Stuller to lose customers, and offered to perform some research on the issue.  Id. at 46-47.  SNS later shared their research with Stuller, which advised against a price increase.  Stuller Exhibit 20, Stuller, Inc. Pricing Perspective dated June 11, 2008 (2008 Pricing Perspective).  Wilma Stuller testified that she continued to believe that a 10 percent increase was necessary.  March 14 Transcript, at 47. Wilma Stuller testified that during her final telephone call with representatives of SNS on this issue, Ken Faulkner of Steak n Shake, stated that, although SNS recommended against the price increase, SNS

could only give Stuller the benefit of its expertise and research, and that SNS "cannot set your prices for you."  March 14 Transcript, at 47-49; see 2008 Pricing Perspective, at 7.  Wilma Stuller testified that Brad Manns was also on the call. He was Vice President of Franchising for Steak n Shake at the time.  Wilma Stuller testified that he did not disagree with Faulkner's representation.  March 14 Transcript, at 49.  Thereafter, between June and August of 2008, SNS printed Stuller's custom menus with a 10 percent across-the-board price increase.

Wilma Stuller testified that after Stuller raised its prices in 2008, it suffered no customer loss; in fact, customers commented that Stuller appeared to be among the last of the local businesses to raise its prices. March 14 Transcript, at 50.  Bruno opined that, but for Wilma Stuller's cash infusion into Stuller and the 10 percent price increase, the loss suffered in 2008 would have put Stuller out of business.  Id. at 195-96.

Stuller's current pricing is largely unchanged since its 2008 price increase.  Id. at 55.  Wilma Stuller testified that these prices were in line with other local full-service restaurants.  Id. at 50.

On June 15, 2010, Steak n Shake Enterprises announced its new Policy.  Stuller Exhibit 3 Policy/Procedure Menu Pricing and Promotion

(Policy).  The Policy applies to corporate-owned and franchised

restaurants. The Policy states:

> All restaurants are required to follow set company menu and
> pricing as published with the exception of breakfast items.
> Additionally, all restaurants are required to offer all company
> promotions as published.
>
> Participation includes the following:
>
> > ☐ Offer valid during all hours in all revenue centers
> > ☐ Interior and exterior marketing materials posted in
> > accordance with published criteria, except as
> > prohibited by local regulation

Id.  The Policy contains the following explanation of the purpose of the

Policy:

> Steak n Shake recognizes the value of "One Voice" of the brand
>
> > ☐ Maximizes brand equity through enforcement of
> > standards
> > ☐ Promotional communication to guests is consistent
> > among all locations
> > ☐ Maintains a standardized look and feel of each unit.
>
> Additionally, the Company has standardized the cost of goods
> across the brand, allowing us to meet our mission of providing
> the lowest possible prices to our guests.

Id.[8]

---

[8]The statement in the Policy regarding Steak n Shake's standardizing the cost of
goods refers to the fact that, in June of 2010, Steak n Shake eliminated its own
distribution facility and contracted with another company, Sygma, to be the single
distributor of products to the company-owned and franchised restaurants.  March 14
Transcript, at 77-79.

On August 11, 2010, Brad Manns, currently SNS Enterprises Vice President Development and Franchise Operations, sent a letter to franchisees, including Stuller.  <u>Stuller Exhibit 4, Letter dated August 11, 2010 (August 11th Letter)</u>.  The August 11th Letter stated in part:

> In order to help you increase guest frequency to help offset the impact of these changes, we are willing to implement certain marketing initiatives at our expense focusing on value pricing if you agree to follow our Pricing/Promotion Policy pursuant to the timetable outlined herein.  During the first three periods of FY2011, we will invest an amount . . . of your Adjusted Net Sales . . . ("Marketing Investment") in . . . advertising in your Designated Market Area with an emphasis on value messaging. . . .

> By signing below, you agree to follow the Pricing/Promotion Policy beginning September 1, 2010 and for the remainder of your Franchise Agreement Term, except for specified items during the Transition Period (described below). For the period beginning September 1, 2010 and ending the later of (i) February 15, 2011; or (ii) Company's issuance of the second menu during Company's FY2011 ("Transition Period"), you shall not be required to adhere to the Company's published menu pricing for the following items: (i) drinks (excluding shakes and freezes); (ii) chili products; and (iii) Melts (Frisco Melt, Pepperjack Melt, Patty Melt and Chicken Melt). On or before the end of Transition Period, you agree to adhere to the Company's pricing for all menu items (except breakfast).

