E-FILED
Friday, 20 May, 2011  05:14:12 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| STULLER, INC., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Case No.: 3:10-cv-03303-SEM-BGC |
| STEAK N SHAKE ENTERPRISES, INC., | ) |
| et al., | ) |
| Defendants. | ) |

**PLAINTIFF STULLER, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

COMES NOW Plaintiff Stuller, Inc. ("Plaintiff" or "Stuller"), by and through its undersigned attorneys, and pursuant to Fed. R. Civ. P. 72(b)(2) and CDIL – LR 72.2(a), submits the following Memorandum in Opposition to Defendants' Objections (Docs. 58 & 59) to the Magistrate Judge's Report and Recommendation (Doc. 55).

**ARGUMENT**

**I.  AS A MATTER OF LAW, DEFENDANTS DO NOT HAVE THE RIGHT TO SET MENU PRICES UNDER THE PARTIES' AGREEMENTS (DEF. OBJ., AT 4-7).**

Defendants object to the Magistrate Judge's finding that: "This silence [the franchise agreements do not expressly grant Defendants the right to require uniform pricing and marketing] arguably creates either an ambiguity or suggests a lack of authority for SNS to modify the Operations Manual to include uniform pricing." (Doc. 55, at 28; Def. Mem. of Law in Support of Obj. to Report and Recommendation, Doc. 59 ("Def. Obj."), at 4-7.)

Conceding that pricing is not mentioned in the main body of the franchise agreements (the "Agreements"), Defendants argue that the Illinois Franchise Disclosure Act ("IFDA") grants franchisors the unilateral right to set pricing, and that such right is incorporated into the Agreements as a matter of law. (See Def. Obj., at 4, 5; See also Def. Obj., at 7 ("'Specification

1

of price' is included in the franchisor's system as a matter of Illinois law as if IFDA § 3(18) was 'expressly referred to' in the Agreements.")) This is patently false.

The IFDA does not mandate that **all** franchise systems include specification of price, or otherwise grant franchisors the right to unilaterally set prices – it merely suggests that such specification *may* be part of a system, where properly disclosed and agreed upon by the parties. Under the IFDA, a "marketing plan or system" (a phrase used only once in the IFDA – that is, in the definition of "Franchise") is defined as:

> a plan or system relating to *some aspect* of the conduct of a party to a contract in conducting business, including but not limited to (a) specification of price, *or* special pricing systems *or* discount plans, (b) use of particular sales *or* display equipment *or* merchandising devices, (c) use of specific sales techniques, (d) use of advertising or promotional materials *or* cooperation in advertising efforts; provided that an agreement is not a marketing plan or system solely because a manufacturer or distributor of goods reserves the right to occasionally require sale at a special reduced price which is advertised on the container or packaging material in which the product is regularly sold, if the reduced price is absorbed by the manufacturer or distributor.

815 ILCS § 705/3 (emphasis added).[1]

This definition clearly is not a grant of power to the franchisor, but, instead, simply sets up the definition of "Franchise," which in turn serves as the lynchpin for the franchisor's disclosure, anti-fraud and other obligations under the IFDA. Defendants seek to turn the IFDA on its head, suggesting that "specification of price" is part of their system when they disclosed the exact opposite in their Uniform Franchise Offering Circulars ("UFOCs") distributed to Plaintiff per federal law and the IFDA. Those UFOCs indicated that *Plaintiff*, rather than

---

[1] In his Report and Recommendation, the Magistrate Judge concluded that the definition of "marketing plan or system" in the IFDA did not support Defendants' argument. See Report and Recommendation, Doc. 55, at 29-30 ("The section in the IFDA defines a term 'franchise system' as it is used in the statute; the section says that a franchise system can include the authority of a franchisor to set prices. 8 ILCS 705/3 (18). The statutory definition, however, does not require the inclusion of that particular term into every franchise agreement. The parties are free to structure the franchise relationship with respect to pricing.")

Defendants, had the right to set its own prices under Defendants' franchise system. (See Doc. 57, at 6-10; Pl.'s Hrg. Exs. 2, 29, 30, 31 & 32.) Defendants seek to undermine the purpose of the IFDA. See 815 ILCS § 705/2 ("Illinois residents have suffered substantial losses where franchisors or their representatives have not provided full and complete information regarding the franchisor-franchisee relationship…[including]…the details of the contract between the franchisor and franchisee…")

Incredibly, Defendants base their entire objection on a legal premise that undeniably supports Plaintiff's position – that is, "existing Illinois law [including all the requirements of the IFDA] is incorporated into all of the Agreements signed by Stuller and SNS." (See Def. Obj., at 5.) Therefore, unlike the imaginary price setting rights Defendants claim under the IFDA, Defendants' UFOC statements were, in fact, incorporated into the Agreements as part of the IFDA anti-fraud provisions. (See Pl.'s Mem. of Law in Support of Obj. to Report and Rec. of U.S. Mag. Judge, Doc. 57, at 6-10; Pl.'s Reply in Further Supp. of Mot. for Prelim. Inj., Doc. 30, at 5-8; Pl.'s Mem. of Law in Support of Renewed Mot. for Prelim. Inj., Doc. 18, at 6-7.)

