UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CASE NO. 3:10-CV-03303-SEM-BGC

STULLER, INC.,

                    Plaintiff,

v.

STEAK N SHAKE ENTERPRISES, INC. and
STEAK N SHAKE OPERATIONS, INC.,
                    Defendants.
_____/

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION

Defendants, Steak n Shake Enterprises, Inc. and Steak n Shake Operations, Inc. (together "SNS"), pursuant to Fed. R. Civ. P 72 and CDIL – LR 72.2(a), file this response opposing Plaintiff Stuller, Inc.'s Objections to the Report and Recommendation of the United States Magistrate Judge [DE 56] and Supporting Memorandum of Law [DE 57] (together "Stuller's Objections") addressed to the Report and Recommendation ("Report") [DE 55] issued by Magistrate Judge Byron G. Cudmore on Plaintiff's Renewed Motion to Preliminary Injunction

## INTRODUCTION

Stuller's Objections do not demonstrate any error in the Report's conclusion that a preliminary injunction should not be entered.  Stuller did not show at the hearing on March 14-15, 2011, or in its Objections, that it is entitled to the extraordinary relief of a preliminary injunction.

Stuller's Objections fail principally because Stuller did not establish that it will suffer irreparable harm prior to trial or that it lacks an adequate legal remedy.  That failure of proof makes unnecessary any consideration of the issue of likelihood of success – the so-called

1

"sliding scale" -- or the other elements of a preliminary injunction claim.  Because Magistrate Judge Cudmore correctly determined that Stuller made no showing of irreparable harm, or that it had no adequate legal remedy, he was not required to engage in any "sliding scale" analysis of irreparable harm and likelihood of success on the merits.   Nonetheless, Magistrate Judge Cudmore did do that analysis and thus gave Stuller's case more consideration that it was due on the basis of a request for injunction.  Still, no case for preliminary injunctive relief was made; the recommendation to deny Plaintiff's motion for preliminary injunction was correct and it should be adopted by this Court.

## ARGUMENT

## I.      IRREPARABLE HARM AND NO ADEQUATE REMEDY AT LAW

### a.  The Standard Imposed on Stuller For Establishing Irreparable Harm By the Recommendation Is Proper

Stuller first argues that the "Recommendation errs in denying Plaintiff's Motion by requiring Plaintiff to meet too high of a standard to establish irreparable harm."  DE 56 at 1; DE 57 at 14-16.  This argument ignores the heavy burden Stuller faced in seeking a preliminary injunction.  The Seventh Circuit has cautioned that "the granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 389 (7th Cir. 1984) (reversing preliminary injunction) (quoting Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (3d Cir. 1940) (per curiam)).  "It frequently is observed that a preliminary injunction ... should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 973 (1997) (emphasis in original) (quoting 11 A C. Wright, *et al*., Fed. Practice & Procedure § 2948, pp. 129-30 (2d ed. 1995)).  The Supreme Court thus instructs that the moving party must satisfy a "requirement of substantial proof [that] is much higher" than on

a summary judgment motion.  Id.  The Report properly required Stuller to make a strong showing of irreparable harm.

Stuller's principal argument is that the Report erred by requiring Stuller "to prove that adopting the Policy would put it out of business."  DE 56 at 2 ¶3.  That is not, however, what the Report requires and Stuller badly mischaracterizes the Report.  Judge Cudmore actually stated:

> Even if the Policy would eventually put Stuller out of business, a preliminary injunction is not available unless Stuller will suffer irreparable damage *during the pendency of the case*.  Stuller must show that it would be irreparable injured by the losses it would suffer if it were required to follow the Policy *from the date that the District Court would adopt this Report and Recommendation until the conclusion of the trial on the merits.*

See DE 55 at 33 (emphases added) (citations omitted).

Here, Stuller had the burden of proving, "by a clear showing," that it would suffer irreparable harm, whether characterized by going out of business, or a "significant blow," **between the denial of an injunction and the time of trial.**  That is the standard in the Seventh Circuit and it is what the Report requires.  As the Seventh Circuit has stated, when considering a request for a preliminary injunction, "we are concerned only with the period between now and the entry of final judgment; it is only these interim losses that are relevant in deciding whether [Plaintiff] is entitled to a preliminary injunction."  Roland, 749 F.2d at 391.

At the hearing, and in its Objections, Stuller chose to ignore its burden of showing harm that will ensue during the pendency of the case.  Stuller focuses exclusively on its claim that it will lose "almost $650,000.00" DE 56 at 3 ¶¶ 5-6; DE 57 at 2.  Setting aside that Stuller failed to prove that it will lose that amount, that number is the maximum amount of loss Stuller has ever claimed it would incur in a full year.  DE 57 at 2 ("Policy will cause Plaintiff to loss approximately $650,000.00 per year.").  It has nothing to do with the period through trial.  Stuller never made any showing whatsoever of an amount of loss that will put it out of business

3

or even deal it a serious blow in the then-five months to trial, which now is even less time.  In fact, Stuller deliberately chose not to put in evidence its case any showing of its current profit; SNS put on that proof because it shows that Stuller's "going out of business" claim is nonsense.[1]

Judge Cudmore understood that the issue on Stuller's motion for preliminary injunction is not whether Stuller might possibly lose profits (which can be rectified by damages); rather, Stuller must show that it will be "irreversibly injured" during the pendency of the case if it must follow the Policy.  Praefke Auto Elec. & Battery Co., Inc. v. Tecumseh Products Co., Inc., 255 F.3d 460, 463 (7th Cir. 2001) (reversing preliminary injunction based on no irreparable harm); Roland, 749 F.2d at 386-87 (same).  Stuller's objections to that finding, which mischaracterized what Judge Cudmore reported, are without merit.

### b.  The Report Properly Finds That Plaintiff's Controller, Derek Bruno, Conceded on Cross Examination That He Overstated Stuller's Potential Sales Loss

Derek Bruno, Stuller's Controller, was the only witness Stuller offered to calculate its alleged losses to show that it would suffer irreparable harm prior to the trial in this case.  Bruno acknowledged that his calculations of potential losses were overstated because he failed to account properly for the reduced impact of coupons, discounts, and employee meals if Stuller adopted the Policy. Tr. 162-192.  In the face of Bruno's testimony, Stuller suggests that "the Recommendation errs in finding that Plaintiff's witness, Derek Bruno, conceded on cross examination that he overstated the sales loss because of the way in which he calculated the

