IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| STULLER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-CV-3303 |
| | ) | |
| STEAK N SHAKE ENTERPRISES, | ) | |
| INC. and STEAK N SHAKE | ) | |
| OPERATIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

This matter is before the Court on the Report and

Recommendation (d/e 55) entered by United States Magistrate Judge

Byron G. Cudmore on April 28, 2011.  The Report and Recommendation

recommends this Court deny Plaintiff Stuller, Inc.'s Renewed Motion for

Preliminary Injunction (the Motion) (d/e 17).

Plaintiff timely filed Objections to the Report and

Recommendation (d/e 56) on May 12, 2011.  See 28 U.S.C. §

636(b)(1); Fed.R.Civ.P. 72(b).  On May 13, 2011, Defendants, Steak N

Shake Enterprises and Steak N Shake Operations, Inc., also timely filed Objections to the Report and Recommendation (d/e 58). For the reasons that follow, this Court ADOPTS IN PART and REJECTS IN PART the Report and Recommendation and GRANTS Plaintiff's Renewed Motion for Preliminary Injunction.

## I. STANDARD OF REVIEW

This Court reviews <u>de</u> <u>novo</u> any part of the Report and Recommendation to which a proper objection has been made. <u>See</u> 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). Upon review of the Report and Recommendation, this Court may accept, reject, or modify the recommended disposition, receive further evidence, or recommit the matter to the magistrate judge with instructions. <u>See</u> 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b)(3).

## II. BACKGROUND

The parties are familiar with the facts of the case. Those facts, and a summary of the evidence presented at the hearing on the Motion, are fully set forth in the "Statement of Facts" section of the Report and

Recommendation, which this Court adopts.   To summarize, Plaintiff is a franchisee of five Steak N Shake restaurants.  Plaintiff, through its predecessors, has operated Steak N Shake restaurant franchises in Central Illinois since 1939, making it the longest standing Steak N Shake franchise.  Defendants operate and grant franchises to operate Steak N Shake restaurants nationwide.

Plaintiff alleges that in June 2010, Defendants adopted a policy (the "Policy") requiring all franchisees to follow set menu and pricing (with the exception of breakfast items) and offer all company promotions as published.  According to Plaintiff, this Policy was contrary to "long-standing custom, practice, policy, agreement, and representation," that franchisees could set their own prices for menu items, maintain "custom menus," and choose whether to follow promotions.  Plaintiff further alleges that, when Plaintiff refused to implement the Policy, Defendants sent default notices threatening to terminate Plaintiff's franchises.

In November 2010, Plaintiff filed suit against Defendants.  In December 2010, Plaintiff filed the First Amended Complaint.  Count I

seeks a declaratory judgment that the Agreements do not permit Defendants to set prices or require Plaintiff to participate in all promotions as published and Plaintiff is not subject to default or termination for refusing to adopt the Policy. Counts II and III allege breach of contract and violations of the Illinois Franchise Disclosure Act (IFDA) (815 ILCS 705/1, et seq.), respectively.

In January 2011, Plaintiff filed the instant Motion. In the Motion, Plaintiff asks the Court to restrain Defendants from: (1) forcing Plaintiff to implement the Policy while this case is pending; or (2) taking any adverse action against Plaintiff for refusing to adopt the Policy.

## A.    The Hearing on the Renewed Motion for Preliminary Injunction

On March 14 and 15, 2001, the Magistrate Judge held an evidentiary hearing on the Motion. To summarize, Plaintiff presented evidence that, for 70 years, Plaintiff had set its own prices and decided whether to participate in Defendants' promotions. In fact, the 1972 and 1978 franchise agreements expressly reserved to Plaintiff the right to set prices. Such language was removed from later agreements and was not

contained in the Agreements at issue here.

In 2007, Plaintiff decided to adopt the highest tier of corporate pricing to save money on custom menus. Thereafter, in 2008, Plaintiff suffered a loss of $538,446.98, due to the new pricing, increased fuel costs, and increased food costs. Wilma Stuller, the President and sole shareholder of Plaintiff, made a cash infusion into the business. Plaintiff also decided to raise prices by 10%, over Defendants' recommendation not to do so. Ms. Stuller testified Plaintiff did not lose customers due to the price increase.

Plaintiff also presented evidence attempting to show that following Defendants' Policy would put Plaintiff out of business. Derek Bruno, Plaintiff's comptroller, testified Plaintiff would experience a 6 to 7 percent drop in net sales if it followed Defendants' Policy, which would put Plaintiff out of business. Plaintiff asserted Defendant ran a similar calculation before implementing the Policy–a comparison of items sold at the Plaintiff's price versus items sold at the new Policy price–and estimated Plaintiff would experience at 6.5 percent drop in sales. See

Plaintiff Exhibit 36.