> In exchange for the Marketing Investment benefitting your Restaurants, you agree to release the Company (and its officers, directors, employees, agents, parent companies, subsidiaries, affiliates, and their respective successors, predecessors, and assigns), from and against all manner of actions, complaints, causes of action, claims, suits, breaches, torts, controversies, damages, claims and demands, whatsoever, in law or in equity, arising out of, directly or indirectly, Company's implementation of the Pricing/Promotion

Policy. Except for the obligations of Company and Franchisee set forth herein, all other terms and conditions of the Franchise Agreement shall remain in full force and effect.

If you have any questions or concerns about the Pricing/Promotion Policy, please do not hesitate to contact me. **If you do not execute and return this Agreement to me on or before August 31, 2010, we will not commence the Marketing Investment on your behalf.**

Id. (emphasis in original).  Below Manns' signature on the August 11th Letter was the following sentence, followed by a signature block for Stuller:

**BY SIGNING BELOW, FRANCHISEE ACKNOWLEDGES AGREEMENT WITH THE FOREGOING TERMS AND CONDITIONS[.]**

Id. (emphasis in the original).

Stuller did not sign the letter and did not implement the reduced pricing called for under the Policy.  Stuller Exhibit 16, Wilma Stuller Declaration dated January 13, 2011, ¶7.  Rather, Stuller and other franchisees formed a group named One Voice Franchise Association ("Franchise Association").  Stuller Exhibit 5.  The Franchise Association communicated with Steak n Shake Enterprises regarding the Policy through two letters dated August 16, 2010 and October 1, 2010, respectively.  Stuller Exhibits 5 and 6.

On October 27, 2010, SNS Enterprises sent Stuller a Notice of Default on two of the Agreements covering the restaurants located on Wabash Avenue and North Dirksen Parkway in Springfield, Illinois. Stuller

Exhibit 7, Letter Dated October 27, 2010 (Notice). The Notice listed

eighteen defaults. Id. Many were minor, ranging from missing marketing

window-cling advertisements to a need to paint a sign pole. The principal

defaults listed involved charging prices above those allowed by the Policy.

The Notice stated that Stuller failed to "operate the Restaurant[s] in

accordance with the standards and specifications established by [SNS]

from time to time." Id. Stuller had thirty days to correct the defaults,

including by beginning charging prices in compliance with the Policy. The

Notice further stated that SNS reserved, "the right to exercise all rights and

remedies set forth in the Franchise Agreement." Id.

Counsel for Stuller responded to the Notice by letter dated November

12, 2010. Stuller Exhibit 9, Letter dated November 12, 2010. The

November 12th Letter disputed that Stuller was in default of or had

otherwise breached its obligations under the Agreements. The letter

further stated that SNS Enterprises did not have authority under the

Agreements to impose the Policy on Stuller, and Stuller did not agree to be

subject to the Policy and did not sign the August 11, 2010, letter.

Therefore, Stuller stated that it was not in default for electing not to follow

the Policy. Id.

On November 18, 2010, Stuller commenced this action seeking a

temporary restraining order and preliminary injunction preventing SNS from

enforcing the Policy against Stuller and from taking any adverse action

against Stuller for non-compliance with the Policy during the pendency of

the litigation.  During hearings on November 19 and 23, 2010, SNS's

counsel agreed not to enforce the November 27, 2010 default and/or

termination date against Stuller, but reserved its right to enforce the Policy

against Stuller at a later date.  Based on SNS's counsel's representations,

the Court denied Plaintiff's Motion for Temporary Restraining Order and/or

Preliminary Injunction as moot with leave to re-file if necessary.  <u>Minute</u>

<u>Entry entered November 19, 2011</u>; <u>Minute Entry entered November 23,</u>

<u>2011</u>.

Approximately a month later, on December 20, 2010, SNS's counsel

sent an e-mail to Stuller's counsel, notifying Stuller that SNS was now

electing to enforce the Policy against Stuller.  <u>Stuller Exhibit 21, E-mail</u>

<u>dated December 20, 2010</u>. In the e-mail, SNS made a demand that Stuller

"remedy its default under its five franchise agreements by complying with

the Policy on or before January 24, 2011."  SNS further stated that "[i]f the

default is not cured by January 24, 2011, the five franchise agreements will

be subject to termination according to their terms for failure to cure a

default after notice, and Steak n Shake Enterprises, Inc. reserves all rights

and remedies available to it as a result of the failure to cure the defaults."