Further, in citing to the IFDA definition of "marketing plan or system," Defendants blatantly ignore the fact that the Agreements explicitly define what constitutes part of Defendants' particular franchise "system," in a manner that excludes price specification:

> The Company has created and developed a unique restaurant concept, including buildings with a distinctive architectural design, decorative color scheme and trade dress, and has standardized methods of preparing and serving certain food products and beverages for on-premises and off-premises consumption in manuals and other materials of the Company (the "Operating Standards Manual") as issued and revised from time to time (hereinafter collectively referred to as the "System").

(Recitals to Agreements.)  This definition provides that Plaintiff is required to construct and maintain the appearance of its restaurants and to offer particular types of food and beverages as required by Defendants, not that it is required to set prices as dictated by Defendants.

Burger King Corp. v. E-Z Eating, 41 Corp., 572 F. 3d 1306 (11th Cir. 2009) does not alter this result.  Contrary to Defendants' broad characterization, E-Z Eating, which was decided under Florida law, does not stand for the proposition that Defendants have a general "contractual right" under Illinois law to set menu prices as part of their "franchise system, even if the specific franchise agreement never mentions price or pricing." (Def. Obj., at 7.)  In E-Z Eating, the Eleventh Circuit held that Burger King had the authority under its particular franchise agreements to require its franchisees to adopt a "Value Menu" setting prices on a handful of menu items. Id. at 1314.  This conclusion appears to be based solely on the court's interpretation of a provision requiring franchisees to accept and comply with good faith modifications to Burger King's franchise system. Id. at 1314.

By contrast, the current litigation involves Defendants' much broader effort to specify pricing for all menu items under a very narrow definition of the "franchise system," and contrary to representations made by Defendants in their franchise disclosure documents.  "[D]istrict courts within the Seventh Circuit are bound by that Circuit's precedent, and not precedent from other Circuits." Auten v. Steigmann, Case No. 11-3013, 2011 U.S. Dist. LEXIS 16836, *11-12 (C.D. Ill. Feb. 18, 2011).  Here, after considering the E-Z Eating opinion, the Magistrate Judge correctly found that it "does not resolve the issue" present in this litigation. (Doc. 55, at 30.)  Therefore, the Court should reject Defendants' objection.

4

## II. DEFENDANTS FALSELY REPRESENT THAT THE IFDA DID NOT EXIST PRIOR TO 1987, AND MISCONSTRUE THE MAGISTRATE JUDGE'S COMMENTS ABOUT THE 1972 AND 1978 FRANCHISE AGREEMENTS (DEF. OBJ., AT 12).

In his Report and Recommendation, the Magistrate Judge correctly rejects Defendants' contention that franchisors are granted the right to impose pricing on franchisees by operation of the IFDA. (Doc. 55, at 29-30.) By contrast, the Magistrate Judge concludes that "[t]he parties are free to structure the franchise relationship with respect to pricing." (Id. at 30.) As an example, he cites the fact that Defendants and Plaintiff's predecessor expressly agreed in their 1972 and 1978 franchise agreements that the franchisee had the right to set prices. (Id.)

Defendants claim that the Magistrate Judge erred in concluding that agreements pre-dating 1987 were subject to the IFDA. Defendants represent to the Court that the IFDA did not exist prior to 1987. Defendants are, however, grossly mistaken. Although the current version of the IFDA was in fact enacted in 1987, a prior version of the statute was in effect at least as early as January 1, 1974, a copy of which is attached hereto as Exhibit 1. See Exhibit 1, 121.5 ILCS § 701 et seq. (1977). This version of the Act, like the current IFDA, defined franchise, in pertinent part, as "a contract or agreement…between two or more persons by which: (a) a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services, ***under a marketing plan or system*** prescribed or suggested in substantial part by a franchisor…" 121.5 ILCS § 703(1) (1977) (emphasis added). "Marketing plan" was in turn defined under the prior Act, in pertinent part, as follows:

> (19) "Marketing plan" means a plan relating to some aspect of the conduct of a party to a contract in conducting business, including but not limited to (a) ***specification of price***, or special pricing systems or discount plans, (b) use of particular sales or display equipment or merchandising devices, (c) use of specific sales techniques, (d) use of advertising or promotional materials or cooperation in advertising efforts…