---

[1] In several instances, Stuller tries to avoid its substantial burden of proof and complains that SNS did not put specific evidence showing some amount of losses Stuller might suffer.  Of course, Stuller had the burden of proof, not SNS.  Nonetheless, SNS put in evidence actual, historical data of other franchisees showing 27 of 28 other franchisees who adopted the Policy in late 2010 had sales gains, not losses.  By contrast, Stuller, the only franchisee not offering Policy pricing, had the second worst sales and customer counts in the entire country.  See Defs. Hrg. Exs. 11, 13-15 Stuller's response to that evidence is to argue that it is "irrelevant" and the Court should ignore it.  See pp. 9-13 infra.

effects of coupons and other discounts." DE 56 at 3; DE 57 at 21.  Judge Cudmore, having

listened to the testimony, correctly found that Bruno conceded exactly that.  Although Bruno

offered lame excuses for his flawed methodology, which excuses were disproved by other

testimony, Bruno repeatedly admitted on cross-examination that his estimates overstated losses

because he failed to properly account for discounts and coupons.  Some examples of Bruno's

testimony are as follows:

> Q. So what you're saying is even though we [Stuller] would have sold all this
> stuff at a loss less under the Steak N Shake policy prices, the discounts that we
> would all have been the same?  They would have been the same dollar amount,
> 44,723.  That's what your model presumed?
>
> A. On Exhibit 1, yes.
>
> Q. And the same thing with any employee discounts or manager meals?
>
> A. Correct, on that exhibit.
>
> Q. But that's just a flawed analysis, isn't it?
>
> A. That's why we also included Exhibit 2.
>
> Q. We're going to get to Exhibit 2.  But on Exhibit 1, I mean, are you admitting
> that it is flawed?
>
> A. It was the only way that we knew to do it at the point when that was originally
> made.  Then we came up with our other exhibit here for Exhibit 2.

(Tr. 162:4-21).

***

> Q.  In that original.  So it overstates the discount that you would have – that
> would happen under the system Policy.
>
> A. Yes, that's why we went on to - -

(Tr. 165:3-6).

***

> Q. All right, all right.  So now you're – that's Exhibit 2, right?

A. Correct.

(Tr. 166:1-166:13).

*** 

Q. So instead of putting the 44,000 dollars, you took the comparable percentage, 4 percent or so, and applied it to the 851 [thousand].  Is that what you did on Exhibit 2?

A. Yes.

Q. And it's to try to equalize that problem that you – and now that – that actually took well over a hundred thousand dollars off your ultimately annualized numbers, didn't it?

A. From the beginning number, yes.  From our estimate at the beginning.

Q.  Okay.  Now, and that is it your belief that that kind of solves the problem?

A. It was as good as we could do with the limitations we were given through our corporate system.  We had to be able to look at discounts.

Q.  But it still also very badly overstates the discounting that happens under the policy?

A.  Not very badly.

(Tr. 167:23-168:17).

*** 

Q. Okay.  So if you take - - if you say this is a 25 percent discount off 5.49, the discount becomes 1.37, right? 25 percent.  . . . So what you're saying is you're subtracting 1.37 out of there, not a dollar.  That's a 37 percent overstatement of the impact of this one transaction on your numbers, isn't it?

A.  Like I said, it was the best we could do with our limitations we were given through corporate.

Q.  But it is, it is a 37 percent overstatement.

A.  It appears to be.

(Tr. 169:7-21).

*** 

Q.  I do have one other question. You also have a product called Chili Five Ways?

A.  Yes.

Q.  Pretty popular product?

A.  Yes.

Q.  And there's some coupons that are offered on that, correct?

A.  I believe there are.  Corporate does all the couponing.

Q.  A $3.99 coupon?

A.  Corporate does all the couponing.

Q.  Well, that's actually one of the items, one of the biggest price differences.  Your price is $5.89 and the policy price is $4.99. Does that make --- sound right?

A.  It sounds --- could be.

Q.  And there's a coupon offer for $3.99?

A.  Okay.

Q.  So again back to your policy rate, for you that would constitute a $1.90 discount from $5.89, right?

A.  For the month that coupon would run.

Q.  And it would only be a dollar discount for corporate off $4.99.

A.  Yes.

Q.  So if you take a $1.90 discount and move it over in the column over --- you're almost doubling the impact.  You're overstating by 90 percent the reduction of the --- of your sales under the policy aren't you? Just for that ---

A.  It may be for that one item for the one month that coupon would run.

Q.  It actually ran for three months?

A.  Or two months, whatever.

Q.  And do you know how many of those items you sold?

A.  I don't off the top of my head.  We could look it up.

7

Q.  Right, we can.  Would it surprise you to know you sold 6,300 of those?

A.  I really don't know off the top of my head how many there are, sir.

(Tr. 191-192).

The example on the 37% overstatement of sales loss related to a coupon for just one product, the "Patty Melt with Fries."  The 90% overstatement was for "Chili 5 Ways."  Although Bruno could not say how many of these products were sold, and thus how egregious were his overstatement of projected losses, the evidence showed that during the three-month period which Bruno used to make annual projections, Stuller sold over 17,500 Patty Melt products and over 6,300 chili products.  Tr. 166-67; DE 18-1 at 5-6, 24-25, 42-43.  A similar concession of overstating projected losses on discounted milk shakes and sodas must be considered in the context of Stuller having sold over 280,000 beverages, including 95,000 shakes during the three month period.  Id.  The small dollar amount errors accumulate quickly, and Bruno's lack of facility with those huge volumes adds another layer of unreliability to his calculations.  Tr. 166-67.

As noted, Bruno repeatedly tried to excuse his inaccuracies by claiming that he did not have access to more specific data.  However, the testimony showed that Bruno did have access to very specific information; he simply failed to use that data in his analysis.  Mike Freeney, SNS's Senior Director of Information Technology, testified that all of the data Bruno suggested might help him measure the magnitude of his inaccuracies were available to Bruno on his own computer system:

Q.  In your understanding, does a franchisee have access on its server or through the Steak 'N Shake system to detailed data about coupon redemption and discounts that have been offered, promotions?

A.  Absolutely.

8

Q.  Okay.  In what form is that data available?

A.  Well, they have a variety of reports they can run both on the back office server as well as on the corporate reporting portal that will detail exactly which coupons were used, how many of them were used….

\*\*\*

Q.  Does the data show what product the coupon was applied to?

A.  The vast majority of the coupons do, something over 99 percent….

\*\*\*

(Tr. 203-204).

The Report properly found that Plaintiff's witness, Derek Bruno, conceded on cross-examination that his analysis overstated the sales loss because of the way in which he calculated the effects of coupons and other discounts.  Because it was Stuller's burden to prove entitlement to the extraordinary relief of a preliminary injunction, Stuller's criticism of the Magistrate Judge's finding in that regard is not well-taken.  Judge Cudmore's finding as to the credibility of a witness should not be cavalierly ignored as Stuller requests.  Quela v. Payco. Gen. Am. Credits, Inc., 200 WL 1696966, at *3 (N.D. Ill. Nov. 6, 2000) ("we are disinclined to disturb magistrate judge's credibility assessments….").