Ms. Stuller personally guaranteed the five mortgages on the stores, which total $7.5 million. Some of the debt is due to Defendants asking Plaintiff to rebuild or remodel two stores. Plaintiff chose to rebuild those stores. Plaintiff also rebuilt a third restaurant by choice.

Defendants presented evidence showing the net sales and customer count data from franchisees who had complied with the Policy. For example, Defendants presented evidence showing that the 48 franchise restaurants that adopted the Policy in November 2009 had an average annual increase in net sales of 7.06 percent and an average increase in customer count of 9.75 percent when comparing 2010 data to 2009 data.

No franchise went out of business after following the Policy. As of the date of the hearing, only one other franchise–located in Las Vegas, Nevada–had refused to follow the Policy. That Las Vegas franchise had been following the Policy but stopped in approximately March 2011.

B.     The Report and Recommendation

The Report and Recommendation outlined the parties' respective positions and concluded that, on the evidence presented to date, the Agreements were silent or ambiguous regarding whether Defendants can require Plaintiff to follow the Policy. The Report and Recommendation found that the statement in Item 19 of the Uniform Franchise Offering Circular (UFOC[1])–which stated "Franchisees are free to set consumer prices different from prices on [Defendant]-owned restaurant menus and several do so"– did not resolve the issue of whether Defendants could require Plaintiff to follow the Policy. The integration clause limited incorporation of representations in the UFOC to those required by the IFDA, and the IFDA did not mandate the incorporation of that representation into the Agreements.

The Report and Recommendation found that because the Agreements were ambiguous, extrinsic evidence could be considered. That evidence was conflicting, however, because, beginning in 1995, the

_____

[1] The parties sometimes refer to the amended UFOC as the Illinois Franchise Offering Circular or IFOC. This Court will use the term UFOC when referring to the franchise offering circular.

Agreements deleted the express authority of Plaintiff to set its own prices but additional evidence supported the position that Plaintiff could set its own prices, including that: (1) until Defendants sought to implement the Policy, Plaintiff continued to set its own prices even after the change in the Agreements in 1995; (2) Plaintiff implemented the 10 percent increase in 2008, despite Defendants' recommendation that Plaintiff not do so; and (3) Item 19 of the UFOC stated that many franchisees set their own prices. Therefore, the Report and Recommendation concluded Plaintiff had "some prospects of success on the merits." <u>Report</u>, p. 31.

The Report and Recommendation also found, however, that Plaintiff failed to demonstrate it had no adequate remedy at law or that it would suffer irreparable harm if the injunction were not granted. Specifically, if the injunction were not granted, Plaintiff could comply with the Policy during the pendency of the case or lose the franchise. If Plaintiff chose to lose the franchise, the loss would be self-inflicted, and "courts are not sympathetic to requests for an injunction to avoid an injury that is self-inflicted." <u>Report</u>, at 31.

The Report and Recommendation further found that Plaintiff failed to demonstrate that following the Policy would force it out of business or would impose irreparable harm during the pendency of the case. The Report and Recommendation noted that "compensatory damages are generally an adequate remedy at law for economic losses." Report, p. 32. To show lack of an adequate remedy at law, Plaintiff needed to show that compliance with the Policy would put it out of business. To show irreparable harm, Plaintiff had to show that "it would be irreparably harmed by the losses it would suffer if it were required to follow the Policy from the date that the District Court would adopt this Report and Recommendation until the conclusion of the trial on the merits." Report, at 33.

The Report and Recommendation concluded that Plaintiff's comptroller Bruno–who testified that Stuller would experience a 6 to 7 percent reduction in net sales if it followed the Policy–overstated the decline in net sales because of the way he calculated the affect of coupons and other discounts. Bruno also assumed that lower prices and sales

promotions would not effect the volume of Stuller's business.   The Report and Recommendation found Bruno's opinions inconsistent with the experience of other franchisees who have complied with the Policy.

The Report and Recommendation also recognized Plaintiff's argument that its restaurants currently operate at a very high capacity and would not experience any increase in sales from lowering prices.  The Report and Recommendation found, however, that Plaintiff did not demonstrate that it was unique from the other franchisees.  Moreover all of the other franchisees who had complied with the Policy had stayed in business and not experienced dire financial consequences.

The Report and Recommendation rejected Plaintiff's argument that its experience in 2008-when it adopted corporate pricing and lost money–demonstrates it would go out of business if it adopted the Policy. Although the records showed a loss of $538,446.98 in 2008, Plaintiff was still able to pay its rent–which covered the mortgages plus an additional $80,000 paid to Stuller–Ms. Stuller's salary of $469,126.72, and a dividend of $257,625.28.

C.     Objections to the Report and Recommendation

Plaintiff raises several objections to the Report and Recommendation.  Plaintiff objects to the findings on likelihood of success on the merits, irreparable harm, and inadequate remedy at law.  Plaintiff further objects that the Report and Recommendation failed to consider the balance of the harms and the public interest.