<u>Id.</u>  SNS's counsel advised that SNS was providing this advance notice so

that Stuller could make arrangements to comply with the Policy "or

alternatively seek injunctive relief or pursue other rights it may believe it

has prior to the January 24, 2011 deadline." <u>Id.</u>

In response to the December 20th e-mail, Stuller filed the Motion. The

District Court held a telephone conference regarding the Motion. The

District Court referred the matter to this Court for a hearing and Report and

Recommendation. The parties agreed at that time that no action would be

taken by SNS pending the hearing on the Motion. <u>Minute Entry entered</u>

<u>December 23, 2010</u>; <u>Text Order entered December 23, 2010</u>. Manns

testified at the hearing that notices have been sent through the litigation

process, but the Stuller franchises have not been terminated, and that SNS

wants Stuller to stay in business and comply with the Policy. <u>March 14</u>

<u>Transcript</u>, at 273-74.

At the hearing, Derek Bruno testified regarding his estimate of the

effect that implementation of the Policy would have on Stuller. Bruno

opined that Stuller would experience a 6 to 7 percent reduction in net sales

revenue.[9] To reach this conclusion, Bruno took the sales data of the items

---

[9]SNS and Stuller define net sales as the proceeds actually received from the
sales. Stuller and SNS calculate gross sales based on the total products sold times the
*a la carte* prices for such items. Net sales reflects the money actually received for the
products sold after discounts for selling products together as a meal, discount coupons,
and other discounts. <u>March 14 Transcript</u>, at 112. Bruno based his opinions on net
sales data. He did not supply any data directly on profits or the impact of the Policy on
profitability. SNS similarly based its response on net sales data.

sold at Stuller's restaurants for the months of October, November, and December 2010, assumed that all items were sold at *a la carte* prices, and then assumed that if Stuller adopted the Policy, sales volume would not change and the same number of items would be sold at the lower *a la carte* prices allowed by the Policy. Bruno subsequently adjusted his estimates to reflect the fact that Steak n Shake restaurants often sell items as parts of a meal rather than *a la carte*, and often give discounts to customers and employees. After these adjustments, Bruno estimated a $616,000 to $695,000 annual reduction in net sales revenues, or approximately, a 6 to 7 percent reduction. Stuller Exhibit 24, Supplemental Declaration of Bruno Stuller, ¶ 12. SNS ran a similar calculation before introducing the Policy and estimated that Stuller would experience a 6.5 percent drop in net sales. Stuller Exhibit 36, Estimated Impact of Enforcing Corporate Promotions and Pricing In Franchising Community; March 14 Transcript, 118-24. Bruno opined that Stuller would go out of business in a year if it implemented the Policy. March 14 Transcript, at 139-40. On cross examination, Bruno admitted that his final estimates overstated the reduction in net sales revenues that Stuller would experience because of the methods used to adjust for the impact of discounting and sales of products in combination rather than *a la carte*. March 14 Transcript, at 168-70.

Stuller submitted affidavits of Mark Gratkowski and James Spornhauer, the owners of two other Steak n Shake franchisees.  Stuller Exhibits 40, Declarations of Mark Gratkowski dated January 7, 2011 and March 2, 2011; Stuller Exhibit 41, Declaration of James Spornhauer. Gratkowski and Spornhauer complied with Policy under protest beginning in November 2010.  Gratkowski and Spornhauer each calculated the reduction in net sales revenue for the items sold in under the Policy, again assuming that all items were sold at *a la carte* prices, and that there was no change in volume of sales due to implementation of the Policy.  Based on these assumptions, Gratkowski stated that his company, Eastern Shore Restaurants, Inc., lost nearly $50,000 in net sales revenues in the first two months that it complied with the Policy, and Spornhauer opined that his company, People, Sales & Profit Co., Inc., lost $46,209.99 in net sales revenues from November 26, 2010 through December 28, 2010, as a result of implementing the Policy.

In response, SNS submitted data of the net sales data from franchisees that complied with the Policy.  SNS's Manager of Financial Planning and Analysis Ryan Poppelman testified that forty-eight franchise restaurants adopted SNS's corporate uniform pricing beginning November 1, 2009.  March 14 Transcript, at 223-24.  SNS sought to impose this level of pricing on Stuller through the Policy.  A comparison of the net sales data

from these restaurants from the years ending October 31, 2009, and October 31, 2010, showed an average annual increase in net sales revenues from 2009 to 2010 of 7.06 percent.  SNS Exhibit 14, Franchise Sales and Guest Count Pre and Post Company Pricing.  These data also showed an average increase in customer count of 9.75 percent.  Id.