5

121.5 ILCS § 703(19) (1977) (emphasis added). Thus, it is clear that the 1978 agreement was, indeed, subject to the IFDA.[2]  Defendants are undoubtedly aware of the existence of this earlier Act, because, in discovery in this matter, they produced a September 28, 1977 letter and related correspondence to Plaintiff, in which they confirmed that they had "received an exemption from Sections 4 and 16 of the Franchise Disclosure Act of Illinois."  See attached, Exhibit 2, Letter from Richard Seal to Harold Stuller, September 28, 1977 and related correspondence.  It is unclear why Defendants would take a position before this Court that is contrary to the documents they produced in this litigation.

In any event, the Magistrate Judge's statement that the 1972 and 1978 franchise agreements were subject to the IFDA is, in reality, immaterial.  His conclusion is not that the existence of the IFDA at the time of the 1972 and 1978 agreements had an impact on them, but rather that the IFDA does not impose particular terms with respect to price specification.[3]

### III. ASSUMING THE AGREEMENTS ARE "AMBIGUOUS," THE MAGISTRATE JUDGE PROPERLY CONSIDERED THE PARTIES' COURSE OF DEALING. (DEF. OBJ., AT 13-14).

Defendants also argue that the Magistrate Judge's consideration of admissions made by Defendants in 2008 as part of the parties' course of dealing was improper because "non-waiver provisions stating that no course of dealing between the parties shall be construed to alter or amend a parties' contractual rights" prevents this consideration. (Def. Obj., at 13.)  This argument is seriously flawed.

---

[2] There were no amendments to 121.5 ILCS § 703 prior to the execution of the 1978 Agreement. See 121.5 ILCS § 703 (1979).

[3] As part of its argument, Defendants incorrectly state that none of the parties' franchise agreements expressly allow Plaintiff to set its own prices. (Def. Obj., at 12.)  Again, the evidence shows that Defendants expressly represented to Plaintiff that Plaintiff would be allowed to set prices as part of UFOCs distributed Plaintiff to induce Plaintiff to enter franchise agreements with Defendants.  These statements are incorporated by law into Plaintiff's franchise agreements with Defendants. See supra, at Section I.

6

First, Defendants' argument rests on the errant presumption that Defendants had An express contractual right to set prices in the first place that could be waived. As discussed above, the Magistrate Judge correctly found that the Agreements do not clearly give Defendants the right they claim. See supra, Section I.

Second, Defendants' argument mischaracterizes the way in which the Magistrate Judge considered evidence of the parties' course of dealing. Defendants suggest that course of dealing evidence cannot be used to "alter or amend" the parties' contractual rights. However, the Magistrate Judge referred to course of dealing evidence to ascertain what the parties rights were, after concluding the agreements "ambiguous." Simply put, the Magistrate Judge found that the Agreements were either "silent or ambiguous regarding whether SNS can require franchisees such as Stuller to follow the Policy." (Doc. 55, at 30.)[4] Although Plaintiff maintains that the Agreements unambiguously grant Plaintiff the right to set its own prices (and that, in any event, the Agreements should be construed against their drafters), it was not error for the Magistrate Judge to consider extrinsic evidence to the extent he properly found that the Agreements were ambiguous. Under Illinois law, where a contract is ambiguous, extrinsic evidence (including the parties' course of dealing) may properly be considered by the Court. See Brethren Home of Girard, Illinois v. OSM, Inc., No. 06-3161, 2008 U.S. Dist. LEXIS 10116, at *24 (C.D. Ill. Feb. 11, 2008) (citing Bourke v. Dun & Bradstreet Corp., 159 F. 3d 1032, 1036 (7th Cir. 1998)).

Finally, Defendants mischaracterize the nature of the non-waiver provisions contained in the Agreements. Defendants cast these provisions as barring the consideration of "course of dealing" evidence. However, the provisions themselves merely state that the parties' practices

---

[4] The Magistrate Judge ultimately concluded that both the agreements' silence on the issue of setting prices and the extrinsic evidence it considered indicated that Plaintiff "had some prospects of success on the merits" of its claim. (Doc. 55, at 31.)