### c.  Judge Cudmore Properly Considered Evidence of the Actual Business Results of Franchisees Who Abided by the Policy

The actual business performance of other SNS franchisees who complied with the Policy further refutes Stuller's claim that its sales will decrease disastrously when it implements the Policy.  Those actual business results of franchisees undermine the admittedly flawed opinions of Stuller's comptroller, Derek Bruno.  The reality is that that no franchisee that has complied with the Policy has gone out of business.  Tr. 277.

Rather than acknowledge that reality, Stuller argues that Judge Cudmore erred in even considering evidence of actual, historical results of like franchisees, presented in Defendants' Exhibits 11 and 13-15.  DE 56 at 2-3, DE 57 at 16-22.  Stuller makes that objection despite acknowledging that the rules of evidence are relaxed at a hearing for preliminary injunction. DE 57 at 17 n.5.[2]  It argues that this data should be excluded because they "lack foundation, are incomplete and irrelevant."  At hearing, however, the only objection made by Stuller was to "relevance." Tr. 233.  Not surprisingly, Stuller cites no case supporting its position.

Regardless of the evidentiary standard, however, the evidence Stuller challenges is highly probative and material, much more so than the meager evidence of "potential losses" Stuller put before the Court.  The data Stuller asks this Court to ignore is actual financial performance for franchisees implementing the very Policy that Stuller claims will put it out of business before trial.  Defs. Hrg. Exs. 11, 13-15.  This historical, real-life data shows that franchisees that complied with the Policy experienced a sales increase, not a decrease.  For example, SNS Exhibit 11 shows that, from December 2010 through February 2011, when all franchisees except Stuller offered Policy pricing, franchisees in total (including Stuller) experienced a 5.6% increase in sales from the prior year.  Backing Stuller out of the results, franchisees complying with Policy pricing had an aggregate 6.4% increase in sales.  Stuller, on the other hand, had a (-2.9%) decrease in sales.  Defs.'s Hrg. Ex. 11.

The data Stuller wants the Court to ignore show that Stuller, with its non-Policy pricing, was the second worst-performing STEAK N SHAKE franchisee in the country for that three-

_____

[2] Judge Cudmore established a broad standard of admitting evidence in overruling one of SNS's objections:  "I'm going to allow most of the things to pour in and I'm going to decide where the merit is and where the merit isn't."  Tr. 43-44.   Stuller itself submitted in evidence affidavits of non-parties whom SNS had no ability to cross-examine, which plainly are hearsay. Pltf. Hrg. Exs. 40-41. Judge Cudmore admitted and considered that hearsay under the relaxed standards applicable in an injunction hearing.

month period, and only one of two franchisees with declining sales from the prior year.  In fact, 16 of the 28 franchisees following the Policy had sales increases of 5.0% or more in the period compared to the prior year.  This evidence is all extremely relevant in determining whether Stuller carried its high burden of making a clear showing that it will be irreparably injured prior to the trial of this case by implementing the Policy. In truth, there could hardly be any better evidence.[3]

Further to this argument, Stuller incongruously suggests that Judge Cudmore should have ignored actual franchisee data and instead relied exclusively on Plaintiff's Exhibit 36, a one-page document prepared prior to the implementation of the Policy in an effort to calculate some possible "Impact on sales" for eight franchisees who had not yet adopted Policy pricing.  Pl.'s Hrg .Ex. 36; Tr. 118-122.  Stuller thus argues that a pre-Policy calculation of potential impact should be given great weight, but the actual experience of those very same franchisees should be excluded as "irrelevant."

Exhibit 36, which Stuller spins as predicting a potential sales impact on Stuller of 6.5%, expressly does not take into account any impact of discounts or coupons.  Id.  Bruno's testimony, on the other hand, acknowledges that that those things absolutely will reduce the potential impact he calculated.  Tr. 161-192.  Nor does Exhibit 36 account for any customer count increases resulting from lower prices, a trend demonstrated by other franchisees' results. Defs.'s Hrg. Exs. 11, 14.  Indeed, the document simply calculates for eight franchisees, including Stuller, the gross

---

[3] SMS also put in evidence data for a one-year period (November 2009-October 2010) from franchised restaurants who voluntarily implemented Policy-level pricing in November 2009. Defs.'s Exs. 13, 14.  The franchises resoundingly outperformed Stuller over the one-year period in both sales and customer counts.  And none went out of business.

difference in sales if the franchisees sold the identified products at lower ala carte prices under the Policy.[4]

Plaintiff's Exhibit 36, upon which Stuller bases so much of its case on irreparable harm, is not based on historical data; all of the SNS Exhibits to which Stuller objects are actual results of franchisees.  Compared to the actual results, moreover, Exhibit 36 was in fact a miserable predictor of what any franchisee's sales actually were after adopting the Policy.  For example, the document estimates a (-3.5%) sales loss for franchisee Eastern Shores; in reality, upon complying with the Policy in November 2010, Eastern Shores' sales increased 6.2%, and from December 2010 through February 2011, sales increased 8.1%.  Defs.'s Hrg. Ex. 11. For another franchise, People Sales & Profits (PSP), Stuller's key document estimates a (-3.5%) sales decline, and in reality PSP's sales increased 4.2%.  For franchisee Reinwald Enterprises a "predicted" (-0.06%) sales decline turned out to be a sales increase of 11.3%.[5]

In perspective, then, Stuller asks the Court to ignore reality and base a decision to grant the extraordinary remedy of a preliminary injunction on a document that significantly underestimated the sales gains of other franchisees by as much as 11.6%.  In fact, five of the seven other franchisees on the exhibit had sales increases of 7.2% or more above the "estimate" in Exhibit 36.  The data show that Stuller is more likely to benefit from the Policy than it is to be harmed at all.

---

[4] Stuller flagrantly overstates the significance of  Exhibit 36, claiming that  "Defendants' own spreadsheet f[ound] that Plaintiff would experience a 6.5% loss in adopting the Policy …" DE 56 at 3.  Exhibit 36 did nothing of the sort.  It is only a mathematical compilation of what the difference would be in sales if the franchisees sold exactly the same products as they did in the past.  It expressly does not account for couponing or discounts and it does not make any attempt to account for increased customer counts resulting from lower prices.

[5] Exhibit 36 had similar underestimates for other franchisees: one estimated at (-2.1%) was actually +7.7%; another estimated at (-0.5%) was +1.6%; a third estimated at (-4.1%) was actually +3.1%.  Pl.'s Hrg. Ex. 36.

Clearly, the Magistrate Judge was justified in relying on the actual business performance of franchisees adopting the Policy, and not limiting the inquiry to a projection which did not take into account either additional customer counts resulting from lower prices or the modified impact of couponing and discounts on Policy-based prices.