Defendants also object to the Report and Recommendation.  Defendants challenge the Report and Recommendation's finding regarding likelihood of success on the merits.

II.  ANALYSIS

A.     Standard of Review for a Preliminary Injunction

A party seeking a preliminary injunction must initially demonstrate: (1) some likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) irreparable harm if preliminary relief is denied.  Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc., 549 F.3d 1079, 1086 (2008).  If the moving party does not demonstrate any one of the three initial requirements, the request for

a preliminary injunction must be denied.  <u>Id.</u>

If, however, the party has met the initial threshold, the Court then "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief."  <u>Id.</u>  When balancing the harms, the Court employs a sliding-scale approach.   <u>See</u> <u>Roland Machinery Co. v. Dresser Industries, Inc.</u>, 749 F.2d 380, 388 (7th Cir. 1984).  That is, the greater the movant's chance of success, the less strong of a showing the movant must make that the balance of harms is in the movant's favor, and vice versa. <u>Id.</u> at 387.   In balancing the harm to each party, the Court should also consider the  public interest.  <u>Judge v. Quinn,</u> 612 F.3d 537, 546 (7th Cir. 2010), <u>opinion</u> <u>am'd</u> <u>on</u> <u>denial</u> <u>of</u> <u>reh'g</u> <u>by</u> 387 Fed.Appx. 629 (7th Cir. 2010).

Whether to grant a preliminary injunction is within this Court's discretion.  <u>Ashcroft v. American Civil Liberties Union</u>, 542 U.S. 656, 664 (2004) (noting that the Supreme Court and appellate courts review

preliminary injunctions for an abuse of discretion); <u>but</u> <u>see</u> <u>Roland</u>, 749

F.2d 380; (discussing whether the abuse-of-discretion standard is

appropriate, ultimately concluding the trial court committed clear factual

and legal errors by granting the motion for a preliminary injunction).

**B.      Likelihood of Success on the Merits**

Plaintiff and Defendants have both  raised objections to the Report

and Recommendation's findings on the likelihood of success on the

merits.

1.      <u>Plaintiff's Objections</u>

The Report and Recommendation found Plaintiff had shown "some

prospects of success on the merits."  Plaintiff nonetheless objects,

asserting the Report and Recommendation should have concluded: (1)

the Agreements were unambiguous as a matter of law as to franchisees'

ability to set their own prices; (2) even if the Agreements were

ambiguous, the parol evidence overwhelmingly favored Plaintiff; or,

alternatively (3) the UFOC representation, even if not incorporated in

the Agreements, was otherwise enforceable under applicable law.

Plaintiff appears to be asking this Court to decide the issue on the merits. However, when determining the likelihood of success on the merits in a preliminary injunction action, the Court is not deciding the merits of the case. See Government Suppliers Consolidating Services, Inc. v. Bayh, 734 F.Supp. 853, 869 (S.D. Ind. 1990) (when determining the likelihood of success on the merits in a preliminary injunction action, the court is not deciding the merits of the case). A determination that a movant has shown a likelihood of success on the merits "is merely a decision that the suit has enough merit—which need not be great merit—to justify an order that will freeze the situation, in the plaintiff's favor, for such time as it may take to determine whether the suit is, or is not, meritorious." Ayres v. City of Chicago, 125 F.3d 1010, 1013 (7th Cir. 1997). Therefore, Plaintiff's objections relating to the findings on the likelihood of success on the merits are overruled as moot.

2.      Defendants' Objections

Defendants also object to the Report and Recommendation's

findings on likelihood of success on the merits.   Defendants object to:
(1) the finding that the Agreements do not authorize Defendants to
implement the Policy because the terms "price" and "pricing" are not
used in either § 1.03 or section § 5.01 of the Agreements; (2) the
conclusion that the 1972 and 1978 franchise agreements were subject to
the IFDA because the IFDA was not enacted until 1987; (3) the Report
and Recommendation's interpretation of <u>Burger King Corp. v. E-Z
Eating, 41 Corp.</u>, 572 F.3d 1306 (11th Cir. 2009); (4) the consideration
of the parties' course of dealing because the Agreements are not
ambiguous; and (5) the finding that Defendants ran a calculation similar
to that run by Bruno and estimated that Plaintiff would experience at 6.5
percent drop in sales.

The parties agree that the Agreements are governed by Illinois law.
<u>See</u> <u>Bourke v. Dun & Bradstreet Corp.</u>, 159 F.3d 1032, 1036 (7th Cir.
1998) ("In a diversity case, a federal court applies federal procedural but
state substantive laws").  When construing a contract, "the primary
objective is to give effect to the intention of the parties."  <u>Thompson v.</u>

Gordon, 241 Ill. 2d 428, ___ (2011).  To determine the parties' intent, this court looks to the language of the contract, construing it as a whole. Id.