SNS also submitted data showing the change in net sales and change in customer count for all franchisees for December 1, 2010, to March 10, 2011, from the prior year during the same period.  SNS Exhibit 11, Business Summary for All Franchises Rollup From: 12/1/2010 To: 3/10/2011.  During this period all franchisees except Stuller followed the Policy.[10]  The data submitted by SNS show that of the 31 franchisees that operated the seventy-five franchise restaurants, 29 franchisees showed an increase in net sales over prior year sales.  The only exceptions were Stuller and Smith & Sons.  All of the franchisees except Stuller showed an increase in customer count over the prior year.   The franchise operated by Gratkowski showed an 8.1 percent increase in net sales revenues and a 13.4 percent increase in customer count over the previous year.  The franchise operated by Spornhauer showed a 4.2 percent increase in net

---

[10]Approximately two weeks before the March 14 hearing, the franchisee in Las Vegas, Nevada, notified SNS that it would no longer follow the Policy.  March 14 Transcript, at 274.  The Las Vegas franchisee had been complying with the Policy up until that point in time.

sales revenues and a 7.7 percent increase in customer count. Gratkowski

opined that his net sales revenues would have increased even more if SNS

had not imposed the Policy on his franchise. Gratkowski Declaration dated

March 2, 2011, ¶¶ 5-7.

## II. ANALYSIS

To secure a preliminary injunction, Stuller must demonstrate:

(1) Stuller has some likelihood of success on the merits;

(2) Stuller has no adequate remedy at law and is likely to suffer

irreparable harm if the preliminary injunction is not granted;

(3) the likely harm to Stuller would be greater than the harm to SNS

from imposing the injunction; and

(4) the injunction is in the public interest.

Judge v. Quinn, 612 F.3d 537, 546 (7th Cir. 2010); Hoosier Energy Rural

Elec. Co-op., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725

(7th Cir. 2009). To establish a likelihood of success, Stuller must

demonstrate that it has "some prospect of prevailing on the merits."

Hoosier, 582 F.3d at 730.[11]

---

[11]Older Seventh Circuit decisions state the element as requiring the plaintiff to show that it has a "greater than negligible chance of winning." AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 803 (7th Cir. 2002).

The elements of likelihood of success and the likelihood of harm are also interdependent:

> These considerations are interdependent:  the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted.

Quinn, 612 F.3d at 546.[12]  The Hoosier opinion describes the relationship as follows:

> How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief.

Hoosier, 582, F.3d at 725.

SNS argues that Stuller must meet a higher standard of proof because Stuller seeks a mandatory injunction that requires SNS to take some affirmative step to change the status quo.  See W. A. Mack, Inc. v. General Motors Corp., 260 F.2d 886, 890 (7th Cir. 1958).  The status quo is the "last uncontested status which preceded the pending controversy."  Westinghouse Elec. Corp. v. Free Sewing Mach. Co., 256 F.2d 806, 808

---

[12]This interdependence may have been called into question by the Supreme Court decision in Winters v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008).  In Winters, the Ninth Circuit applied a preliminary injunction standard that stated that if a party had a strong likelihood of success on the merits it need only show a possibility of irreparable harm.  Id. at 375.  The Supreme Court held that this was error. The Supreme Court held that the party seeking the injunction had to show a likelihood of irreparable harm.  Id.   The Seventh Circuit decided Quinn and Hoosier after Winters, and both cases cited Winters.   Thus, the Seventh Circuit has concluded that the interdependence aspect of the preliminary injunction test is still viable after Winters.

(7th Cir. 1958).  In this case, SNS has issued a notice of default to Stuller, but has not issued a termination notice.  SNS's Vice President Manns testified that he did not consider the franchises terminated and did not want to terminate the franchises.  Thus, the last uncontested status is an ongoing franchise relationship between SNS and Stuller.  Stuller seeks to maintain that status quo until the merits of the case can be heard by the District Court.  Thus, the preliminary injunction sought is not a mandatory injunction.[13]  Stuller, thus, does not need to meet a higher standard of proof reserved for mandatory injunctions.