7

"shall not constitute a waiver of [Defendants'] right to demand exact compliance with any of the terms herein." (Def. Obj., at 13) (citing Agreements, § 14.08.) Again, this assumes that Defendants have the right that they claim in the first place. Further, despite Defendants' contention that these non-waiver provisions must be "strictly" enforced, the Seventh Circuit has recognized that such clauses themselves may be waived by the words and deeds of a party. See Roboserve, 78 F. 3d 266, 277 (7th Cir. 1996) (authority cited by Defendants). For example, in Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis, 723 F. 2d 512 (7th Cir. 1983), the Seventh Circuit rejected a franchisor's claim that a non-waiver clause barred a franchisee from arguing that the franchisor's actions waived certain contractual requirements. The Court stated that:

> [waiver] is basically an equitable principle used by courts to avoid harsh results when a party has conducted itself in such a way as to make those results unfair. As applied in the present context, we do not believe….that [the franchisor] should be permitted to interpose "boilerplate" contract language in an attempt to obtain a result which the jury could, on the basis of the evidence presented, reasonably have found to be unduly harsh [to the franchisee].

Id. at 518-19 (citing Shearson Hayden Stone, Inc. v. Leach, 583 F. 2d 367 (7th Cir. 1978)); See also Household Fin. Services, Inc. v. Northeastern Mortgage Investment Corp., No. 00 C 0667, 2000 U.S. Dist. LEXIS 8975 (N.D. Ill. June 22, 2000) (finding that non-waiver clauses are "waivable by the words or deeds of the parities to them.") As a result, the Court should reject Defendants' objection.

**IV.    THE MAGISTRATE JUDGE CORRECTLY FOUND THAT DEFENDANTS "ESTIMATED" THAT PLAINTIFF WOULD EXPERIENCE A 6.5% DROP IN NET SALES IF THE POLICY WERE IMPLEMENTED (DEF. OBJ., AT 15).**

In their Objection, Defendants meritlessly assert that Plaintiff's Hearing Exhibit 36 – a spreadsheet prepared by Defendants and accepted into evidence without objection – does not show that Plaintiff would experience a 6.5 percent drop in net sales if the Policy were adopted.

8

Defendants do not cite any testimony supporting their conclusion; instead, they merely try to remake the damaging, dispositive testimony given by their own witness, Mr. Poeppelman.

As explained in detail in Plaintiff's Objections to the Magistrate Judge's Report and Recommendation, Mr. Poeppelman testified at hearing that Exhibit 36, created by Defendants, did in fact show an potential loss of $648,439.00, or approximately 6.5% of Plaintiff's revenue, if Plaintiff were to adopt the Policy. (See Doc. 57, at 19-20, Exhibit 1; Tr. 251:18-252:12.) Further, Mr. Poeppleman acknowledged that "there's no evidence" that recent customer traffic increases at certain locations – including the Reinwald, Eastern Shore, and PSP locations – was the result of lower prices under the Policy. (Id. at 17-19; Tr. 242:15-244:8.) In fact, the owners of Eastern Shore and PSP submitted declarations as part of these proceedings expressly contesting Defendants' conclusion that the Policy has benefitted them. (See Pl.'s Hrg. Exs. 40 & 41.)

The significance of Exhibit 36 cannot be understated. Defendants go to great lengths to recast Exhibit 36 as "nothing more than a mathematical calculation based on prior sales," and "not an 'estimate' of actual impact" of the Policy. (Def. Obj., at 15.) This is belied by the very title Defendants gave to the spreadsheet: "***Estimated Impact*** of Enforcing Corporate Promotions in Franchise Community." (See Doc. 57, Ex. 1) (emphasis added.) Exhibit 36 confirms that Defendants themselves recognized that the implementation of the Policy would harm Plaintiff. Further, the 6.5% loss projected by Defendants is consistent with and substantiates the data presented by Plaintiff evidencing a 6-7% reduction in net revenue. The evidence further shows that this type of loss would be severe enough to threaten Plaintiff's business going forward. As a result, contrary to the Defendants' claims, Exhibit 36 should be given great weight by the Court.

Dated:  May 20, 2011 	Respectfully submitted,

GREENSFELDER, HEMKER & GALE, P.C.

By   */s/ Jason L. Ross*
    Jason L. Ross, #6257974
    jlr@greensfelder.com
    Kirsten M. Ahmad, #6281602
    km@greensfelder.com
    10 S. Broadway, Suite 2000
    St. Louis, MO  63102-1774
    Telephone:  (314) 241-9090
    Facsimile:   (314) 345-5499

*Attorneys for Plaintiff Stuller, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 20, 2011, I electronically filed the foregoing using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| Mark D. Hansen | W. Barry Blum |
| mhansen@heylroyster.com | bblum@gjb-law.com |
| Gregory J. Rastatter | Genovese, Joblove & Battista, P.A. |
| grastatter@hrva.com | 100 Southeast Second Street, 44th Floor |
| Heyl, Royster, Voelker & Allen | Miami, Florida 33131 |
| Suite 600, Chase Building | |
| 124 S.W. Adams Street | |
| Peoria, Illinois 61602-1352 | |

    */s/ Jason L. Ross*

1277282