If Stuller wanted to try to explain away that reality, it had the burden of doing so; SNS did not.  The Magistrate Judge, sitting in the courtroom, observing the witnesses' demeanors and their explanations of the exhibits, properly considered the testimony and determined that Stuller did not prove that it would suffer irreparable harm prior to the trial of this case.6

### d.  The Magistrate Judge Properly Considered the Irreparable Harm Factor and Likelihood of Success on the Merits Factor Together

Stuller incorrectly argues that "the Recommendation errs in failing to apply a 'sliding scale' approach to irreparable harm." DE 56 at 2; DE 57 at 4.  The Seventh Circuit has instructed that no sliding scale analysis is necessary if the court finds—as the Magistrate Judge  did here—

---

6 Stuller mischaracterizes the record in claiming that an SNS witness, Ryan Poeppelman, "admitted under oath that there is 'no evidence' that implementation of the Policy (lowering prices) was the cause of the sales and customer growth Defendants claim was experienced by franchisees adopting the Policy."  [DE 57 at 17].  Even the testimony on cross-examination Stuller cite shows that Mr. Poeppleman consistently maintained that the data showed exactly what SNS said -- franchisees complying with the Policy had both increased customers and increased sales – and Stuller had neither.  Stuller's counsel simply refused to hear that:

> Q.  In fact, most of these franchisees identified on here when you look at the pre policy period are showing, you know, positive guest counts and positive sales increases?
> A.  Right.  Which makes it even more impressive than in the post period they can continue to grow on a higher base.
> Q.  But what evidence do you have that it's the --- that it's the policy of lower prices that has caused this growth?
> A.  There's no evidence, it's merely what the data is saying.
> Q.  So it's pure speculation as to the real cause of these growths in the post policy period?
> A.  Again, the data is what it is.  I wouldn't call it speculation.  It's just telling us that hey, for these stores that are in compliance they are growing still.

(Tr. 242-43).

It was Stuller's counsel who injected the notion of "evidence" into the record.  The lay witness simply testified that the data shows that franchisees who adopted the Policy had improved business results, not irreparable losses.

that the moving party did not meet its threshold burden of showing inadequacy of a legal remedy or irreparable harm.  Kellas v. Lane, 923 F.2d 492, 493 (7th Cir. 1990); Machlett Lab., Inc. v. Techny Indus., Inc., 665 F.2d 795, 797 (7th Cir. 1981).

Although a court must begin its injunction inquiry by analyzing a plaintiff's likelihood of success and whether plaintiff's alleged injury is irreparable because there is no adequate remedy at law, "[i]f the moving party cannot establish *either* of these prerequisites, a court's inquiry is over and the injunction must be denied."  Adams v. City of Chicago, 1996 WL 137660, at *18 (N.D. Ill. Mar. 25, 1996) (emphasis added) (quoting Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir. 1992).  Thus, the court "need not consider whether Plaintiff show[ed] a likelihood of success on the merits because Plaintiff fail[ed] to prove a lack of an adequate remedy or irreparable harm."  Machlett, 665 F.2d at 797; cf. Motor Werks Partners, L.P. v. BMW of N. Am., Inc., 2001 WL 1136145, at *1 (N.D. Ill. Sep. 24, 2001) (where plaintiff failed to demonstrate it would suffer irreparable harm, court need not discuss other conditions for a preliminary injunction); Adams, 1996 WL 137660, at *19 ("[c]ontrary to Plaintiffs' contention otherwise, the Court does not engage in a sliding scale analysis of the two-pronged threshold burden; Plaintiffs' failure to satisfy the irreparable harm prong of its threshold burden warrants denial of the Motion for Preliminary Injunction").

Plainly, the Magistrate Judge need not have even conducted a sliding scale analysis in order to properly come to the conclusion that Stuller was not entitled to a preliminary injunction. Judge Cudmore, however, did address Stuller's likelihood of success.  After considering the arguments on the merits, the Report generously concluded that "Stuller has *some prospects* of success on the merits."  DE 55 at 31 (emphasis added).  Thus, Judge Cudmore assigned a marginal amount of strength to Stuller's case.  Immediately after that observation, however, the

Report compares that factor to the "irreparable harm" and "adequate remedy at law" factors, and finds that "Stuller has failed to demonstrate that it has no adequate remedy at law, or that it will suffer irreparable harm if the preliminary injunction is not granted." Id.

The Magistrate Judge thus applied a sliding scale although not required given the utter absence of irreparable harm. On one side of the scale, the Report assigns marginal strength to Stuller's case. On the other, it notes that Stuller has completely failed to demonstrate a lack of an adequate remedy at law or irreparable harm. Based on this comparison, the Report finds that the scale tips against the entry of an injunction.

The Report correctly concludes that "Stuller has failed to demonstrate that it has no adequate remedy at law, or that it will suffer irreparable harm if the preliminary injunction is not granted." DE 55 at 31. Based on Stuller's failure to make that threshold showing, the Report gives adequate weight to the "likelihood of success on the merits" factor and properly excludes an analysis of the other factors. There is no error in the Magistrate Judge's analysis.

### e. The Evidence Mandates The Magistrate Judge's Finding That the Implementation of the Policy Would Not Irreparably Harm Plaintiff

Stuller argues that "[t]he evidence, when viewed in the light most favorable to the Defendants, at best demonstrates that Plaintiff's adoption of the Policy would effectively remove all profit from Plaintiff's business, delivering it a serious financial blow, and causing it to make significant restructuring or other changes, if not putting it out of business during the pendency of this litigation. Therefore, the Recommendation's finding that implementation of the Policy would not substantially harm Plaintiff is clearly erroneous and against the manifest weight of the evidence." DE 56 at 3. In making this argument, Stuller ignores both its burden to show irreparable harm that it will suffer *prior to trial*, and the compelling evidence demonstrating the positive impact on other franchisees who complied with the Policy.

15

Also, as noted above, Stuller failed to offer any evidence in its case of its current profits in support its claim that "the Policy would effectively remove all profit from Plaintiff's business." SNS put on that evidence, showing that Stuller makes significant profits, even after paying almost $800,000 in rent to its sole shareholder, both at its restaurants and central office. Stuller has little credibility on the question of irreparable harm, given its contention that it suffered a loss of over $500,000 in 2008, when, during that year, it paid its sole shareholder "salary" of over $482,000; paid a special dividend to its shareholder of $257,625; made an "advance" to the shareholder of $100,000; made "advances" to other employees of more than $50,000; and paid two relatives of the shareholder salaries even though they did not work in the business. Defs.'s Hrg. Ex. 18. During the same year, Stuller also paid all of the rent due to its sole shareholder, which included at least $80,000 in profit to the shareholder. Judge Cudmore considered all of that evidence carefully in the Report, and the determination that Stuller will not suffer irreparable harm prior to trial is correct.