If the words in the contract are clear and unambiguous, the court must afford those words their plain, ordinary, and popular meaning. Virginia Surety Co., Inc. v. Northern Ins. Co. of N.Y., 224 Ill.2d 550, 556 (2007).  If the language in the contract is susceptible to more than one meaning, however, it is ambiguous. and a court can consider extrinsic evidence to determine the parties' intent.    Thompson, 241 Ill. 2d at  ___ .

   a.    Defendants' Objection Pertaining to the Absence of the Term "Price" and "Pricing" From the Agreements

The likelihood of success on the merits turns on § 1.03, § 5.01(a), and the amended integration clauses in the Agreements, as well as the representation in Item 19 of the UFOC.   The Agreements require Plaintiff to operate the restaurants in conformance with the "System," which is defined in the recitals to the Agreements as:

a unique restaurant concept, including buildings
with a distinctive architectural design, decorative
color scheme and trade dress, and has
standardized methods of preparing and serving
certain food products and beverages for on-
premises and off-premises consumption in
manuals and other materials of the Company (the
"Operating Standard Manual") as issued and
revised from time to time (hereinafter collectively
referred to as the "System").

"Price" is not specifically mentioned as a part of the System. Section

1.03 contains the franchisee's acknowledgment that uniformity in every

component of the "System" is essential, and that the franchisee agrees to

comply with the entire System as revised from time to time by

Defendants. Section 1.03 does not specifically mention price as a part

of the System. See § 1.03 (uniformity in every component is essential,

including "a designated menu; uniformity of food and beverage

specifications, preparation methods, quality and appearance; and

uniformity of facilities and service").

Item 19 of the UFOC provides, in part, that "Franchisees are free to

set consumer prices different from prices on [Defendant]-owned

restaurant menus and several do so."  Section 14.05 of the Agreements is

an integration clause, providing that Defendants made no representations

that are not incorporated in the Agreements.  However, the Illinois

addendum to the UFOC and the addenda to the two Agreements

executed on July 18, 2006, modify the integration clause.  That

modification provides that: (1) other than the UFOC[2], Defendants made

no representations inducing the execution of the Agreement; and (2) the

UFOC is incorporated into the Agreement only to the extent required by

law.

In their Objections, Defendants argue that the absence of the term

"price" in the Agreements does not mean that price is not part of the

System that Defendants may change from time to time under the

Agreements.  This Court concludes that the Agreements are ambiguous as

to whether price is part of the System Defendants may change from time

to time.  The absence of the term "price" might be construed as

---

[2] The Agreement uses the term "Illinois Franchise Offering Circular
(the "IFOC") rather than the term "UFOC."

permitting Plaintiff to set its own price.  But the absence of price alone does not indicate Plaintiff may set its own prices because the Agreement can also be construed as allowing Defendants to set the price as part of the System.   As such, the Agreements are ambiguous on the issue of whether "price" is part of the System Defendants may modify.

Defendants argue, however, that specification of price is part of the "marketing plan or system" granted by a franchisor to the franchisee in any franchise agreement governed by the IFDA.  See 815 ILCS 705/3(18) (defining "Marketing plan or system").  Defendants assert that § 3(18) of the IFDA incorporates in every franchise system the authority to specify prices and discount plans as a matter of law.

Section 3(1)(a) of the IFDA defines "franchise" as an agreement between two or more persons by which a franchisee is granted the right to engage in the business of selling goods or services "under a marketing plan or system prescribed or suggested in substantial part by a franchisor." 815 ILCS 705/3(1)(a).  The IFDA defines "marketing plan or system" as:

a plan or system relating to some aspect of the conduct of a party to a contract in conducting business, including but not limited to (a) specification of price, or special pricing systems or discount plans, (b) use of particular sales or display equipment or merchandising devices; (c) use of specific sales techniques, (d) use of advertising or promotional materials or cooperation in advertising efforts, providing that an agreement is not a marketing plan or system solely because a manufacturer or distributor of goods reserves the right to occasionally require sale at a special reduced price which is advertised on the container or packaging material in which the produce is regularly sold, if the reduced price is absorbed by the manufacturer or distributor.

815 ILCS 705/3(18). As noted by Defendants, this provision means that a marketing plan or system may include "specification of price, or special pricing systems or discount plans." This does not mean that, as a matter of law, franchisor's have the authority to specify prices and discount plans. Section3(18) merely defines the types of agreements that will be governed by the IFDA. This Court overrules Defendants' objection to the Report and Recommendation's finding that the absence of the word "price" or "pricing" in § 1.03 or § 5.01 of the Agreements was relevant in determining whether the Agreements were ambiguous.

b.    Defendants' Objection Pertaining to the 1972 and 1978
       Agreements Being Subject to the IFDA

The Report and Recommendation also rejected Defendants'

argument–discussed immediately above–that the IFDA incorporated in

every franchise system the authority to specify prices and discount plans.