The two key issues are the likelihood of success and irreparable harm.  Stuller's likelihood of success turns on meaning of § 1.03, § 5.01(a), and the amended integration clauses in the Agreements, and the representation in Item 19 of the UFOC.  The parties agree that the Agreements are governed by Illinois law.  See [Proposed] Report and Recommendation on Plaintiff's Renewed Motion for Preliminary Injunction, at 28-29; Proposed Findings of Fact and Conclusions of Law, ¶ 191.

The interpretation of a contract is a matter of law in Illinois.  GNB Battery Technologies, Inc. v. Gould, Inc., 65 F.3d 615, 621 (7th Cir. 1995).

---

[13]In W. A. Mack, the General Motors Cadillac Division had already issued the notice of termination to the automotive dealership before the suit was filed.  Id. at 889-90.  The injunction effectively sought to force General Motors to reinstate the terminated dealership.  Here, the Stuller franchises have not been terminated.

The purpose is to give effect to the expectation of the parties.  Id. at 622.

When interpreting a contract, all documents that are entered into

simultaneously should be construed together, and the Court must give

meaning to all of the stated terms.  Id.  Absent an ambiguity, the Court

must give effect to the plain meaning of all of the terms of the agreement.

Atlantic Mut. Ins. Co. v. Metron Engineering and Const. Co., 83 F.3d 897,

898 (7th Cir. 1996).  If the agreement is ambiguous, then the parties may

present extrinsic evidence to establish the intent of the parties.  Air Safety,

Inc. v. Teachers Realty Corp., 185 Ill.2d 457, 462-63, 706 N.E.2d 882, 884

(Ill. 1999).

Stuller argues that these provisions entitle it to set its own prices and

to choose whether to participate in SNS marketing promotions.  Stuller

argues that §§ 1.03 and 5.01 do not mention pricing, but only products,

services, and quality, and so, do not authorize SNS to set prices for Stuller.

Stuller further argues that the integration clause incorporates into the

Agreements the representations in the UFOC, including the

representations that franchisees are free to set their own prices.  Stuller

relies on the phrase in the integration clauses that, "the Company has

made no representations inducing the execution of this Agreement that are

not incorporated herein."  Stuller argues that this phrase incorporated all

representations made by SNS to induce Stuller to sign the Agreements,

which necessarily includes all representations in the UFOC. Thus, Stuller argues that the statement in Item 19 of the UFOC that franchisees can set their own prices is incorporated into the Agreements.

Stuller also appeals to provisions of the Federal Trade Commission's Franchise Rule (FTC Rule), 16 C.F.R. § 436.9, and to the IFDA, 815 ILCS 705/1, et seq. The FTC Rule states that it is an unfair and deceptive trade practice to disclaim any representation in a franchise disclosure document such as the UFOC. The IFDA requires all statements in offering circulars, such as the UFOC, to be free from any false or deceptive representations or omissions. 815 ILCS 705/16. Stuller argues that the FTC Rule and the IFDA effectively require SNS to honor the representation in Item 19 of the UFOC.

Stuller also appeals to the parties' course of dealing. Stuller and the Stuller family have operated Steak n Shake franchise restaurants for over 70 years, since 1939. Throughout that time, Stuller has set its own prices, has added items to the standard Steak n Shake menu, and has had the option to decide whether to participate in any Steak N Shake marketing promotions. Stuller relies on this history as further evidence that the parties did not intend to authorize SNS to set prices or dictate marketing promotions for Stuller. Wilma Stuller testified that in 2008, SNS opposed her plan to raise prices 10 percent, but SNS representative Faulkner stated

that SNS could not dictate pricing to Stuller.  The 2008 SNS analysis of the Stuller proposal to raise prices, Stuller Exhibit 20, supports Wilma Stuller's testimony that SNS took the position at that time that it could not dictate pricing to Stuller.

Stuller finally argues that the August 11th Letter from Manns to Stuller and the other franchisees was an offer to amend the Agreements to authorize SNS to establish the Policy.  Stuller argues that the August 11th Letter is a recognition by SNS that the Agreements did not authorize Stuller to impose the Policy on franchisees.

SNS counters that §§ 1.03 and 5.01 of the Franchise Agreements, quoted above, justify establishing the Policy.  SNS argues that these clauses authorize it to maintain uniform operations and to modify the operations of Steak N Shake Restaurants.  SNS argues that the Policy is just a modification of the Operations Standards Manual designed to maintain uniform operations in all Steak N Shake restaurants.