### f. The Recommendation Properly Finds That Any Harm to Plaintiff For Non-Compliance With the Policy Would Be "Self-Inflicted"

Stuller's last objection on irreparable harm is that "the Recommendation errs in finding that any harm from the future termination of Plaintiff's franchises for non-compliance with the Policy would be 'self-inflicted.'" DE 56 at 3; DE 57 at 22-24 However, the Report astutely notes that, while Stuller argues that denial of the preliminary injunction will result in a loss of its franchises, the evidence does not support that position. DE 55 at 31. Denying the preliminary injunction would only allow SNS to exercise its contractual right to pursue its remedies for Stuller's failure to abide by the Policy, one of which is termination after notice and opportunity to cure. Stuller has had, and still has, the opportunity to avoid termination by complying with the Policy prior to any notice of termination. Stuller may indeed face a choice when the injunction is

denied: Stuller can comply with the Policy during the pendency of the case, or Stuller can risk termination of its franchises.  Id.  The denial of the motion for injunctive relief will not, however, result in loss of any franchise agreement; only Stuller's conscious decision to continue refusing to comply with the Policy threatens its franchises.  Any harm to Stuller from losing its franchises in the future will be "self-inflicted."

Courts are not sympathetic to a claim of irreparable harm that is self-inflicted.  Second City Music, Inc. v. City of Chi., 333 F.3d 846, 850 (7th Cir. 2003); Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 806 (3d Cir. 1998) ("a party's self-inflicted harm by choosing to stop its own performance under the contract" is not irreparable harm); cf. Original Great Am. Chocolate Chip Co. v River Valley Cookies, Ltd., 970 F.2d 273, 277 (7th Cir. 1992) (claims that plaintiffs' income will "drop to zero," they will lose their home and retirement funds, and that one plaintiff's father would lose "two houses, and a retirement fund" if franchise was terminated "is a wobbly footing for a finding of irreparable harm" because plaintiffs' had opportunity to avoid termination; "[t]hey have only themselves to blame") (reversing injunction against termination).

The Magistrate Judge correctly relies on Second City Music, 333 F.3d 846.  In that case, Second Hand Tunes, sued for declaratory and injunctive relief challenging an ordinance requiring it to obtain a license and keep records of customers and transactions.  Second Hand Tunes alleged that the ordinance was unconstitutional, and it refused to obtain the required license.  333 F.3d at 847.  In affirming the denial of a preliminary injunction, Judge Easterbrook observed:

> Second Hand Tunes contends that it does suffer irreparable injury because, without the aid of an injunction, it will go out of business.  Yet *two* things could keep it in business; and injunction or a license.  If the license can be had, then the lack of an injunction does not lead to irreparable harm.  Injury caused by failure to

secure a readily available license is self-inflicted, and self-inflicted wounds are
not irreparable injury.

Id. at 850 (emphasis in the original).

Here, Stuller can preserve its license by complying with the Policy and the franchise
agreements.  Stuller cannot knowingly choose to continue in breach of its agreements and beg
the Court for extraordinary equitable relief to protect itself from its own decisions.  "Only the
injury inflicted by one's adversary counts for this purpose."  Id. at 850.

## II.   PROSPECT OF SUCCESS ON THE MERITS AND OTHER PRELIMINARY INJUNCTION REQUIREMENTS

The determination that Stuller failed to meet its substantial burden of proving irreparable
harm and no adequate legal remedy effectively ends the inquiry on the motion for preliminary
injunction.  However, if the Court considers the other elements Stuller needed to prove, the
Magistrate Judge's recommendation to deny the motion for preliminary injunction is correct and
should be adopted.

### a.   Even if Plaintiff Demonstrated Some Likelihood of Success on the Merits, It Failed to Show a Right to the Extraordinary Remedy of a Preliminary Injunction

Stuller argues at length that the Report errs by understating Stuller's likelihood of success
and "failing to consider" the balance of harms and public interest in determining whether its
motion for preliminary injunction should be granted.  DE 56 at 2; DE 57 at 4-14, 24-27.  As
noted above, however, Stuller's objections on these points are immaterial because Stuller's
failure to establish irreparable harm made unnecessary consideration of any other factors,
including likelihood of success on the merits.  Absent irreparable harm, a preliminary injunction
must be denied even if a plaintiff demonstrates a substantial likelihood of success on the merits.
Nuclear-Chicago Corp. v. Nuclear Data, Inc., 465 F.2d 428, 430 n. 4 (7th Cir. 1972); Trading

Tech. Int'l, Inc. v. Espeed, Inc., 370 F. Supp. 2d 691, 705 (N.D. Ill. 2005).  This is because "[a] showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009), and "is 'the sine qua non of injunctive relief.'" Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting N.E. Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)).

As such, even if the Magistrate Judge concluded that Stuller had more than "some prospects" of success on the merits, which is all he found here, he properly recommended denying the motion for preliminary injunctive relief based on the well-supported finding that Stuller failed to demonstrate irreparable harm.

### b. The Report Properly Concluded That the IFDA Does Not Mandate Incorporation of Any the Statement in Item 19 of the UFOC that Franchisees Were Free to Set Their Own Prices

In assailing Judge Cudmore's Report, Stuller continues to argue that a statement in the UFOC that franchisees have historically set their own prices is somehow incorporated into the franchise agreements to create a contractual right of Stuller to always set its own prices.  The UFOC is a required disclosure document provided to prospective franchisees; it is not a contract. Courts do not refer at all to the UFOC to interpret or rewrite the terms of unambiguous franchise agreements.  See, e.g., Doyle v. Nutrilawn U.S., Inc., 2010 WL 1980280, at *5 (W.D.Wash. May 17, 2010) ("the franchise agreement speaks for itself" and the court "declines to rely on the UFOC to interpret the Franchise Agreement"); Klosek v. Am. Express Co., 2008 WL 4057534 (D. Minn. Aug. 26, 2008) ("the franchise agreements are unambiguous, and so there is no need to consider the UFOCs here.")