In doing so, the Report and Recommendation noted that the 1972 and

1978 Agreements were clearly agreements subject to the IFDA even

though the agreements contained an express provision that allowed

franchisees to set prices.

Defendants object to the statement that the IFDA applied to the

1972 and 1978 agreements because the IFDA was enacted in 1987.

Plaintiff attaches to its response to Defendants' objections the prior

version of the IFDA in effect as of January 1, 1974.  See Ill. Rev. Stat.

1973, ch. 121 ½, par. 701 et seq.  The 1974 version of the IFDA

contained substantially the same definition of "marketing plan."  See Ill.

Rev. Stat. 1973, par. 121 ½, par. 703(19) (defining "marketing plan" to

include "a plan relating to some aspect of the conduct of the party to a

contract in conducting business, including but not limited to (a)

specification of price, or special pricing systems[,] or discount plans").

Clearly, the IFDA applied to the 1978 franchise agreement. In any

event, the statement in the Report and Recommendation that the IFDA

applied to the 1972 and 1978 franchise agreements was only additional

support for the conclusion that the IFDA did not incorporate in every

franchise system the authority to specify prices. Defendants' objection is

therefore overruled.

> c.  Defendants' Objection Pertaining to the Interpretation of <u>E-Z Eating</u> Case

Defendants also assert that <u>E-Z Eating, 41 Corp.</u>, 572 F.3d 1306,

supports the conclusion that setting minimum prices is part of the

franchisor's right to establish and enforce its franchise system, even if the

franchise agreement does not mention price or pricing. In their

Objections to the Report and Recommendation, Defendants assert that

the Report and Recommendation erroneously interpreted the <u>E-Z Eating</u>

case by finding the franchise agreement therein gave much broader

discretion in modifying the franchise operating system than the language in the Agreements in this case. Defendants assert the franchise agreement language in E-Z Eating actually gave the franchisor less discretion than the Agreements here.

The E-Z Eating case involves a summary judgment ruling and a determination on the merits. The Eleventh Circuit affirmed the district court's finding that the franchise agreements gave the franchisor the power to impose menu pricing on its franchisees. See E-Z Eating, 572 F.3d at 1313.

The instant case does not involve a finding on the merits. Moreover, while similarities exist between the franchise agreements in E-Z Eating and the Agreements here, differences exist as well. In E-Z Eating, the franchise agreement provided that "the franchisee 'agrees that changes in the standards, specifications[,] and procedures may become necessary and desirable from time to time and agrees to accept and comply with such modifications, revisions, and additions to the MOD [(Manual of Operator Data)] which BKC in good faith exercise of its

judgment believes to be desirable and reasonably necessary.'" <u>E-Z Eating</u>, 572 F.3d at 1314.

Here, Plaintiff agreed to comply with the System as revised from time to time. The System was defined as including the distinctive building design and standardized methods of preparing and serving food. Although the Agreements also gave Defendants the right to modify their Operating Standards Manual, the Agreements provide that Defendants had the right to modify the Manual "to reflect changes in authorized products and services, standards of product quality[,] and services for the operation of a STEAK N SHAKE Restaurant." The language in the Agreements herein is much more specific than the language in <u>E-Z Eating</u>, and <u>E-Z Eating</u> is distinguishable on that ground. The Agreements herein identify the specific items in the Operating Standards Manual that Defendants had the right to modify–products, services, standards of product quality–and do not specifically mention "price." Because the <u>E-Z Eating</u> case is distinguishable, Defendants' objection to the Report and Recommendation's interpretation is overruled.

d.     Defendants' Objection Pertaining to Extrinsic Evidence

Defendants argue the Report and Recommendation erred by considering the parties' "course of dealing." In particular, Defendants assert that this Court should not consider any evidence surrounding the 2008 discussions around Plaintiff's price increase because of the non-waiver provision contained in the Agreements.  The non-waiver provision provides as follows:

> No failure of the COMPANY to exercise any
> power reserved to it by this Agreement, or to insist
> upon strict compliance by Franchisee with any
> obligation or condition hereunder, and no custom
> or practice of the parties at variance with the terms
> hereof, shall constitute a waiver of the
> COMPANY'S right to demand exact compliance
> with any of the terms herein.

Defendants' argument presupposes that the Agreements specifically allow them to set prices.  See, e.g., McDonald's Corp. v. C.B. Management Co., Inc., 13 F.Supp. 2d 705, 711 (N.D Ill. 1998) (finding the failure to exercise a contractual right in the past does not modify the right to exercise that contractual right).   As noted, the Agreements are

ambiguous in that regard, and the Report and Recommendation properly considered extrinsic evidence. Defendants' objection is overruled.

     e.     Defendants' Objection Pertaining to Claim that Report and Recommendation Gave Undue Significance to Plaintiff's Exhibit 36

Finally, Defendants claim the Report and Recommendation gave undue significance to Plaintiff's Exhibit 36, which was not an estimate of actual results but rather was only a calculation of hypothetical sales numbers. Because, as discussed below, this Court does not even consider Plaintiff's Exhibit 36, Defendants' objection is denied as moot.