SNS also relies on the definition of "Marketing plan or system" in the IFDA.  The provision states, in part:

> (18) "Marketing plan or system" means a plan or system
> relating to some aspect of the conduct of a party to a contract in
> conducting business, including but not limited to (a)
> specification of price, or special pricing systems or discount
> plans, . . . .

815 ILCS 705/3(18).  SNS argues that this provision incorporates into

every franchise system the authority to specify prices and discount plans as a matter of law.  As a result, SNS's authority to modify the Operations Standards Manual from time to time necessarily includes the authority to modify policies regarding prices and marketing promotions.

SNS also relies on the Eleventh Circuit's decision in <u>Burger King Corp. v. E-Z Eating, 41 Corp.</u>, 572 F.3d 1306 (11th Cir. 2009).  In <u>E-Z Eating</u>, the Burger King franchisor (BKC) required franchisees to sell certain items on a dollar menu.  The Eleventh Circuit held that BKC had the authority to set prices for franchisees.  <u>Id.</u> at 1314.

SNS argues that representation in Item 19 of the UFOC was not incorporated into the Agreements.  SNS appeals to the last sentence in the integration clause which states that the IFOC "is incorporated into the Agreement only to the extent required by law."  SNS argues that the IFDA did not require incorporation of the representation in Item 19 into the Agreements, and so, the representation is not incorporated into the Agreements.

SNS further argues that it did not violate the anti-fraud provisions of the IFDA because the representations in Item 19 that franchisees could set their own prices was true when made in 2004.  SNS argues that its decision several years later to change pricing policies did not make the statement false or fraudulent.

SNS argues that the Agreements are clear so consideration of extrinsic evidence is improper. SNS, however, presents evidence that the prior 1972 and 1978 franchise agreements with Stuller expressly authorized Stuller to set prices. Those express authorizations were omitted from the Agreements. SNS argues that this change demonstrates that the parties changed their relationship at that time to end Stuller's authority to set its own prices. SNS further argues that the August 11th Letter did not seek to amend the Agreements. Rather, the August 11th Letter offered additional advertising assistance in exchange for a release and an agreed schedule for complying with the Policy.

Neither sides' arguments are completely persuasive. The Agreements do not address whether SNS can modify operational standards to require uniform pricing and marketing. Sections 1.03 and 5.01 do not discuss pricing. Section 1.03 recognizes the importance of uniformity and consistency throughout Steak n Shake restaurants, but does not mention pricing. Section 5.01 states that SNS may modify the Operations Manual to reflect changes in authorized products and services and standards of quality in products and services, but does not mention price. This silence arguably creates either an ambiguity or suggests a lack of authority for SNS to modify the Operations Manual to include uniform pricing.

The statement in Item 19 of the UFOC does not resolve the issue either. The integration clause limits incorporation of representations from UFOC to those required by the IFDA. The IFDA does not mandate the incorporation into the Agreements the representation in Item 19 that franchisees are free to set their own prices. The anti-fraud provision of the IFDA cited by Stuller does not require incorporation of any representation into an franchise agreement; it only prohibits false or fraudulent statements. The representation in Item 19 of the UFOC was true when made; it does not appear to be deceptive. The fact that SNS intends to change the franchise pricing system several years later does not render the representation in Item 19 false or fraudulent. The Agreements all clearly contemplate some ability of SNS to modify the franchise system; thus, all parties knew when the 2004 UFOC was distributed that the franchise system could change over time. The issue is the extent of SNS's authority to change the franchise system. The representation in Item 19 of the UFOC does not resolve that question.

The definition of "Marketing plan or system" in the IFDA also does not resolve the issue. The section in the IFDA defines a term "franchise system" as it is used in the statute; the section says that a franchise system can include the authority of a franchisor to set prices. 815 ILCS 705/3(18). The statutory definition, however, does not require the inclusion of that

particular term into every franchise agreement.  The parties are free to structure the franchise relationship with respect to pricing.  For example, SNS and Stuller expressly reserved to Stuller the right to set prices in the 1972 and 1978 franchise agreements.  Those agreements were clearly franchise agreements subject to the IFDA even though the agreements contained this express provision that allowed the franchises to set prices.

The Eleventh Circuit's decision in Burger King v. E-Z Eating also does not resolve the issue.  The franchise agreement in E-Z Eating stated that BKC could make any changes to the operating system, "which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary."  Id. at 1308.  This contract language gave BKC much broader discretion in modifying the franchise operating system than the language in the Agreements.  The E-Z Eating decision does not provide guidance on how to interpret the Agreements.