Plaintiff continues to argue that the statements in the UFOC regarding pricing were "expressly incorporated" into the Franchise Agreements. DE 57 at 7. It fails to explain, though, how this "express incorporation" occurs. In truth, three of the five agreements, those signed in 1995, 2000 and 2005, contain standard merger and integration clauses that state that the agreement constitutes the entire agreement of the parties and "all prior negotiations, commitments, representations and undertakings of the parties" are merged into the Agreements. Pl.'s Ex. 1, Parts 3-5, § 14.05. Merger and integration clauses are enforceable under Illinois law to bar any reference to other evidence of contract terms or representations, not included in the Agreement, to vary the terms of the Agreements. Brooklyn Bagel Boys, Inc. v. Earthgrains, Inc., 212 F. 3d 373, 380 (7th Cir. 2000); Druckzentrum Harry Jung GmbH & Co. v. Motorola, Inc., No. 09 CV 7231, 2010 WL 2680116, at *5 (N.D. Ill. June 30, 2010); First Am. Commercial Bancorp v. Interior Architects, Inc., No. 03 CV 00638, 2004 WL 2011398, at 8-9 (N.D. Ill. Aug. 31, 2004). Neither the UFOC nor any other parol evidence may be used to vary the terms of the three Agreements in light of the merger and integration clauses. Id.

The two Agreements signed in 2006 [Pl.'s Ex. 1, Parts 1, 2], include a merger and integration clause that makes reference to the UFOC, but specifically limits incorporation only to the UFOC provisions *required by the IFDA*." DE 55 at 29 (emphasis added). That integration clause reads:

> 14.05 Entire Agreement. The recitals to this Agreement are hereby incorporated into and made part of this Agreement, which, together with Schedule 1 and any addendum hereto, constitute the entire agreement of the parties (and which supersedes all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter hereof, all of which are deemed to have been merged into this Agreement). Other than the Illinois Franchise Offering Circular (the "IFOC") that was previously provided to Franchisee, the Company has made no representations inducing the execution of this Agreement that are not incorporated herein. *Notwithstanding the previous sentence, the IFOC is incorporated into this Agreement **only to the extent required by law***.

20

Pl.'s Ex. 1, Part 1, at 48 (emphasis added).  No matter how many times Stuller misstates the law, it remains that the IFDA does not *require* the incorporation into franchise agreements of all statements in a UFOC.  Nothing in the UFOC requires that a true statement regarding franchisees historical ability to set their own prices be incorporated as a contractual undertaking in every franchise agreement in Illinois.[7]  Stuller cannot credibly argue that a statement in Item 19 of the UFOC, which is an optional provision that a franchisor can choose to omit entirely from the UFOC, see 16 C.F.R. §436.5(s) (1979), is so essential that it is required by Illinois law to be incorporated into every franchise agreement.

Moreover, under Illinois law, for an entire document to be incorporated by reference into another agreement, the "contract must display an intention to completely adopt that document, not merely require compliance with specified portions."  Hayes v. M&T Mortgage Corp., 389 Ill. App. 3d 388, 390-91, 906 N.E.2d 638, 641 (1st Dist. 2009) (reference to HUD Regulations in mortgage did "not demonstrate an intent to make each loan regulation enforceable under the parties' agreement");  McWhorter v. Realty World-Star, Inc., 171 Ill. App. 3d 588, 592, 93, 525 N.E.2d 1205, 1207-08 (5th Dist. 1988) ("office policy manual was not incorporated by reference, in its entirety, into the Independent Contractors Agreement . . . Paragraph nine . . . which makes reference to the office policy manual, specifically limits that reference to specific provisions").  No such intent to completely incorporate the UPOC is expressed here.

Stuller's reliance on Martrano v. The Quizno's Franchise Co., LLC, 08-0932, 2009 WL 1704469 (W.D. Pa. July 15, 2009) is badly misplaced.  The integration clause in Martrano had

---

[7] The IFDA only requires that the following provisions of the UFOC be incorporated into franchise agreements: (a) choice of venue (§4); (b) participation in trade associations (§17); (c) non-discrimination against Illinois franchisees (§18); (c) termination for "good cause" (§19); and (d) rights upon non-renewal (§20).

no limiting language, and the court found that "this Franchise Agreement expressly encompasses the signed UFOC." Id. at \*17. The case is inapplicable here under any strained interpretation.[8] In contrast, the integration clause of the SNS Franchise Agreements "limits incorporation of representations from the UFOC to *those required by the IFDA*." DE 55 at 29 (emphasis added).

SNS thus agreed to Illinois venue, without regard to what the franchise agreement might otherwise say. It also agreed that termination would only be for "good cause" and that Plaintiff had certain rights upon non-renewal. However, unlike in Martrano, there is nothing in the franchise agreements here evidencing an intent to make every statement in the UFOC enforceable for the next 20 years as a contract terms under the franchise agreement.[9] To the contrary, the integration clause expressly limits the scope of incorporation by reference.

Plainly, the Report properly concluded that statements in Item 19 of the UFOC were not incorporated into the franchise agreements for the purpose of considering likelihood of success on the merits on the motion for preliminary injunction.

---

[8] Martrano has never been cited by any other court for any reason, and its reasoning is suspect. The quoted sentence, for example, reflects a lack of clarity as to the franchise disclosure process given that a UFOC is not "signed." It is a form disclosure document filed with certain states and delivered to prospective franchisees (and not even required in most circumstances to be delivered to existing franchisees such as Stuller).

[9] Plaintiff's argument leads to absurd results. For example, SNS discloses in the UFOC that it "is an Indiana corporation" and identifies specifically who are its principal officers and directors. Under Stuller's theory, those required disclosures, all true at the time, would create contractual rights in every franchisee. Thus, if SNS became an Illinois corporation, or any officer or director changed over the 20-year term, the franchise agreement would be breached. In addition, a form franchise agreement is a required exhibit to the UFOC. Under Stuller's logic, the franchise agreement would incorporate that different franchise agreement into the one the parties negotiated and signed.

     **c.**  **The Recommendation Properly Concludes that Removal of the Pricing Language From Previous Versions of the Franchise Agreement Indicates That Stuller Has No Contractual Right to Set Prices**

Stuller also argues that "the Recommendation erred in concluding that, as between, on the one hand, the 1972 and 1978 franchise agreements executed by Plaintiff's predecessor, and, on the other hand, the present franchise agreements executed by Plaintiff, there was a "change" that "indicates that Stuller gave up control of pricing." DE 56 at 5. Again, Stuller ignores the uncontroverted evidence considered by the Magistrate Judge, and it ignores clear Illinois law.

Prior franchise agreements between the parties, signed in 1972 for the Wabash location and 1978 for the Jacksonville location, expressly reserved to Stuller the right to set its prices. Defs.'s Exs. 19, 21; DE 31-2 ¶ 2, Exhs. A-B. However, the parties negotiated that term out of later agreements, including the current agreements. Defs.'s Ex. 18, 20; Pl.'s Ex. 1, Parts 1-5.