## C.    Irreparable Harm/No Adequate Remedy at Law

Plaintiff raises numerous objections to the Report and Recommendation's conclusion that Plaintiff failed to demonstrate the absence of an adequate remedy at law or that it would suffer irreparable harm if the preliminary injunction were not granted. Because one of those issues–whether termination of the franchise would be self-inflicted harm–is dispositive, this Court addresses only that issue.

To obtain a preliminary injunction, the movant must "establish that it will be irreparably harmed if it does not receive preliminary relief, and that money damages and/or an injunction ordered at final judgment would not rectify that harm." Abbott Laboratories v. Mead Johnson & Co, 971 F.2d 6, 16 (7th Cir. 1992). As stated in Roland Machinery:

> The absence of an adequate remedy at law is a precondition to any form of equitable relief. The requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief.

Roland Machinery, 749 F.2d at 386.

The Report and Recommendation found that Plaintiff failed to demonstrate it had no adequate remedy at law or that it would suffer irreparable harm if the preliminary injunction were not granted. If the preliminary injunction were not granted, Plaintiff had a choice whether to comply with the Policy during the pendency of the case or not comply with the Policy and lose the franchise. The Report and Recommendation found that Plaintiff could take action to avoid the loss of the franchise

without the preliminary injunction, such that, if Plaintiff should choose to lose the franchise, the injury would be self-inflicted.

This Court disagrees with the Report and Recommendation's finding that any harm from the loss of the franchise would be self-inflicted. The parties dispute whether Plaintiff must follow the Policy under the terms of the Agreements. Defendants have threatened to terminate the Agreements if Plaintiff does not follow the Policy.

As noted above, Plaintiff has shown a likelihood of success on the merits on the issue of whether Plaintiff may deviate from the Policy. Plaintiff contends that Defendants are violating the Agreements by trying to force Plaintiff to implement the Policy. If Plaintiff is correct, and Defendants are violating the Agreements, termination of the Agreements is not a self-inflicted injury. The harm to Plaintiff would, therefore, arise out of Defendants' alleged violation of the Agreements and is not self-inflicted. See, e.g., Jackson v. Mortgage Electronic Registration Systems, Inc., 2008 WL 413293, *4 (D. Minn. 2008) (rejecting argument that the plaintiffs' harm was self-inflicted because they faced foreclosure only

because they did not pay their loans; the harm faced by the plaintiffs arose out of the defendants' alleged violation of state statute).

The cases cited by Defendants, <u>Second City Music, Inc. v. City of Chicago</u>, 333 F.3d 846 (7th Cir. 2003), and <u>Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc.</u>, 143 F.3d 800 (7th Cir. 1998), are distinguishable.  In <u>Second City</u>, the plaintiff challenged an ordinance that required dealers in used audio and video equipment to obtain licenses to sell the merchandise.  <u>Second City</u>, 333 F.3d at 847.  The plaintiff sought a preliminary injunction to prevent the City from applying the amendment to established businesses, like the plaintiff's business.  <u>Id.</u>  On appeal of the denial of the plaintiff's request for a preliminary injunction, the Seventh Circuit found the plaintiff "would incur no detriment by the act of applying" for the license.  <u>Id.</u> at 849.  The Court rejected the plaintiff's contention that it would suffer irreparable harm without the injunction.  In the Court's view, if the plaintiff went out of business, such injury would be self-inflicted because the plaintiff could have avoided that injury by simply applying for a

license.  Id. at 850.  In fact, the plaintiff conceded it could lawfully be

required to obtain a license "provided that the terms on which the

licenses issue curtail administrative discretion."  Id.  The Seventh Circuit

concluded that the "sensible way to proceed is for [the plaintiff] to obtain

a license and continue to operate while it builds a record."  Id.

In this case, however, Plaintiff's injury would not be self-inflicted.

Plaintiff does not concede that it can be required to follow the Policy.

Morever, the "sensible way to proceed" in this case is to maintain the

status quo, which is Plaintiff continuing to operate with its custom

menus.

Pappan Enterprises, the other case cited by Defendants,  is also

distinguishable.  In Pappan Enterprises, the plaintiff sued the defendant

franchisor asserting the defendant mismanaged the restaurant system.

Pappan Enterprises, 143 F.3d at 802.  Subsequently, the defendant

terminated the plaintiff's franchise agreement for failing to make the

required royalty payments.  Id., at 803.  The defendant also filed a

counterclaim and sought a preliminary injunction to restrain the plaintiff

from continuing to use the franchisor's name. Id. In balancing the respective harms, the Seventh Circuit noted that any harm to the plaintiff was self-inflicted because the plaintiff chose to stop its own performance under the contract. Id., at 806. In contrast here, Plaintiff has not chosen to stop its own performance under the Agreements. Plaintiff believes the Agreements permit Plaintiff to set its own prices.