The evidence presented to date, therefore, indicates that the Agreements are silent or ambiguous regarding whether SNS can require franchisees such as Stuller to follow the Policy.  If the Agreements are ambiguous, extrinsic evidence may be considered.  The change in the franchise agreements beginning in 1995 to delete the express authority of Stuller to set its own prices supports SNS's position that the parties changed their relationship regarding pricing.  This change indicates that

Stuller gave up control of pricing. Stuller, however, still set its own prices from 1995 to 2010 even without the clause expressly giving it authority to do so. The 10 percent price increase in 2008 also supports Stuller's claim that the parties understood that Stuller could set its own prices. The statement in Item 19 of the UFOC also supports that position. The silence in the Agreements on the issue of setting prices and the conflicting extrinsic evidence both show that Stuller has some prospects of success on the merits. See Hoosier, 582 F.3d at 728-30 (example of the Seventh Circuit's approach to evaluating likelihood of success on the merits).

However, Stuller has failed to demonstrate that it has no adequate remedy at law, or that it will suffer irreparable harm if the preliminary injunction is not granted. Stuller argues that SNS will terminate the franchise if the preliminary injunction is not granted. The evidence does not support this position. The evidence shows that Stuller will face a choice if the preliminary injunction is not granted: Stuller can comply with the Policy during the pendency of the case, or Stuller can lose the franchise. Stuller can take action to avoid the loss of the franchise without the preliminary injunction. Should Stuller choose to lose the franchise, the loss at this point would be self-inflicted. The courts are not sympathetic to a request for an injunction to avoid an injury that is self-inflicted. See

Second City Music, Inc. v. City of Chicago, Ill., 333 F.3d 846, 850

(7th Cir. 2003).

Therefore, the issue is whether Stuller has no adequate remedy at

law if it complies with the Policy during the pendency of the case.  Stuller's

injury from complying with the Policy is essentially economic; Stuller claims

that it will lose money if it complies with the Policy by lowering certain

prices and honoring all SNS promotions.  Compensatory damages are

generally an adequate remedy at law for economic losses.  Thus, if Stuller

prevails on the merits and there is a finding that SNS breached the

Agreements by imposing the Policy on Stuller during the pendency of this

proceeding, then Stuller can resume setting its own prices at the

conclusion of the case and recover damages for the breach.[14]  On the other

hand, if SNS is found to be correct in its interpretation of the Agreements,

then SNS could impose the Policy, and Stuller suffered no compensable

injury.

Damages are an adequate remedy for Stuller's economic losses for

following the Policy unless the impact of the Policy is so severe that

---

[14]Wilma Stuller opined that Stuller could not raise prices after the case ended. Stuller offered no basis for this opinion other than her belief about customer expectations.  Stuller offered no other evidence regarding the ability of Stuller to raise prices again after the case has ended.  Her opinion about customer expectations is insufficient to establish that Stuller could not raise prices if it prevailed on the merits. Regardless, Stuller could include within its damage claim the effect of its inability to raise prices at the end of the case.

following the Policy threatens to put Stuller out of business.  <u>Praefke Auto Elec. & Battery Company, Inc. v. Tecumseh Products Co., Inc.</u>, 255 F.3d 460, 463 (7th Cir. 2001); <u>Roland Machinery Co. v. Dresser Industries, Inc.</u>, 749 F.2d 380, 386 (7th Cir. 1984).  Thus, Stuller must show that compliance with the Policy will put it out of business in order to show that it has no adequate remedy at law.  <u>Id.</u>

Stuller must also prove irreparable harm.  Even if the Policy would eventually put Stuller out of business, a preliminary injunction is not available unless Stuller will suffer irreparable damage during the pendency of the case.  <u>Roland Machinery</u>, 749 F.2d at 386-87.  Stuller must show that it would be irreparably injured by the losses it would suffer if it were required to follow the Policy from the date that the District Court would adopt this Report and Recommendation until the conclusion of the trial on the merits.

Stuller has failed to demonstrate that following the Policy will force it out of business, let alone that the Policy will impose irreparable harm during the pendency of the case.  Stuller's comptroller, Bruno, opined that Stuller would experience a 6 to 7 percent reduction in net sales if it followed the Policy; however, he conceded on cross examination that he overstated the amount of the reduction in net sales because of the way in which he calculated the effects of coupons and other discounts.  <u>See</u> <u>March 14</u>

Transcript, at 168-70.  Bruno also assumed that lower prices and sales promotions would not affect the volume of Stuller's business.