The 1972 and 1978 agreements, both with 20-year terms, obligated Stuller to operate under the "rules and procedures as [the franchisor] may from time to time prescribe," but specifically reserved to Stuller the right to "establish and determine in its sole discretion the prices to be charged for products sold or offered for sale in the licensed restaurant." Defs.'s Ex. 19, 21; § 4.09; 19. Stuller signed new franchise agreements in 1995 for the Wabash and Jacksonville locations requiring Stuller to comply with "the Company's plans, specifications and procedures as … revised from time to time." Defs.'s Ex. 18, 20. Both 1995 agreements had addenda with negotiated terms allowing Stuller to deviate in stated ways from the STEAK N SHAKE system, including selling non-standard products. Id. However, the parties removed the provision reserving to Stuller the right to determine prices in its sole discretion. Id. The current Agreements for the five Stuller locations, signed in 1995, 2000, 2005 and two in 2006, all contain negotiated amendments or addenda allowing for sale of non-standard products and other

changes to the standard agreement.  Pl.'s Ex. 1, Parts 1-5.  None of the current Agreements reserve to Stuller a right to determine prices in its restaurants.  Id.

The absence of the pricing language demonstrates that Stuller has little likelihood of success on the merits. "If a party could have negotiated to include a specific term in a contract but failed to do so, it is bound by its bargain." Phelps Dodge Corp. v. Schumacher Elec. Corp., No. 01-4305, 2004 WL 443992, at *4 (N.D. Ill. Mar. 2004).  Here, not only could Stuller have negotiated a specific term reserving its right to set its own prices, it did so in prior agreements. Stuller wants to simply ignore the fact that the parties, when negotiating addenda to the current agreements, removed the provision reserving to Stuller the right to set prices; however, courts take notice when parties negotiate terms out of a contract.  Cf. Regency Commercial, 869 N.E.2d 310, 318-19 (landlord's removal of language prohibiting any "restaurant facility featuring chicken" evidenced intent to limit prohibition to "fast-food restaurant"); Shelby County State Bank v. Van Diest Supply Co., 303 F.3d 832, 837 (7th Cir. 2002)(when parties delete term used in prior agreements, "it tends to show that the parties knew how to achieve such a result if they wanted to"; contract construed not to include deleted provision under Iowa law).  The parties' negotiated removal in 1995 and thereafter of the express reservation to Stuller of the right to set its own prices evidences that Stuller has no such right in the current agreements.  "There must be a reason why the historically used [Stuller has discretion to determine prices clause] was modified in this case." Shelby County, 303 F.3d at 837. Illinois law is clear that removing that specific term has great significance.

Moreover, although both sides contend the franchise agreements are unambiguous, the Court could ultimately determine that they are ambiguous.  In that case, the removal of the provision reserving to Stuller the right to set its prices will be competent and substantial evidence

as to the parties' intent that price is a part of the franchisor's system unless reserved to the franchisee.  Id.

Somehow, despite all of this evidence, Stuller argues some error in the finding that there was a "change" indicating that Stuller gave up control of pricing.  There clearly was a change.  The fact that the provision regarding pricing was removed from prior agreements certainly serves as strong basis for Judge Cudmore's conclusion.  The Report is correct on this point.

### d.  The Recommendation Properly Omits an Evaluation of Plaintiff's Counts II and III

Stuller argues that Judge Cudmore erred in omitting a discussion of Stuller's likelihood of success on Counts II and III.  DE 56 at 5.  This argument is unavailing because Stuller seeks only damages or rescission in Counts II and III.  See DE 10 at 17, 22.  Only Count I of Stuller's Complaint seeks an injunction.

Stuller, in fact, is pursuing Count III "only in the event this Court finds that Defendants have the ability under the franchise agreement to implement and enforce the Policy."  DE 10 at 22.  Because Stuller must have a right not to abide by the Policy in order to be entitled to injunctive relief, Count III is actually repugnant to Stuller's injunction claim.

Count II, moreover, is simply the damages claim parallel to Count I.  It is axiomatic that an injury is not irreparable if damages would rectify it.  See Nuclear Chi. Corp. v. Nuclear Data, Inc., 465 F.2d 428, 430 (7th Cir. 1972) ("a defendant's ability to compensate a plaintiff in money damages precludes issuance of a preliminary injunction"); see also Am. Hosp. Ass'n v. Harris, 625 F.2d 1328, 1331 (7th Cir. 1980) (mere monetary injuries, however substantial, are not enough to constitute irreparable harm).  The fact that Stuller is pursuing Count II, and the Court has now allowed it to do so, DE 61, shows that injunctive relief is not appropriate.  Stuller can proceed to prove its claimed damages

The Court need not determine whether Stuller is likely to succeed on the merits in Counts II and III as only damages, not an injunction, are sought in those counts.

>   **e.  The Recommendation Did Not Err in Omitting a Discussion of the Balance of Harms and the Public Interest, and, Even Those Factors Weigh Heavily Against the Entry of an Injunction**

Stuller argues that the Report "errs in failing to examine, and failing to find in Plaintiff's favor, the other two requirements for a preliminary injunction: the balance of the harms and public interest." DE 56 at 5; DE 57 at 24-27.  Because the Report properly found that Stuller failed to meet the threshold requirement of demonstrating irreparable harm, it was not required to conduct an analysis of the balance of harms and the public interest.  As a result, the Report does not err in omitting an analysis of these factors.

In any event, these factors do not weigh in favor of a preliminary injunction.  First, the balance of harms is decidedly in Defendants' favor.  Despite Stuller's claim that it will be irreparably harmed by losing its franchises absent an injunction prohibiting enforcement of the Policy, denial of an injunction will ***not*** result in termination of the Agreements.  Termination of the Agreements requires a subsequent affirmative act by SNS, to-wit: the delivery of a notice of termination.  Stuller has the right to cure the claimed default by complying with the Policy prior to receiving a notice of termination.  Any loss Stuller might suffer if its franchise agreements are terminated will be self-inflicted, because it will have consciously decided not to to take actions available to it to avoid termination by complying with the Policy like every other franchisee.

In situations like this, "when a party knowingly takes actions that increase the potential for harm if an injunction is ordered against them, courts give those harms little weight in the balancing test."  Bad Ass Coffee Co. of Haw., Inc. v. JH Nterprises, L.L.C., 636 F. Supp. 2d 1237, 1251 (D. Utah 2009); cf. Dunkin' Donuts Franchised Restaurants LLC v. D&D Donuts,

Inc., 566 F. Supp. 2d 1350, 1361-62 (M.D. Fla. 2008) ("Although the court recognizes that [franchisees] will suffer financial losses ... that harm is the result of [their] own failure to comply ... the balance of harms weighs decisively in favor of [the franchisor]").

On the other hand, if Stuller is permitted to ignore the Policy, SNS will be forced to continue to license the STEAK N SHAKE brand to a party that ignores the requirements of the operating system and the franchise agreement.  The Seventh Circuit has recognized that to "real though unquantified harm" to a franchisor.  Original Great Am. Chocolate Chip Co. v. River Valley Cookies, Ltd., 970 F.2d 273, 277 (7th Cir. 1992). Granting an injunction would be an unwarranted message that a franchisee can choose which directives of SNS it wishes to abide by, and it will condone a franchisee rebelling against its own system.