Having determined that Plaintiff's injury would not be self-inflicted if the preliminary injunction did not issue and Defendants' terminated the franchise, this Court must now examine whether Plaintiff has demonstrated it has no adequate remedy at law and would suffer irreparable harm absent the preliminary injunction. In Count I, Plaintiff seeks equitable relief, which implies Plaintiff has no adequate remedy at law. See Roland, 749 F.2d at 386 ("The requirement of irreparable harm is needed to take care of the case where although the ultimate relief that the plaintiff is seeking is equitable, implying that he has no adequate remedy at law, he can easily wait till the end of trial to get that relief").

The loss or threatened loss of a franchise can constitute irreparable

harm.  See Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197,

1205 (2d Cir. 1970) (temporarily enjoining the defendant from

terminating 20-year old dealership, finding the loss of the dealership was

not entirely measurable in monetary terms).  Plaintiff has shown

irreparable harm may occur here.  An injunction or declaratory judgment

entered at the end of the case would be inadequate because the franchise

Plaintiff or Plaintiff's predecessor has held for 70 years would have been

terminated.  See Manpower Inc. v. Mason, 377 F.Supp.2d 672, 677

(E.D.Wis. 2005) (finding irreparable harm even if an award of damages

would compensate the defendants for pecuniary harm, noting that "even

if defendants prevail at trial, it is unlikely that they will be able to simply

pick up where they left off when they were terminated"); Jack Walters &

Sons, Corp. v. Morton Bldgs., Inc., 1978 WL 1521, at *6 (E.D. Wis.

1978) ("Damages will rarely be an entirely satisfactory remedy to a dealer

terminated after an extended period in business", but also noting "that a

dealership termination is involved cannot require a finding routinely that

legal remedies are inadequate").

Moreover, the restaurant buildings themselves are specifically designed to be Steak N Shake restaurants. In fact, Plaintiff recently rebuilt two of the restaurants in the Steak N Shake model at Defendants' request. It would be difficult for Plaintiff to operate a different type of restaurant following termination of the franchise. In addition, the Agreements contain a covenant not to compete. If Defendants terminate the Agreements, Plaintiff cannot, for one year and in the designated territory, have any interest in a restaurant "which offers fast service or full service meals which feature ground beef sandwiches as a principle product[.]" This further limits Plaintiff's ability to avoid irreparable harm.

Plaintiff has shown that it will face termination of the Agreements if it fails to immediately implement the Policy. Plaintiff therefore has no adequate remedy at law and will suffer irreparable harm without the preliminary injunction. Plaintiff's objection to the Report and Recommendation's conclusion on the adequate remedy at law and irreparable harm requirements is granted.

### D. Balance of the Harms

Having found Plaintiff meets the initial threshold for injunctive relief, the Court must now analyze the balance of the harms. Specifically, this Court must weigh the irreparable harm that Plaintiff would endure without the protection of the preliminary injunction against any irreparable harm Defendants would suffer if the Court were to grant the requested relief. See Roland Machinery, 749 F.2d at 388. The greater Plaintiff's chance of success, the less strong of a showing Plaintiff must make that the balance of harms is in Plaintiff's favor. Roland Machinery, 749 F.2d at 388.

Plaintiff has shown a likelihood of success on the merits, although not an extremely strong one. However, the balance of harms weighs strongly in Plaintiff's favor.

Defendants assert they will be harmed if the preliminary injunction is granted. Defendants argue they will be harmed by being forced to continue to license the Steak N Shake brand to a party that ignores the requirements of the operating system and the Agreements. However, the

case Defendants cite in support of that argument is distinguishable.  In

Original Great Am. Chocolate Chip Co. v. River Valley Cookies, Ltd.,

970 F.2d 273, 277 (7th Cir. 1992), the Seventh Circuit found that the

harm to the plaintiff-franchisor outweighed the harm to the defendant-

franchisee, noting the "real though unquantified harm to the Cookie

Company of being forced to continue doing business with franchisee who

not only committed rampant violations of the franchise agreement but

also infringed the franchisor's trademarks."   In contrast here, Defendants

have not cited "rampant violations" or infringement of a trademark.  The

parties have a genuine dispute about one aspect of the

Agreements–whether Defendants can set prices.  Moreover, this is not a

case where the relationship between the parties has been damaged by

poor performance by Plaintiff.  See, e.g., Ormsby Motors, Inc. v. General

Motors Corp., 842 F.Supp. 344, 351 (N.D. Ill. 1994) (finding balance of

harms slightly favored the defendant where, if a preliminary injunction

were granted, the defendant would have to continue to deal with a

franchisee where an employee of the franchisee submitted false warrant

claims and issue was whether the owners/officer had knowledge of the submission of those false claims). In fact, Plaintiff's Steak N Shake restaurants are among the highest volume Steak N Shake restaurants in the country.