Bruno's opinions are inconsistent with the experience of the other SNS franchisees that have complied with the Policy.  The data presented by SNS show that franchisees that have complied with the Policy have experienced an increase in net sales, not a decrease.  Only one franchisee that complied with the Policy experienced a decrease in net sales from December 1, 2010, through March 10, 2011.  Smith and Sons experienced a 4.2 percent decrease in net sales during this period.  The other twenty-nine franchisees experienced increases in net sales.  On average, all franchisees during this three-month period experienced a 5.6 percent increase in net sales.  That figure includes Stuller, which was not following the Policy and which experienced a 2.9 percent drop in net sales during the period.  The historical data from the other franchises provides strong evidence that Bruno's opinions are not correct.

Even more telling, none of the other franchisees that complied with the Policy went out of business.  SNS presented evidence that forty-eight restaurants have complied with the Policy since November 1, 2009.  None of them have gone out of business.   If Bruno's predictions of the effect of the Policy were correct, at least some of these franchisees would show financial problems and/or be near bankruptcy.  There is simply no evidence

of this.  Even the franchisees owned by Gratkowski and Spornhauer experienced increases in net sales after complying with the Policy. Gratkowski's franchise has experienced an 8.1 percent increase in net sales since adopting the Policy and Spornhauer's franchise has experienced a 4.2 percent increase in net sales.  Gratkowski claims that his net sales would have increased even more without the Policy, but even if true, his claim is not persuasive.  The issue is not whether Stuller will lose profits under the Policy, the issue whether Stuller will be "irreversibly injured" during the pendency of the case if it must follow the Policy.  Roland Machinery, 749 F.2d at 386-87.  Gratkowski's franchise may or may not show a loss of profits since it began to comply with the Policy, but it has not suffered an irreversible injury.

Stuller claims that it would not experience any benefit from an increase in sales volume by lowering prices and honoring SNS promotions. Wilma Stuller has testified that the Stuller Steak n Shake restaurants already operate at full capacity and so will not experience any increase in sales from lowering prices.  See March 14 Transcript, at 54.  Stuller argues that the increases in net sales at other franchisees were the result of other factors, such as opening new restaurants, market size, or local economic conditions in specific markets.  Id. at 183-87.

Stuller has established that its restaurants operate at a very high capacity, but Stuller has not demonstrated that it is unique among SNS franchisees. All of the other franchisees have complied with the Policy, and none has gone out of business or experienced the dire financial consequences that Bruno has predicted. If Bruno is correct, at least one of the other franchisees would be suffering financially. Stuller presents no such evidence. Thus, Stuller fails to show that it will suffer irreparable harm.

Stuller also argues that its experience in 2008 shows that it will go out of business if it adopts SNS's uniform pricing and promotions. Stuller argues that it lost money in 2008 when it adopted SNS pricing. Stuller's financial records show that it lost $538,446.98 in 2008. Those records also show, however, that Stuller paid Wilma Stuller a salary of $469,126.72 and a dividend of $257,625.28 in 2008. Stuller also made all the rent payments, including the $80,000 in net income to Wilma Stuller. These distributions are inconsistent with the claim that Stuller lost money that year. At a minimum, these 2008 distributions indicate that Stuller could withstand a similar reduction in revenue during the pendency of this action.

Stuller argues that it is entitled to a preliminary injunction if adoption of the Policy would be a significant blow to Stuller during the pendency of the case even if Stuller could survive. Stuller relies on General Leaseways,

Inc. v. National Truck Leasing Ass'n, 744 F.2d 588, 591 (7th Cir. 1984).

Stuller, however, failed to prove that it would suffer a significant blow during the pendency of this case.  The historical data from the other franchisees show that the Policy has not imposed a significant blow on any franchisee that has adopted it.  Bruno's opinions to the contrary are not persuasive.

WHEREFORE, this Court recommends that Plaintiff Stuller, Inc.'s Renewed Motion for Preliminary Injunction (d/e 17) be DENIED.  The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after being served with ECF copy of this Report and Recommendation.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  Failure to file a timely objection will constitute a waiver of objections on appeal.   See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986);  Local Rule 72.2.


ENTER:    April 28, 2011

<u>        s/ Byron G. Cudmore        </u>
BYRON G. CUDMORE
UNITED STATES MAGISTRATE JUDGE