Stuller's own counsel recently argued the opposite position Stuller takes here in the Northern District of Illinois while representing a franchisor in a similar case.  As Plaintiff's law firm argued in successfully terminating a franchise agreement, a "[franchisor] may suffer irreparable harm if it is prevented from enforcing the provisions of the franchise agreement similar to the one signed by all of its franchisees ..."  See Memorandum of Law in Support of Motion for Preliminary Injunction in Arby's Restaurant Group, Inc. v. Sayegh, (N.D. Ill.), available at 2010 WL 3352956 (Apr. 29, 2010) (citing Jiffy Lube Int'l, Inc. v. Weiss Bros., 834 F. Supp. 683, 693 (D.N.J. 1993) (If a franchisor is not allowed to enforce its franchise agreement against "an errant franchisee, even (if not especially) one with a proven sales record, other franchisees would get the message that they could [ignore their agreements] with impunity")). Id. at 4.  For those reasons, the balance of harms factor weighs heavily against the entry of an injunction in this case.  The Magistrate Judge did not need to consider that issue; if he had, the issue weighs against injunctive relief.

Similarly, the public interest will not be served by the entry of a preliminary injunction. On the contrary, there is a benefit to having parties honor and adhere to contractual obligations. Quizno's Corp. v. Kampendahl, No. 01 C 6433, 2002 WL 1012997, at *7 (N.D. Ill. May 20, 2002); Baskin-Robbins, Inc. v. Patel, 264 F. Supp. 2d 607, 611 (N.D. Ill. 2003); cf. Cummins-Allison Corp. v. Glory Ltd., 2003 WL 355470, at *52 (N.D. Ill. Feb. 12, 2003) (arguments that "absent preliminary injunction, [plaintiff] will lose sales, its employees will lose jobs, and the United States will lose tax revenue … do not persuade the Court that there is a strong public interest to be vindicated by granting preliminary injunctive relief."). As noted above, Stuller's arguments as to the loss of their franchises and the loss of employees' jobs are "harms self-inflicted and are not properly considered as harms to the 'public interest' anyway." Bad Ass Coffee Co. 636 F. Supp. 2d at 1252.

### f. The Franchise Agreements Should Not Be Construed Against SNS As They Were Negotiated Between Sophisticated Parties

While not actually objecting to any finding of fact or conclusion of law contained within the Recommendation, Stuller argues that "any 'silence' on the right to set prices would have to be construed against [SNS] – the drafters of the franchise agreements – and should not create an 'ambiguity' that requires resort to parol evidence." DE 56 at 4; DE 57 at 11. As Stuller admits in this argument, the Franchise Agreement is not ambiguous. SNS agrees. The parties merely disagree on the meaning of the terms of the Franchise Agreements, but this disagreement does not create an ambiguity. See Bourke v. Dun & Bradstreet Corp., 159 F.3d 1032, 1036 (7th Cir. 1998) ("A contract is not rendered ambiguous simply because the parties do not agree on the meaning of its terms").

As the parties agree that the terms of the franchise agreement are unambiguous, Stuller's position that its reading should be adopted because ambiguous language in the contract must be

construed against the drafter misses the mark.  See Starnet Ins. Co. v. S. W. Indus., Inc., 2010 WL 1337690, at *3 n.4 (N.D. Ill. Mar. 30, 2010).[10]

However, even if the agreement is ambiguous, it should not be construed against SNS. The "anti-drafter" rule is "intended to aid a party whose bargaining power was less than that of the draftsperson," and may be "inappropriate if both parties are equally sophisticated in the use of the language."  5 Corbin on Contracts § 24.27, at 292 (rev. 1998).  Furthermore, the principle that an ambiguity should be construed against the drafter does not apply where a contract is negotiated between sophisticated commercial clients advised by counsel and having equal bargaining power.  Dawn Equip Co. v. Micro-Trak Sys., Inc., 186 F.3d 981, 989 n.3 (7th Cir. 1999);  In re Octagon Roofing, 141 B.R. 968, 981 n.4 (N.D. Ill. 1992) (noting that the anti-drafter rule does not apply where "the [agreement] was negotiated with aid of counsel and experienced businessmen on both sides ...").

Here, the current franchise agreements were heavily negotiated by the parties with the aid of counsel.  Every agreement contains an addendum making extensive and substantive changes – almost all to Stuller's benefit -- as compared to the standard form of franchise agreement attached to the UFOC.  The franchise agreements thus were heavily negotiated by experienced parties and their counsel, and there is no place for the application of the anti-drafter rule.

---

[10] It is worth noting that Stuller makes these arguments without pointing to anything in the record indicating that the Franchise Agreements were indeed drafted solely by SNS.  To the contrary, the addenda attached to each Franchise Agreement indicates that the agreements were the product of extensive negotiations between the parties.

## **CONCLUSION**

Based on the foregoing, Stuller's Objections to the Recommendation are meritless.  This Court should adopt the Recommendation's findings of fact and conclusions of law to the extent SNS has not objected to them, and the Court should enter an order denying Plaintiff's renewed motion for preliminary injunction.

Dated: May 31, 2011.                                STEAK N SHAKE ENTERPRISES, INC.
                                                    STEAK N SHAKE OPERATIONS, INC.

                                                    **s./ W. Barry Blum**
                                                    _____
                                                    W. BARRY BLUM
                                                    GENOVESE JOBLOVE & BATTISTA, P.A.
                                                    100 S.E. 2nd Street, 44th Floor
                                                    Miami, Florida 33131
                                                    Tel.: (305) 349-2300 / Fax: (305) 349-2310
                                                    bblum@gjb-law.com

                                                    HEYL, ROYSTER, VOELKER & ALLEN
                                                    124 S.W. Adams Street, Suite 600
                                                    Peoria, Illinois  61602
                                                    Tel.: (309) 676-0400 / Fac: (309) 676-3344
                                                    grastatter@heylroyster.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on the following counsel of record via transmission of a Notice of Electronic Filing generated by CM/ECF (electronic notice) or via regular, first-class United States mail, postage pre-paid:

> Jason L. Ross
> Kirsten M. Ahmed
> GREENSFELDER, HEMKER & GALE
> 10 S. Broadway, Suite 200
> St. Louis, MO  63102-1774
> jlr@greensfelder.com
> km@greensfelder.com

> Mr. Timothy Rigby
> Hart, Southworth & Wittsman
> Suite 501, One N. Old State Capitol Plaza
> Springfield, IL  62701
> tribgy@hswnet.com

s/  W. Barry Blum_____

10548-002/#501