Defendants also argue they would suffer harm because granting the injunction would send the message to other franchisees that they can choose which franchise directives they wish to abide by. This Court recognizes Defendants' concern that other franchisees may refuse to follow the Policy if the preliminary injunction is granted. However, the Las Vegas franchisee has already stopped following the Policy, despite no injunction yet being entered. In addition, any similarity between Plaintiff's Agreements and other franchisee agreements is not clear. In any event, the potential harm to Defendants does not outweigh the harm to Plaintiff that would result if the franchises are terminated. See, e.g., Greco v. Mobil Oil Corp., 597 F.Supp. 468, 473 (N.D. Ill. 1984) (finding the harm to the plaintiff from the loss of his franchise outweighed any harm to the defendant if the franchise relationship continued until the

merits of the case were reached).

Finally, this Court finds the public interest favors entry of the preliminary injunction. As noted by Defendants, the public has an interest in the compliance with "contractual undertakings." See, e.g., American Hardware Mutual Ins. Co. v. Moran, 545 F.Supp. 192, 200 (N.D. Ill. 1982) (case involving a covenant not to compete), aff'd 705 F.2d 219 (7th Cir. 1983). However, the public also has an interest in preserving a business that provides a valuable product to the community and preserving jobs. See, e.g., Emergency Accessories & Installation, Inc. v. Whelen Engineering Co., Inc., 2009 WL 1587888, at *7 (D.N.J. 2009) (finding public interest favored issuing a restraining order, noting in part that the injunction would preserve the jobs of the employees and avoid added burden on the state's unemployment benefits fund); but see Bad Ass Coffee Co. of Hawaii, Inc. v. JH Nterprises, L.L.C. 636 F.Supp.2d 1237, 1252 (D. Utah 2009) (rejecting claim that public would be harmed by enforcement of covenant not to compete even though employees would lose their jobs). Given Plaintiff's long-time presence in the

community and the number of employees employed, this Court concludes that the public interest favors granting the injunction.

## E.    Security

Federal Rule of Civil Procedure 65(c) provides that a court may enter a preliminary injunction only if the "movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   Fed.R.Civ.P. 65(c).  Courts generally err on the high side when setting bond because setting bond too high is not a serious error and  "damages for an erroneous preliminary injunction cannot exceed the amount of the bond."  <u>Mead Johnson & Co. v. Abbott Laboratories</u>, 201 F.3d 883, 888 (7th Cir. 2000).

Here, it is difficult to determine the appropriate bond where Defendants do not face any direct financial harm.  Defendants' counsel even noted at the hearing on the Motion that Defendants' potential irreparable harm was not "financial harm" but harm to their "brand."  Plaintiff has suggested a bond of $1,000.  Defendants have not suggested

a bond in any particular amount.  Therefore, this Court will require

Plaintiff to post a bond of $1,000.  Defendants may request this Court

increase the  bond on motion supported by appropriate documentation.

See, e.g., Builder's World, Inc v. Marvin Lumber & Cedar, Inc. 482

F.Supp. 2d 1065, 1078 (E.D. Wisc. 2007) (setting a nominal bond of

$1,000 and directing the parties to submit additional information).

## III. CONCLUSION

For the reasons stated, the Report and Recommendation (d/e 55) is

ADOPTED IN PART AND REJECTED IN PART.  Plaintiff's Objections

to the Report and Recommendation (d/e 56) are GRANTED IN PART

and DENIED IN PART.  Defendant's Objections to the Report and

Recommendation (d/e 58) are DENIED.  Plaintiff's Renewed Motion for

Preliminary Injunction (d/e 17) is GRANTED.

Defendants and their officers, agents, servants, employees,

attorneys, and all other persons acting in concert or participation with

any of them or on any of their behalf, pending final hearing and

determination of this lawsuit, are preliminary enjoined from, in any

manner, directly or indirectly:

(1) forcing, or attempting to force, Plaintiff to implement the Policy, including without limitation through any self-help measures such as a forced software update to Plaintiff's Point-of-Sale systems or forced shipment of any menus or promotional items; and

(2) taking, or attempting to take, any adverse action against Plaintiff as a result of its failure and/or refusal to adopt the Policy and/or its continued use of its pricing and promotions in effect as of the date of the filing of its First Amended Verified Complaint.

This Opinion shall go into effect upon Plaintiff depositing with the clerk of the court the sum of $1,000 in a cashiers check or other certified funds. If Plaintiff provides the requisite security, this preliminary injunction shall remain in effect until further order of the Court.

IT IS SO ORDERED.

ENTERED: June 21, 2011

FOR THE COURT:

s/ Sue E. Myerscough
SUE E. MYERSCOUGH

UNITED STATE DISTRICT JUDGE