IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| STULLER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10-CV-3303 |
| | ) | |
| STEAK N SHAKE ENTERPRISES, | ) | |
| INC. and STEAK N SHAKE | ) | |
| OPERATIONS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

<u>OPINION</u>

SUE E. MYERSCOUGH, U.S. District Judge:

This matter is before the Court on Plaintiff Stuller, Inc.'s Motion for Summary Judgment (d/e 92) and the Motion for Summary Judgment (d/e 93) filed by Defendants Steak N Shake Enterprises, Inc. and Steak N Shake Operations, Inc. (hereinafter SNS)[1].  The Motions are fully

---

[1] Steak N Shake Operations, Inc. operates Steak N Shake franchise restaurants and Steak N Shake Enterprises, Inc. grants franchises to operate Steak N Shake restaurants nationwide.  Defs.' Reply Mem., p. 1 (d/e 98).  For ease of reading, the Court refers to Defendants singularly and collectively as SNS.  The Court notes that SNS disputes that Steak N Shake Operations, Inc. is a party to the franchise agreements.  <u>See Id.</u>, at p. 3, ¶ 10.

briefed, and, on June 1, 2012, the Court heard oral argument.

For the reasons that follow, Plaintiff's Motion for Summary Judgment, seeking summary judgment on Count I or, in the alternative, Count III, is GRANTED IN PART and DENIED IN PART. Defendants' Motion for Summary Judgment on all counts is DENIED. Plaintiff is entitled to judgment in its favor on Count I. Questions of fact remain regarding Count II. Finally, because Count III was pled in the alternative to Counts I and II, Count III is dismissed.

## I. OVERVIEW

SNS operates and grants franchises to operate Steak N Shake restaurants nationwide. Plaintiff is the franchisee of five Steak N Shake restaurants, four in Springfield, Illinois (Wabash, North Dirksen, South Dirksen, and Prairie Crossing) and one in Jacksonville, Illinois. Plaintiff, through its predecessors, has operated Steak N Shake restaurant franchises in central Illinois since 1939, making it the longest-standing Steak N Shake franchise in the country.

In November 2010, Plaintiff filed suit against SNS. In December

2010, Plaintiff filed the First Amended Complaint.  In the First Amended Complaint, Plaintiff alleges that in June 2010, SNS adopted a policy (the "Policy") requiring all franchisees to "follow set menu and pricing (with the exception of breakfast items), and to offer all company promotions as published."  Am. Compl. ¶ 12 (d/e 10).   According to Plaintiff, this Policy is contrary to "long-standing custom, practice, policy, agreement, and representation," that franchisees could set their own prices for menu items, maintain "custom menus," and choose whether to follow promotions.  Am. Compl. ¶ 1.  Plaintiff further alleges that, when Plaintiff refused to implement the Policy, SNS sent default notices threatening to terminate Plaintiff's franchises.  Am. Compl. ¶ 17.

In Count I, Plaintiff seeks a declaratory judgment that Plaintiff was not required to comply with the Policy under the terms of the franchise agreements (Agreements) and applicable law.  Plaintiff also asked for injunctive relief  to stop SNS from enforcing the Policy.  In Count II, Plaintiff alleged SNS breached the implied covenant of good faith and fair dealing by attempting to force Plaintiff to adopt the Policy.

In Count III, pled in the alternative to Counts I and II, Plaintiff alleges that, if SNS can impose the Policy on Plaintiff, then SNS violated the Illinois Franchise Disclosure Act (IFDA) (815 ILCS 705/1 et seq.) because the disclosure statements provided to Plaintiff by SNS prior to entering into and renewing the franchises (1) did not provide that SNS was entitled to set maximum or minimum prices or require Plaintiff to participate in all promotions and (2) provided that franchisees could set their own prices.  Am. Compl. ¶¶ 62, 63.

On June 22, 2011, this Court granted Plaintiff's Renewed Motion for Preliminary Injunction.  See d/e 69.  The Court enjoined SNS from forcing Plaintiff to implement the Policy and from taking any adverse action against Plaintiff for refusing to adopt the Policy.  In its Opinion, this Court found the Agreements ambiguous with respect to whether price was part of the "System" as that term is defined in the Agreements. This Court also found Plaintiff had shown a likelihood of success on the merits and met the other factors for a preliminary injunction.

SNS has now moved for summary judgment on all three counts.

Plaintiff has moved for summary judgment on only Counts I and, in the alternative, Count III.

SNS asserts that, even if the Court finds the Agreements ambiguous, all of the admissible extrinsic evidence shows that Plaintiff is obligated to implement maximum prices and promotions as part of the franchise system.  SNS points to (1) the use of the term "System" in the franchise industry; (2) the removal of Plaintiff's right to set prices from the 1972 and 1978 License Agreements; and (3) the fact that, in the 1990s, Plaintiff's right to set prices was discussed by the parties and was not specifically included in the 1995 or subsequent Agreements.  (The parties focus on the 1995 negotiations because pricing was not addressed by the parties in connection with the Agreements signed in 2000, 2005, and 2006.  See Defendant's Response,  p. 39, n. 11 (d/e 96); Tonya Sallee Dep. p. 116 (d/e 92-1) (noting that pricing was not discussed when Sallee personally handled the Jacksonville, North Dirksen, and Wabash Agreements executed in 2005 and 2006)).

Plaintiff asserts that the undisputed extrinsic evidence demonstrates

SNS does not have the right to enforce the Policy under the Agreements. Plaintiff points to: (1) the disclosure documents provided to Plaintiff before entering the Agreements; (2) the negotiation of the 1995 Agreements; (3) the parties' course of performance; (4) the parties' course of dealing; and (5) trade usage.

## II.  LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Fed.R.Civ.P. 56(c).  A moving party must show that no reasonable fact-finder could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1139 (7th Cir. 1997).

The movant bears the burden of establishing that there is no genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  If the

movant meets this burden, the non-movant must set forth specific facts demonstrating that there is a genuine issue for trial.  Fed.R.Civ.P. 56(e); Anderson, 477 U.S. at 252.  The evidence is viewed in the light most favorable to the non-movant and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Here, the parties have filed cross-motions for summary judgment. "[Co]ntract interpretation is often a question of law well suited for disposition on summary judgment."  Zemco Mfg., Inc. v. Navistar Intern. Transp. Corp., 270 F.3d 1117, 1129 (7th Cir. 2001).  "However, when a contract contains ambiguities that the parties must explain through extrinsic evidence, the trier of fact . . . must resolve the conflicting interpretations of the agreement."  Id.  "If there is a dispute as to the interpretation of the extrinsic evidence, this becomes a genuine issue of material fact for a jury and is thus inappropriate for summary judgment." Markin v. Chebemma Inc., 526 F. Supp. 2d 890, 895 (N.D. Ill. 2007). If, however, the extrinsic evidence is uncontroverted, the court decides the issue as a matter of law.  Marusiak v. Adjustable Clamp Co., 2005

WL 2420370, at *7 (N.D. Ill. 2005).

## III. FACTS

Currently, five franchise agreements (Agreements) govern the relationship between the parties, including (1) the July 18, 2006 Wabash Agreement[2] (d/e 92-6); (2) the July 18, 2006 Jacksonville Agreement[3] (d/e 92-5); (3) the January 27, 2000 Prairie Crossing Agreement[4] (d/e 92-3); (4) the January 26, 2005 North Dirksen Agreement[5] (d/e 92-4); and (5) the February 1, 1995 South Dirksen Agreement[6] (d/e 92-2).  To a large extent, this case turns on the language in the Agreements that gives SNS the right to revise "the System" from time to time and the

---

[2] Executed by Wilma Stuller (president and sole shareholder of Plaintiff) and Brad Manns (for SNS).  The prior agreements for this location included the 1972 License Agreement and the 1995 Agreement.

[3] Executed by Wilma Stuller and Brad Manns.  The prior agreements included the 1978 License Agreement and the 1995 Agreement.

[4] Executed by Harold Stuller (for Plaintiff) and Gary Walker (for SNS).  This is the only Agreement ever executed for this location.

[5] Executed by Wilma Stuller and Brad Manns.  The prior Agreements include the 1972 Agreement (for the Seventh & South Grand location, which later moved to Sixth and Ash) and the 1995 Agreement (for the Sixth & Ash location, which moved to North Dirksen).

[6] Executed by Harold Stuller and James Richmond (for SNS).  This is the only Agreement ever executed for this store.

agreement by Plaintiff that it will comply with the entire System, as revised from time to time. SNS construes the System as including price and promotions while Plaintiff does not.

The following is a chronological recitation of the facts, starting with the 1972 and 1978 License Agreements and ending with the implementation of the Policy at issue in this lawsuit. Thereafter, evidence submitted regarding SNS's current standard unit franchise agreement and custom and practice in the industry is set forth.

## A.    The 1972 and 1978 License Agreements for the Wabash, Jacksonville, and Seventh & South Grand Locations

Prior to February 1, 1995, Plaintiff or its predecessor-in-interest[7] was the franchisee of three Steak N Shake restaurants. The three License Agreements that existed prior to February 1, 1995 included (1) the 1972 Wabash License Agreement; (2) the 1972 Seventh and South Grand License Agreement; and (3) the 1978 Jacksonville License Agreement.

---

[7] Stuller Inc. was the entity involved in the 1972 Wabash and 1972 Seventh and South Grand Agreements. Stuller's Steak n Shake was formed in 1978 and was the entity involved in the 1978 Jacksonville Agreement. The two merged in 1994/1995.

The 1972 and 1978 License Agreements provided, in part, that:

> LICENSEE shall diligently operate the licensed
> business during the term of this agreement, and in
> such operation shall comply with the terms of this
> agreement and such rules and procedures as
> LICENSOR may from time to time prescribe,
> including but not limited to the rules and
> procedures set forth in the Steak n Shake
> Manager's Guide (a copy of which will be
> delivered to the LICENSEE within 10 days of the
> execution of this agreement), together with all
> amendments and supplements thereto. * * * In no
> event however may such amendments or
> supplements act or modify or amend any specific
> term or provision set forth in this document. * * *
> The parties recognize that LICENSOR itself is
> engaged in the operation of Steak n Shake
> restaurants, and that the Manager's Guide and
> amendments and supplements thereto are and will
> be used in connection with all such restaurants as
> well as licensed restaurants.  Such guides contain
> references to pricing of merchandise, and may
> from time to time contain other restrictions which
> LICENSOR may properly impose with respect to
> its own operations but with which it may not have
> the right to require LICENSEE to comply.  In such
> respects, such guide and amendments and
> supplements are and are intended to be only
> suggestions and recommendations of the
> LICENSOR which it considers might be of benefit
> to LICENSEE.  LICENSEE shall make its own
> determinations with respect to such items, and
> specifically shall establish and determine in its sole

<u>discretion</u> <u>the</u> <u>prices</u> <u>to</u> <u>be</u> <u>charged</u> <u>for</u> <u>products</u>
<u>sold</u> <u>or</u> <u>offered</u> <u>for</u> <u>sale</u> <u>in</u> <u>the</u> <u>licensed</u> <u>restaurant</u>.

<u>See</u> 1972 Wabash and Seventh & South Grand License Agreements, §
4.09 Operating Standards (d/e 95-1; 95-2) (emphasis added); <u>see</u> <u>also</u>
1978 Jacksonville License Agreement, § 4.09 Operating Standards (d/e
95-3) (substantially the same language with some differences in
capitalization and punctuation).  The initial term of the agreements was
20 years for the Wabash and Jacksonville agreements and 15 years for
the Seventh & South Grand locations.  All three agreements contained
an option for a five-year renewal and thereafter a second renewal period
of five years.  <u>See</u> License Agreements, §5.02.

B.    The Negotiation of the 1995 Agreements

In early 1993, Harold Stuller, the former president of Plaintiff (now
deceased), and James Richmond, the former Vice-President of
Franchising for SNS, began negotiating new franchise agreements for the
three existing restaurants operated by Plaintiff.  The parties also began
discussing a development agreement under which Plaintiff would open
additional restaurants.

In the 1990s, SNS was changing direction and began "doing some new franchises."  Richmond Dep. p. 66 (d/e 92-7) (agreeing with question asked).  SNS developed a standard unit franchise agreement and an addendum.  Richmond Dep. p. 75.  The purpose of the addendum was to "carve out any special provisions to any of those agreements, but particularly for old franchisees that we were working with to get–get more consistent with the new system."  Richmond Dep. p. 130.

On April 23, 1993, Richmond sent a memorandum to Alan Gilman, the then-President of SNS, reviewing a number of issues pertaining to Plaintiff's Agreements.  The issues included Richmond's recommendation on issues of area development, the length of the agreements, marketing contributions, hours of operation, and menu offerings.  The April 23, 1993 memorandum does not mention pricing.

On August 6, 1993, Richmond sent another memorandum to Gilman suggesting to Gilman the positions SNS should take on the following issues: menu offerings, marketing contributions, remodels,

length of the agreements, and area development.   Again, the August 6, 1993 memorandum does not mention pricing but does note that "[t]he requirement to participate in ADI wide marketing programs will be strengthened."

On or about August 16, 1993[8], Richmond sent Gilman a memorandum reporting on a meeting that occurred between Richmond and Harold and Wilma Stuller.  The memorandum states, in part, as follows:

> The following items were tentatively agreed to:
>
> 1.   Stuller will adopt the Steak n Shake menu effective with our next revision, which we expect to issue this fall, subject to the following:
>
> * * *
>
> (c) Stuller is free to establish his own pricing.  (By law, all franchisees may

---

[8] Richmond testified at his deposition that the August 16, 1993 date on the memorandum could not be correct because the memorandum references on August 17, 1993 meeting that had already occurred.  Richmond could not explain the discrepancy in the dates.  Richmond Dep., p. 105.

set their own prices[9].)

<u>See</u> d/e 93-3.

Despite Richmond's reference in the August 16, 1993 memorandum to a tentative agreement having been reached, negotiations continued.  Richmond testified that the August 16, 1993 memorandum was the parties' final agreement on the issue of pricing.  SNS disputes this, asserting that nearly every issue listed in the August memorandum was renegotiated.  Richmond also testified that the parties did not intend to change the existing relationship regarding pricing when they negotiated the 1995 contracts.  Richmond Dep. p, 148.

At one point during the negotiations, Plaintiff proposed an amendment to Section 3.03 of the Agreements related to "Installation of

---

[9]  Richmond could not recall why he believed franchisees could set their own prices.  Richmond Dep. p. 149.  This Court notes the following cases:  <u>State Oil Co. v. Khan</u>, 522 U.S. 3, 22 (1997) (overruling <u>Albrecht v. Herald Co.</u>, 390 U.S. 145 (1968), which had held that vertical maximum price fixing was <u>per se</u> unlawful and holding that vertical maximum price restraints should be evaluated under the rule of reason); <u>Leegin Creative Leather Products, Inc. v. PSKS, Inc.</u>, 551 U.S. 877, 907 (2007) (overruling <u>Dr. Miles Medical Co. v. John D. Park & Sons. Co.</u>, 220 U.S. 373 (1911), which held that it was <u>per se</u> illegal for a manufacturer to agree with its distributor to set minimum prices, and holding that vertical price restraints should be judged by the rule of reason).

Equipment and Furnishing." Plaintiff suggested the paragraph include the following language; "Provided, however, that the COMPANY acknowledges that all current practices of the Franchisee as of the date hereof are acceptable to the COMPANY." The language ultimately provided as follows: "Provided, however, that the COMPANY acknowledges that all current equipment utilized by the Franchisee as of the date hereof is acceptable to the COMPANY."

The negotiations that began in March 1993 culminated with the parties signing an Area Development Agreement dated January 23, 1995 and four Franchise Agreements dated February 1, 1995, with Addenda. Three of those franchise agreements replaced the existing franchise agreements for the Wabash, Jacksonville, and 6th & Ash locations. The fourth 1995 agreement was for the South Dirksen location that Plaintiff planned to build and open during 1995. The 1995 South Dirksen agreement remains in effect.

All of the franchise agreements signed in 1995 were standard form SNS agreements with addenda modifying the provisions of the standard

form of the SNS franchise agreement.  The express language in the 1972

and 1978 License Agreements providing that Plaintiff "shall establish and

determine in its sole discretion the prices to be charged for products sold"

is not included in the 1995 Agreements or addenda.

## C.    The Uniform Franchise Offering Circular

Prior to signing the 1995 Agreements, SNS provided Plaintiff with

a Uniform Franchise Offering Circular (UFOC) (now called the Franchise

Disclosure Document but, for clarity, this Court will refer to the

document as the UFOC).  See 7-Eleven Inc. v. Spear, 2011 WL

2516579, at *4 (N.D. Ill. 2011) (explaining the Federal Trade

Commission's (FTC) Franchise Rule and that the "FTC accepts

satisfaction of the UFOC Guideline as compliance with the Franchise

Rule").  The UFOC contained an "Item 19," which relates to "Earnings

Claims."

Item 19, which is an optional provision, sets forth information,

both in text and in a table, about historical sales volumes and other data

for Steak N Shake restaurants.  See, e.g., 7-Eleven Inc., 2011 WL

2516579, at *4 (noting that the Franchise Disclosure Regulations do not

require that franchisors disclose earnings information).   Item 19 in the

UFOCs provided to Plaintiff states, in part:

>Any potential franchisee who attempts to estimate
>from this table his or her own costs and
>performance must keep in mind that the Table
>does not reflect the performance of Steak N Shake
>franchised operations.
>
>Furthermore, there are some differences between
>the operations of a franchised restaurant and a
>SNS-owned restaurant. . . . . <u>Franchisees</u> <u>are</u> <u>free</u>
><u>to</u> <u>set</u> <u>selling</u> <u>prices</u> <u>different</u> <u>from</u> <u>prices</u> <u>on</u> <u>SNS-</u>
><u>owned</u> <u>restaurant</u> <u>menus</u> <u>and</u> <u>several</u> <u>do</u> <u>so</u>.

1994 UFOC, p. 34 (d/e 92-14) (emphasis added) (also noting that two

franchise restaurants "currently do not offer breakfast service").  The

language cited above was also in the UFOCs provided to Plaintiff before

signing the current Agreements.  <u>See</u> 1999 UFOC (d/e 92-19); 2004

UFOC (d/e 92-24); 2005 UFOC (d/e 92-25).

D.   **The 1992 Stennett Agreement**

In support of its Motion for Summary Judgment, SNS points to an

agreement entered into between SNS and another franchisee in 1992.

Specifically, in June 1992, Richmond, on behalf of SNS, signed a unit franchise agreement with Stennett's S'NS, Inc. for a new franchised location in Missouri.

The Stennett Agreement generally provided that (1) SNS had "created and developed a unique restaurant concept" that was expressed in the Operating Standards Manual and referred to as "the System" (recitals); (2)  the franchisee would comply with the entire System, as revised from time to time by SNS (section 1.03); and (3) that SNS had the right to add to and modify the Operating Standards manual (section 5.01).  <u>See</u> d/e 95-4.  The Stennett Agreement does not contain an addendum.  Instead, the parties signed a Memorandum of Agreement which modified certain standard provisions of the Stennett Agreement. <u>See</u> d/e 95-5.

For example, the Memorandum of Agreement contained an exception to the 24-hour operation requirement ("For purposes of Section 5.02, the Restaurant may be operated by Franchisee . . . no less than seventeen (17) hours per day) and permitted the operation of a

breakfast bar ("Notwithstanding the provisions of Section 4.01 and

5.01(a), Franchisee may operate a breakfast bar or breakfast buffet).  <u>See</u>

d/e 95-5.  The Memorandum of Agreement also contained the following

paragraph:

> <u>Menu Pricing</u>.  Franchisor acknowledges that
> Franchisee is free to establish menu pricing that
> may differ from menu pricing used by Franchisor.
> Franchisee will use his best efforts to maintain
> pricing that is competitive with similar restaurant
> operations within Taney County.

d/e 95-5.

**E.    The Current Agreements**

As noted above, the current Agreements include the 2006 Wabash

Agreement, the 2006 Jacksonville Agreement, the January 2000 Prairie

Crossing Agreement, the 2005 North Dirksen Agreement, and the 1995

South Dirksen Agreement.  The current Agreements contain, in

substantially the same form, the following recital pertaining to the

System:

> The Company has created and developed a unique
> restaurant concept, including buildings of
> distinctive architectural design, decorative color

> scheme and trade dress, and has standardized
> methods of preparing and serving certain food
> products and beverages for on-premises and off-
> premises consumption in one or more manuals and
> written or other materials of the Company (the
> "Operating Standards Manual") as issued and
> revised from time to time (hereinafter collectively
> referred to as the "System").[10]

See Wabash Agreement (d/e 92-6); Jacksonville Agreement (d/e 92-5);

North Dirksen Agreement (d/e 92-4); and Prairie Crossing Agreement

(d/e 92-3). Section 1.03 of the Agreements, pertaining to Franchisee

Obligations, requires that Plaintiff comply with the System:

> Franchisee acknowledges that maintaining
> uniformity in every component of the operation of
> the System is essential to the success of the entire
> chain of STEAK N SHAKE Restaurants, including
> a designated menu; uniformity of food and
> beverage specifications, preparation methods,
> quality and appearance; and uniformity of
> facilities and service. Franchisee agrees to comply
> with the entire System, as revised from time to
> time by the Company.[11]

---

[10] The South Dirksen Agreement is slightly different: (1) the word Company is capitalized as "COMPANY"; (2) the provision does not mention "trade dress"; and (3) the provision refers to "formalized standard methods" as opposed to "standardized methods". See d/e 92-2.

[11] The South Dirksen Agreement is slightly different, providing as follows: "Franchisee acknowledges that maintaining uniformity in every component of the

Id.  The Addendum to Section 1.03 of the Agreements provides that the

Franchisee is allowed to offer the additional menu items shown in an

attached document.  Id.  The South Dirksen Agreement also provides

that the Franchisee may offer Coca-Cola products rather than Pepsi

products.  See South Dirksen Addendum (d/e 92-2).

Section 5.01(a) of the Agreements, pertaining to Operational

Standards, contains, in substantially the same form, the following

language:[12]

> The Franchisee will receive during the term of the
> Franchise one copy each of the Operating
> Standards Manual, and other applicable manuals
> and publications of the Company for STEAK N
> SHAKE Restaurants, containing mandatory and
> suggested specifications, standards and operating
> procedures prescribed from time to time by the

---

operation of the System is essential to the success of the entire Franchise System and COMPANY-WIDE Restaurant chain, including a designated menu of food and beverage products; uniformity of food specifications, preparation methods, quality and appearance; and uniformity of facilities and service.  Franchisee agrees to comply with the entire System, as revised from time to time by the COMPANY."  See d/e 92-2.

[12] The South Dirksen Agreement (1) capitalizes "Company" as "COMPANY" and (2) contains the language: "The COMPANY shall have the right to add to, and otherwise modify . . .".  The South Dirksen and Prairie Crossing Agreements do not contain the language "and publications" as is contained in the other three Agreements.  See d/e 92-2.

> Company for STEAK N SHAKE Restaurants and
> information relative to other obligations of
> Franchisee hereunder for the operation of a
> STEAK N SHAKE Restaurant.  The Company
> shall have the  right to modify the Operating
> Standards Manual  and other manuals and
> publications from time to  time to reflect changes
> in authorized products and services, standards of
> product quality and services for the operation of a
> STEAK N SHAKE Restaurant.[13]

See Wabash Agreement (d/e 92-6) (Emphasis added); Jacksonville

Agreement (d/e 92-5) (Emphasis added); North Dirksen Agreement (d/e

92-4) (Emphasis added); and Prairie Crossing Agreement (d/e 92-3)

(Emphasis added).

With the exception of the South Dirksen Agreement (which has

different language), the Agreements also contain Section 6.02, which

pertains to Advertising and Marketing Expenditures:

> Franchisee understands and hereby acknowledges
> that advertising, marketing and promotional
> activities are essential to the furtherance of the

---

[13] The North Dirksen, Prairie Crossing, and South Dirksen Agreements are
slightly different in that they provide that the Company will "loan" the Franchisee a
copy of the Operating Standards Manual and other applicable manuals. In the South
Dirksen Agreement, "Company" is written as "COMPANY."  See d/e North Dirksen
Agreement (92-4); Prairie Crossing Agreement (92-3); and South Dirksen Agreement
(92-2).

> goodwill and public image of the Company and
> the success of the business franchised hereunder,
> and agrees as follows:
>
> (a) * * * Included in [the Franchisee's] required
> advertising and marketing expenditures will be a
> payment to the Company of one percent (1%) of
> Gross Receipts which will be used by the
> Company, at its sole discretion, for expenditures
> reasonably related to the creation, development,
> administration and supervision of marketing and
> advertising programs and menu development for
> all STEAK N SHAKE restaurants.

See Wabash Agreement (d/e 92-6); Jacksonville Agreement (d/e 92-5);

North Dirksen Agreement (d/e 92-4); and Prairie Crossing Agreement

(d/e 92-3).  Section 6.02(b) of the Agreements (except the South Dirksen

Agreement) provides for the creation of an advertising account and

provides that:

> The monies in the advertising account will be used
> by the Company, at its sole discretion, for the
> implementation of local and/or regional and/or
> national marketing and advertising programs
> intended to increase general public recognition and
> acceptance of STEAK N SHAKE Restaurants in
> the Franchisee's Market area[.]

See Wabash Agreement (d/e 92-6); Jacksonville Agreement (d/e 92-5);

North Dirksen Agreement (d/e 92-4); and Prairie Crossing Agreement

(d/e 92-3).

In contrast to the other four Agreements, section 6.02 of the South

Dirksen Agreement provides, in relevant part, as follows:

> Franchisee understands and hereby acknowledges
> that advertising, marketing and promotional
> activities are essential to the furtherance of the
> goodwill and public image of the COMPANY and
> the business franchised hereunder, and agrees as
> follows:

> * * *

> (c) If the Franchisee's Restaurant is located within
> an ADI [Area of Dominant Influence] or other
> geographic region in which there are other Steak n
> Shake Restaurants operated by the Company or
> other Franchisees, Franchisee will participate in
> and contribute toward any marketing programs,
> including but not limited to, television and radio
> marketing programs initiated by the Company
> covering all Steak n Shake Restaurants in such
> ADI or other geographic region. * * *

> (d) [The advertising and marketing service fee paid
> to the Company by Franchisee] shall be used by
> the COMPANY in its sole discretion, to develop
> and prepare advertising materials, to undertake
> marketing research to pay commissions, fees and
> expenses of and marketing agencies and

consultants, to pay talent and talent residuals, to provide for menu development, to provide other marketing services, and to pay all fees and expenses incurred in connection therewith.

See d/e 92-2.

Section 7.01 of all of the Agreements address the form, concepts, and content of marketing and advertising:

(a) Recognizing the value of advertising and the importance of the standardization of advertising to the furtherance of the goodwill and public image of the STEAK N SHAKE System, Franchisee agrees that the Company or its designee shall have the right to conduct, determine, maintain and administer all national, regional, local and other advertising and marketing as may be instituted by the Company from time to time, and to direct all such advertising and marketing with sole discretion over the concepts, materials, form, copy, layout and content used therein.

(b) Franchisee understands and acknowledges that advertising expenditures are intended to maximize general public recognition and acceptance of all STEAK N SHAKE Restaurants[.]

(c) Franchisee shall be free to conduct, at its separate expense, supplemental advertising in addition to the advertising received for the expenditures specified in Section 6.02 herein, to promote and increase the demand for the products

and services of its own STEAK N SHAKE
Restaurant.  All such supplemental advertising
shall either have been prepared or previously
approved in writing by the Company.[14]

<u>See</u> Wabash Agreement (d/e 92-6); Jacksonville Agreement (d/e 92-5);

South Dirksen Agreement (d/e 92-2); and Prairie Crossing Agreement

(d/e 92-3).

Each of the Agreements contains a provision (Section 14.05)

entitled "Entire Agreement."  Taking into account the addendum to each

Agreement, the "Entire Agreement" provision of the Wabash,

Jacksonville, and North Dirksen Agreements provide:

The recitals to this Agreement are hereby
incorporated into and made a part of this
Agreement, which, together with <u>Schedule 1</u> and
any addendum hereto, constitute the entire
agreement of the parties (and which supersedes all
prior negotiations, commitments, representations
and undertakings of the parties with respect to the
subject matter hereof, all of which are deemed to
have been merged into this Agreement).

Other than the Illinois Franchise Offering Circular

---

[14] Section 7.01 in the South Dirksen Agreement differs slightly in that
Company is in all capitals and reads "Paragraph 6.02" (not underlined) instead of
"<u>Section 6.02</u>."  <u>See</u> d/e 92-4.

> (the "IFOC") that was previously provided to the
> Franchisee, the Company has made no
> representations inducing the execution of this
> Agreement that are not incorporated herein.
> Notwithstanding the previous sentence, the IFOC
> is incorporated into this Agreement only to the
> extent required by law.

See Wabash Agreement (d/e 92-6); Jacksonville Agreement (d/e 92-5);

and North Dirksen Agreement (d/e 92-4).  Section 14.05 of the Prairie

Crossing and South Dirksen Agreements are different.  Neither the

Prairie Crossing nor the South Dirksen Agreement contains the language

regarding the Illinois Franchise Offering Circular.  Instead, both of those

Agreements provide that "[t]he Company has made no representations

inducing the execution of this Agreement which are not incorporated

herein."  See Prairie Crossing Agreement, § 14.05 (d/e 92-3); South

Dirksen Agreement, § 14.05 (d/e 92-2).

The Wabash, Jacksonville, and North Dirksen Agreements provide

that "[n]o failure of either party to exercise any power reserved to it by

this Agreement . . . shall constitute a waiver of either party's right to

demand exact compliance with any of the terms herein."  See Wabash

Agreement, § 14.08(b) (d/e 92-6); Jacksonville Agreement, § 14.08(b)

(d/e 92-5); and North Dirksen Agreement, § 14.08(b) (d/e 92-4).  The

Prairie Crossing and South Dirksen Agreements have the same provision

but limit its applicability to the Company as opposed to either party.  <u>See</u>

Prairie Crossing Agreement, § 14.08(b) (d/e 92-3) ("No failure of the

Company to exercise any power . . ..."); South Dirksen Agreement, §

14.08(b) (d/e 92-2) ("No failure of the COMPANY to exercise any power

. . .").

All the Agreements contain a provision acknowledging that some

current franchisees may operate under different forms of unit franchise

agreements and that the Company's obligations and rights in respect to

the various franchisees "may differ materially in certain circumstances."

<u>See</u> Wabash Agreement, § 14.15 (d/e 92-6); Jacksonville Agreement, §

14.15 (d/e 92-5); North Dirksen Agreement, § 14.15 (d/e 92-4); Prairie

Crossing Agreement, § 14.15 (d/e 92-3); South Dirksen Agreement, §

14.14 (d/e 92-2).  All of the Agreements are governed by Illinois law.  <u>See</u>

Wabash Agreement, Addendum to § 14.17 (d/e 92-6); Jacksonville

Agreement, Addendum to § 14.17 (d/e 92-5); North Dirksen Agreement, Addendum to § 14.17 (d/e 92-4); <u>see also</u> Prairie Crossing Agreement, § 14.17 (d/e 92-3) (noting the governing law is Indiana but also noting that the IFDA may afford the franchisee additional protection); South Dirksen Agreement, § 14.16 (d/e 92-2) (same); <u>see also</u> 815 ILCS 705/4 ("Any provision in a franchise agreement that designates jurisdiction or venue in a forum outside of this State is void").

## F.    Plaintiff's 2008 Price Increase

In 2008, Plaintiff requested the printing of custom menus for all of its stores reflecting a 10% price increase over the prices Plaintiff was then charging.  SNS recommended against the price increase but nevertheless allowed SNS to implement the price increase.  Sallee Dep. p. 121. According to Plaintiff, but disputed by SNS, Ken Faulkner of SNS told Wilma Stuller that although SNS recommended against the price increase, SNS "cannot set your prices for you."

## G.    SNS's Implementation of the Policy

On June 15, 2010, SNS announced the Policy, applicable to

corporate-owned and franchised restaurants.  The Policy provided, in

part, as follows:

> All  restaurants  are required to follow set
> company menu and pricing as published with the
> exception of breakfast items.  Additionally, all
> restaurants are required to offer all company
> promotions as published.

d/e 10-8.  According to SNS, but disputed by Plaintiff, SNS implemented

the Policy as a requirement of the operating standards, applicable to all

franchised restaurants.

On August 11, 2010, Brad Manns, the SNS Vice-President of

Development and Franchise Operations, sent franchisees, including

Plaintiff, a letter offering marketing initiatives in exchange for franchisees

agreeing to follow the Policy beginning September 1, 2010, and for the

remainder of the Franchise Agreement Term, except for certain

exceptions.  The letter stated, in part, as follows:

> As you are aware, the Company recently issued a
> policy for Menu Pricing and Promotion
> ("Pricing/Promotion Policy") whereby all Steak n
> Shake restaurants (both company owned and
> franchised) must follow Company's published
> menu pricing (except Breakfast) and offer all

promotions as directed by the Company, including but not limited to Four Meals Under Four Dollars, Milkshake Happy Hour, and Kids Eat Free. The purpose of the Pricing/Promotion Policy is to ensure consistency across the System and emphasize our mission of providing the lowest possible prices to our guests.

In order to help you increase guest frequency to help offset the impact of these changes, we are willing to implement certain marketing initiatives at our expense focusing on value pricing if you agree to follow our Pricing/Promotion Policy pursuant to the timetable outlined herein. * * *

By signing below, you agree to follow the Pricing/Promotion Policy beginning September 1, 2010 and for the remainder of your Franchise Agreement Term, except for specified items during the Transition Period (described below). For the period beginning September 1, 2010 and ending the later of (i) February 15, 2011; or (ii) Company's issuance of the second menu during Company's FY 2011 ("Transition Period"), you shall not be required to adhere to the Company's published menu pricing for the following items: (i) drinks (excluding shakes and freezes); (ii) chili products; and (iii) Melts (Frisco Melt, Pepperjack Melt, Patty Melt and Chicken Melt). On or before the end of the Transition Period, you agree to adhere to the Company's pricing for <u>all</u> menu items (except breakfast).

In exchange for the Marketing Investment

benefitting your Restaurants, you agree to release the Company * * * from and against all manner of actions, complaints, causes of actions, claims, suits, breaches, torts, controversies, damages, claims and demands, whatsoever, in law or in equity, arising out of, directly or indirectly, Company's implementation of the Pricing/Promotion Policy.  Except for the obligations of Company and Franchisee set forth herein, all other terms and conditions of the Franchisee Agreement shall remain in full force and effect.

d/e 10-9 (Emphasis in original.)  At the bottom of the letter, below Mann's signature, was the following sentence: "BY SIGNING BELOW, FRANCHISEE ACKNOWLEDGES AGREEMENT WITH THE FOREGOING TERMS AND CONDITIONS[.]" Id.  Plaintiff did not sign the letter and did not implement the reduced menu pricing called for under the Policy.  In fact, no franchisee accepted the marketing money although several did agree to follow SNS's menu prices.  Sallee Dep., p. 79.

## H.   Other Evidence

### 1.   The New Agreements and UFOC

After implementation of the Policy, SNS revised the standard unit

franchise agreement to provide: (1) the franchisee's acknowledgment that maintaining uniformity is essential "including a designated menu (including the maximum, minimum, or other prices the Company specifies for menu items)" (Section 1.3); (2) the franchisee's agreement not to deviate from the Company's standards, "including to the fullest extent the law allows, the maximum, minimum, or other prices for products and services offered and sold by Steak n Shake restaurants" (Section 4.1(c)); and (3) that the Company has the right to modify the Operating Manual "including the maximum, minium, or other prices for same" (Section 5.1).  <u>See</u> d/e 92-52 (pp. 80, 88, and 89 of 365).  The 2010 standard agreement contains generally the same advertising provision as the Agreements at issue herein.  <u>Id.</u> Article 6, Article 7 (pp. 92-95 of 365).

The 2010 UFOC was also changed to indicate that SNS may regulate maximum, minimum, and other prices charged for all products. <u>See</u>, <u>e.g.</u> , d/e 92-52 at pp. 8 and 32 of 365.  In addition, Item 19 of the UFOC no longer provides that franchisees are setting their own prices.

Id. at d/e 92-52 at pp. 54-56 of 365; see also Sallee Dep., p. 73.

    2.    The Expert Reports

Plaintiff submitted the report of an expert, George Rummel.  In

Rummel's opinion, "[i]t is not the custom and practice in the industry for

franchisors to set prices" and that "'price' is not part of the operating

system and has not traditionally been viewed at such."  Rummel Report,

p. 9 (d/e 84-2).  SNS had submitted the expert report of Michael H. Seid

(d/e 70-3) when SNS filed its first Motion for Summary Judgment (which

this Court struck with leave to refile after a dispute arose regarding

motions for leave to file additional evidence in support of the motions,

see Text Order of November 14, 2011).  SNS did not rely on  Seid's

report in its Renewed Motion for Summary Judgment.  Seid agreed that

it was not common practice in the franchise industry for franchisors to

set menu pricing, but this was because "franchisors were not allowed to

do so until fairly recently."  Seid Report, p. 21 (d/e 70-3) (citing Khan

and Leegin).

IV.  ANALYSIS

## A.    COUNT I: Declaratory Judgment and Injunctive Relief

SNS asserts it is entitled to summary judgment on Count I because Plaintiff's agreement to operate in accordance with the operating system includes following maximum prices and participating in promotions. Plaintiff asserts it is entitled to summary judgment on Count I because SNS does not have the right, under the Agreements, to enforce the Policy.

For the most part, the parties treat pricing and promotion the same way.  That is, the parties seem to accept that if SNS has the right to set prices, then SNS has the right to require Plaintiff to follow promotions (and vice-versa–if Plaintiff has the right to set prices, then Plaintiff has the right to decide whether to follow promotions).  One exception to this is that SNS did argue, during oral argument, that the 1995 South Dirksen Agreement contains a provision that unambiguously provides that Plaintiff will participate in all marketing programs, and that marketing programs include promotions.  <u>See</u> South Dirksen Agreement §6.02(c) (d/e 92-2).  SNS also cited to the various marketing and

advertising provisions of the Agreements (<u>i.e.</u> §6.02, § 7.01) in the

Statement of Undisputed Facts.

    1.   <u>Contract Interpretation</u>

The parties agree that the Agreements are governed by Illinois law.

<u>See</u>, <u>e.g.</u>, Pl.'s Mot. Summ. J., p. 32 (d/e 92); Defs.' Renewed Mot. for

Summ. J., p. 21 (d/e 93); <u>see</u> <u>also</u> <u>Bourke v. Dun & Bradstreet Corp.</u>, 159

F.3d 1032, 1036 (7th Cir. 1998) ("In a diversity case, a federal court

applies federal procedural but state substantive laws").  "When a court

interprets a written contract, it must determine whether the contract is

ambiguous or unambiguous as a matter of law."  <u>Owner-Operator</u>

<u>Independent Drivers Ass'n, Inc. v. Bulkmatic Transport Co.</u>, 503 F.

Supp. 2d 961, 967 (N.D. Ill. 2007).  When construing a contract, "the

primary objective is to give effect to the intention of the parties."

<u>Thompson v. Gordon,</u> 241 Ill. 2d 428, 441 (2011).  To determine the

parties' intent, the court looks to the language of the contract, construing

it as a whole.   <u>Id.</u>

If the words in the contract are clear and unambiguous, the court

must afford those words their plain, ordinary, and popular meaning.

Virginia Surety Co., Inc. v. Northern Ins. Co. of N.Y., 224 Ill.2d 550,

556 (2007).  Extrinsic evidence may not be considered if the contract is

facially unambiguous and contains an integration clause.  Air Safety, Inc.

v. Teachers Realty Corp., 185 Ill. 2d 457,463 (1999) (refusing to apply

the provisional admission approach–wherein a court considers parol

evidence to show that a facially unambiguous contract is ambiguous–

where the contract contained an explicit integration clause).

If the language in the contract is susceptible to more than one

meaning, however, it is ambiguous, and a court can consider extrinsic

evidence to determine the parties' intent.  Thompson, 241 Ill. 2d at 441.

"Unless a contract clearly specifies its own meanings, a court must

interpret the words of the contract with their common and generally

accepted meanings."  William Blair & Co., LLC v. FI Liquidation Corp.,

358 Ill. App. 3d 324, 335 (2005).

2.     The Agreements Are Ambiguous With Respect to Whether the
       System Includes Price and Promotions

SNS argues that it is entitled to summary judgment because the

Agreements unambiguously give "SNS the right to set maximum prices and mandate promotions as part of the System by which all restaurants must be operated."  Defs.' Renewed Mot. for Summ. J., p. 24.  Plaintiff, while not arguing in its Motion that the Agreements are unambiguous, preserves its argument, previously made in its Renewed Motion for Preliminary Injunction, that the Agreements are unambiguous and do not grant SNS the right to set Plaintiff's menu prices.  Pl.'s Mot. for Summ. J., p. 30 n. 13.

When deciding Plaintiff's Renewed Motion for Preliminary Injunction, this Court found that "the Agreements are ambiguous on the issue of whether 'price' is part of the System Defendants may modify." See Opinion on Pl.'s Renewed Mot. for Prelim. Inj., p. 19 (d/e 69). Generally, findings of fact and conclusions of law made at the preliminary injunction stage do not have preclusive effect.  See, e.g., Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 291-92 (7th Cir. 1998) (noting that findings made in a preliminary injunction order are not binding on the court at the summary judgment stage).

In this case, SNS primarily raises the same arguments raised earlier. This Court reaches the same result reached at the preliminary injunction stage that the Agreements are ambiguous with regard to whether the System includes price and promotions.

To summarize the previous finding of ambiguity, this Court notes that the case primarily turns on the language in the Agreements that gives SNS the right to revise the System from time to time and the agreement by Plaintiff that it will comply with the entire System, as revised from time to time.   As noted above, the System is defined in the Agreements as "a unique restaurant concept, including buildings of distinctive architectural design, decorative color scheme and trade dress, and  . . . standardized methods of preparing and serving certain food products and beverages for on-premises and off-premises consumption." See Recitals to Agreements.   The Agreements also provide that the System is maintained in the Operating Standards Manual, which the Company could revise from time to time to "reflect changes in authorized products and services, standards of product quality and services for the

operation of" a Steak N Shake Restaurant.  See Recitals and § 5.01(a).
Plaintiff acknowledged the importance of "maintaining uniformity in
every component of the operation of the System . . . including a
designated menu; uniformity of food and beverage specifications,
preparation methods, quality and appearance; and uniformity of facilities
and service."  See Agreements, § 1.03.

The Agreements do not specifically address whether SNS can
modify operational standards to require uniform pricing and promotions.
SNS argues that the absence of the term "price" or "pricing" does not
render the Agreements ambiguous.  However, the absence of the term
"price" might be construed as permitting Plaintiff to set its own price but
also may be construed as allowing SNS to set the price as part of the
System.  As such, the Agreements are ambiguous on the issue of whether
"price" is part of the System Defendants may modify.

Moreover, sections 6.02 and 7.01 of the Wabash, Jacksonville,
North Dirksen, and Prairie Crossing Agreements are also ambiguous as to
whether Plaintiff must follow all promotions.  While Plaintiff must

contribute toward advertising and marketing expenditures, the
Agreements are ambiguous whether Plaintiff must participate in those
promotions.

SNS also argues that the South Dirksen Agreement unambiguously
requires Plaintiff to comply with all promotions.  As set forth above,
Section 6.02(c) of the South Dirksen Agreement provides as follows:

> Franchisee understands and hereby acknowledges
> that underlined advertising, marketing and promotional
> activities are essential to the furtherance of the
> goodwill and public image of the COMPANY and
> the success of the business franchised hereunder,
> and agrees as follows:
>
> * * *
>
> (c) If the Franchisee's Restaurant is located within
> an ADI [Area of Dominant Influence] or other
> geographic region in which there are other Steak n
> Shake Restaurants operated by the Company or
> other Franchisees, Franchisee will participate in
> and contribute toward any marketing programs,
> including but not limited to, television and radio
> marketing programs initiated by the Company
> covering all Steak n Shake Restaurants in such
> ADI or other geographic region. * * *
>
> (d) [The advertising and marketing service fee paid
> to the Company by Franchisee] shall be used by

> the COMPANY in its sole discretion, to develop
> and prepare advertising materials, to undertake
> marketing research to pay commissions, fees and
> expense of marketing agencies and consultants, to
> pay talent and talent residuals, to provide for
> menu development, to provide other marketing
> services, and to pay all fees and expenses incurred
> in connection therewith.  (Emphasis added.)

SNS asserted at the hearing that the South Dirksen restaurant is located

in a geographic region in which there are other Steak n Shake

Restaurants operated by SNS or other franchisees.

Reading the 1995 South Dirksen Agreement as a whole, this Court

finds that the language is ambiguous whether Plaintiff must follow all

promotional activities.  Section 7.01 of the South Dirksen Agreement

gives SNS the right to conduct advertising in its sole discretion.  While,

in section 6.02 of the South Dirksen Agreement, Plaintiff acknowledges

that "advertising, marketing and promotional activities are essential to

the furtherance of the goodwill and public image of" the SNS, section (c)

only provides that Plaintiff "will participate and contribute toward any

marketing programs" initiated by the SNS.  Subsection (c) says nothing

about participation in promotional activities.  The distinction, if any,

between marketing programs and promotional activities is unclear. Reading the Agreement as a whole, this Court finds that the 1995 South Dirksen Agreement is also ambiguous whether the System includes promotions.

3.    As a Matter of Law, the System Does Not Include Pricing and Promotions

Having found the Agreements ambiguous, this Court may consider extrinsic evidence to determine the parties' intent.  See Thompson, 241 Ill. 2d at 441.  Typically, when a contract term is ambiguous, a question of fact exists and summary judgment is inappropriate.  See Richard W. McCarthy Trust Dated September 2, 2004 v. Illinois Casualty Co., 408 Ill. App. 3d 526, 535 (2011); Marusiak, 2005 WL 2420370, at *7. However, where the extrinsic evidence leaves no genuine issue of material fact in dispute, summary judgment may appropriately be granted. Richard W. McCarthy Trust, 408 Ill. App. 3d at 536; see also William Blair and Co., 358 Ill. App. 3d at 342 ("[I]f the extrinsic evidence available to construe ambiguous language is not in dispute, a court may,

nevertheless, properly decide the issue as a question of law, as no question of fact is raised"); Markin, 526 F. Supp. 2d at 895.  Relevant extrinsic evidence includes the parties' negotiations of the contract, the course of performance, course of dealing, and trade usage in the relevant industry.  Elda Arnhold & Byzantio, L.L.C. v. Ocean Atl. Woodland Corp., 284 F.3d 693, 701 (7th Cir. 2002) (applying Illinois law).

SNS asserts that all admissible extrinsic evidence shows that Plaintiff is obligated to implement maximum prices and promotions as part of the System.  SNS points to (1) the use of the term "System" in the franchise agreement; (2) the removal of Plaintiff's right to set prices from the 1972 and 1978 License Agreements; and (3) the fact that Plaintiff's right to set prices was considered by the parties and was not included in the 1995 or subsequent Agreements.

Plaintiff asserts that it is entitled to summary judgment on Count I because the undisputed extrinsic evidence demonstrates Defendants do not have the right to enforce the Policy under the franchise agreements. Plaintiff points to: (1) the UFOCs; (2) Richmond's 1993 memorandum

during the negotiations of the 1995 agreements; (3) the parties' course of

performance; (4) the parties course of dealing; and (5) trade usage.  SNS

argues that the facts on which Plaintiff relies are inadmissible as parol

evidence, are not probative of the issues raised in the Motion, and fail to

establish any material facts in support of Plaintiff's claim in Count I.

The extrinsic evidence of intent, as set out above, is largely

undisputed (although the parties do in some cases object to the evidence

on relevance and materiality).  After reviewing the evidence presented,

and viewing the evidence in the light most favorable to the nonmoving

party, this Court finds that Plaintiff is entitled to summary judgment on

Count I.

At the outset, this Court finds that the IFDA does not answer the

question of the parties' intent.  SNS argues that the definition of

"System" in the franchise industry supports its right to implement the

Policy.  See, e.g., Intersport, Inc. v. National Collegiate Athletic Ass'n,

381 Ill. App. 3d 312, 319 (2008) ("Contract terms should also be

interpreted in accordance with the custom and usage of those particular

terms in the trade or industry of the parties").   SNS points to section 3

of the IFDA, which defines a franchise, in part, as a contract or

agreement by which "a franchisee is granted the right to engage in the

business of offering, selling, or distributing goods or services, under a

marketing plan or system prescribed or suggested in substantial part by a

franchisor."  815 ILCS 705/3(1)(a).  A marking plan or system:

> means a plan or system relating to some aspect of
> the conduct of a party to a contract in conducting
> business, including but not limited to (a)
> specification of price, or special pricing systems or
> discount plans, (b) use of particular sales or
> display equipment or merchandising devices, (c)
> use of specific sales techniques, (d) use of
> advertising or promotional materials or
> cooperation in advertising efforts; provided that an
> agreement is not a marketing plan or system solely
> because a manufacturer or distributor of goods
> reserves the right to occasionally require sale at a
> special reduced price which is advertised on the
> container or packaging material in which the
> product is regularly sold, if the reduced price is
> absorbed by the manufacturer or distributor.

815 ILCS 705/3(18).  SNS argues that in the "Illinois franchise industry,

specification of price is included in the definition of 'system.'"  See Defs.'

Renewed Mot. for Summ. J., p. 30.

This Court disagrees.  While the IFDA provides that a marketing plan or system can include (and is not limited to) specification of price, it does not require that specification of price be part of the franchise agreement.  For instance, several courts have found a marketing plan or system existed in the absence of all of the elements of a plan or system set forth in the statute.  See, e.g., Salkeld v. V.R. Business Brokers, 192 Ill. App. 3d 663, 671 (1989) (finding that a marketing plan or system existed where the sales manual detailed product information and sales strategies, stated how to demonstrate the product and mix the drinks, and the company promised support in marketing, training, advertising and promotions); To-Am Equipment Co., Inc. v. Mitsubishi Caterpillar Forklift America, Inc., 953 F. Supp. 987, 994 (N.D. Ill. 1997) (finding that "advice about how to run the business need not be comprehensive in order to amount to a 'marketing plan'" ), aff'd 152 F.3d 658 (1998); 14 Ill. Adm. Code § 200.102 (noting that a marketing plan or system under the IFDA "means advice given to the purchaser on how to sell the franchisor's product or service" and noting that such advice can include

"suggested prices or credit practices"). That the IFDA allows a marketing

plan or system to include specification of price does not shed light on the

parties' intent when drafting the Agreements at issue herein.

Instead, this Court finds that the undisputed extrinsic evidence

demonstrates, as a matter of law, that the parties did not intend for the

System to include pricing and promotions.

It is true, as SNS points out, that the 1995 and current Agreements

do not contain the statement in the 1972 and 1978 License Agreements

that Plaintiff "specifically shall establish and determine in its sole

discretion the prices to be charged for products sold or offered for sale in

the licensed restaurant." This Court notes SNS's claim that the removal

of the language specifically giving Plaintiff the right to set prices is

significant, citing  Regency Commercial Assocs., LLC v. Lopax, Inc., 373

Ill. App. 3d 270, 277-78 (2007) (finding significant the rejection of

language in prior drafts of the contract in question). However, the

extrinsic evidence regarding the parties negotiation of the 1995

Agreements (which immediately followed the 1972 and 1978 License

Agreements) demonstrates that the parties did not intend to change their

agreement with regard to pricing.  See, e.g., Regency Commercial Assocs.,

373 Ill. App. 3d at 275 (preliminary negotiations are relevant extrinsic

evidence to determine the meaning of ambiguous terms and the intent of

the parties).

The August 1993 Memorandum from Richmond to Gilman

demonstrates that the parties intended that Plaintiff continue to have the

ability to determine its own prices.  Although the parties clearly

continued to negotiate the Agreements for over a year,  none of the

evidence presented creates a disputed fact regarding whether Plaintiff's

ability to set prices was renegotiated.

In addition, the UFOC provided to Plaintiff before entering into

the 1995 Agreements (and the current Agreements) specifically stated

that franchisees were free to set their own prices, and many did so.

While the UFOC is not a contract (see  Inash Corp. v. American Dairy

Queen Corp., 1990 WL 622095, at *5 (S. D. GA. 1990) (holding that

the UFOC was not a contract between the parties but "simply a

disclosure required by the Federal Trade Commission")) and was not integrated into the Agreements (see, e.g., § 14.05 of the Agreements), it is still evidence of the parties' intent.

Also telling is that the 1994 UFOC contained the statement that two franchise restaurants "currently do not offer breakfast service" (emphasis added). See 1994 UFOC, p. 34 (d/e 92-14). This shows that SNS knew how to indicate that a statement in the UFOC was a qualified statement. The UFOCs did not provide that franchisees were currently free to set their own prices.

This Court also finds the parties' course of performance supports Plaintiff's interpretation of the Agreements. See, e.g., Machine Tool Tech. 21, Inc. v. United Grinding Tech., Inc., 2003 WL 1524646, at *5 (N.D. Ill. 2003) (noting that "course of performance is relevant to show the meaning that the parties to an agreement have attached to that contract being performed, and is concerned with facts that occurred after the time the contract was executed"). For 70 years, Plaintiff set its own prices. Moreover, in 2010, Plaintiff requested SNS print custom menus

for Plaintiff's restaurants which would reflect a 10% increase in the prices Plaintiff charged at that time.  SNS recommended against the price increase, but Plaintiff still increased its prices.

SNS argues, however, that this evidence is not probative of the parties' intent because SNS had the right, under the Agreements, to modify the System to include pricing and promotions but did not do so until 2010.  According to SNS, the parties' course of performance before 2010 was entirely consistent with the System as it existed at that time.  Nonetheless, this Court finds that the parties course of performance supports Plaintiff's interpretation.  Until the implementation of the Policy in 2010, the parties always acted as though Plaintiff had the right to set its own prices.

In further support, this Court notes that the SNS letter offering marketing initiatives supports Plaintiff's interpretation of the Agreement.  See d/e 10-9.  In that letter, SNS asked franchisees to agree to following the Policy beginning September 1, 2010 and for the remainder of their franchise agreement term in exchange for additional marketing funds.

Despite SNS's assertion that it did not need to get Plaintiff's agreement to follow the Policy in light of Plaintiff's alleged obligation to do so under the Agreements, this letter further suggests that the parties understood the Agreements provided Plaintiff the right to set its own prices.

Finally, this Court finds that the Stennett Memorandum of Agreement, which SNS points to as evidence in support of its interpretation of the Agreements, actually supports Plaintiff's interpretation.  As noted above, the Stennett Agreement and Memorandum of Agreement were executed in 1992.  The Memorandum of Agreement contained two provisions that clearly modified  provisions in the franchise agreement.  However, with regard to the right to set prices, the Memorandum of Agreement provides that Franchisee "acknowledges that Franchisee is free to establish menu pricing that may differ from menu pricing used by the Franchisor."  See d/e 95-5.

Acknowledge is defined as: "To recognize the rights, authority, or status of" and "to disclose knowledge of or agreement with."  Merriam-Webster's Collegiate Dictionary 10 (10th Ed. 1998).  This indicates  that

the parties understood that the Agreement gave the franchisee the right

to set prices.  Unlike the paragraphs that <u>changed</u> the terms of the

Agreement, the paragraph regarding pricing <u>acknowledged</u> that the

franchisee had the right to set prices but established an additional

requirement that the pricing be competitive with similar restaurants in

the area.  This language is entirely consistent with Plaintiff's position that

the System did not include the right to set prices.          All of this

evidence, in addition to the report from Plaintiff's expert that "[i]t is not

the custom and practice in the industry for franchisors to set prices"

further supports Plaintiff's interpretation of the Agreements.  <u>See</u> <u>In re</u>

<u>Lakewood Eng'g & Mfg. Co., Inc.</u>, 459 B.R. 306, 334 (N.D. Ill. Bkrtcy.

2011) (applying Illinois law and noting that a court interpreting an

ambiguous contract may consider trade usage in the relevant industry).

In fact, even SNS's expert stated that it was not common practice in the

franchise industry for franchisors to set menu pricing, although he

asserted that was because "franchisors were not allowed to do so until

fairly recently."  d/e 70-3, p. 21 (citing <u>Khan</u> and <u>Leegin</u>).  The

undisputed extrinsic evidence demonstrates that price and promotions were not part of the System.  As such, SNS could not modify the System to require Plaintiff to following SNS pricing and promotions and Plaintiff is entitled to judgment on Count I.


B.    COUNT II: Breach of Contract

To state a breach of contract claim under Illinois law, a plaintiff must allege the existence of a contract, substantial performance by the plaintiff, a breach by the defendant, and damages resulting therefrom. Associated Underwriters of Am. Agency, Inc. v. McCarthy, 356 Ill. App. 3d 1010, 1019 (2005); Manufacturers Life Ins. Co. v. Mascon Info. Techs. Ltd., 270 F.Supp. 2d 1009, 1013 (N.D. Ill. 2003).  Plaintiff must demonstrate it suffered actual damages to succeed on its breach of contract claim.  See Penn-Daniels, LLC v. Daniels, 2009 WL 1475277, at *3 (C.D. Ill. 2009), amended on reconsideration in part by Penn-Daniels, LLC v. Daniels, 2010 WL 431888 (C.D. Ill. 2010) (vacating entry of final judgment on issue of whether the breach was material); see

also TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc., 491 F.3d 625,

631 (7th Cir. 2007) ("Merely showing that a contract has been breached

without demonstrating actual damages does not suffice, under Illinois

law, to state a claim for breach of contract").

SNS argues that Plaintiff has not suffered damages proximately

caused by Defendants because (1) Plaintiff never agreed to comply with

the Policy, (2) Plaintiff voluntarily implemented the promotions, and (3)

the preliminary injunction gave Plaintiff full relief from having to

implement the Policy and, therefore, if Plaintiff is following promotions

covered by the Policy, it is not following them because of the Policy.

See Defs.' Mot. for Summ. J., p. 36-36; Defs.' Reply Mem., pp. 16-17.

SNS also asserts that Plaintiff cannot maintain Count II to recover as

damages only its attorney fees.

Plaintiff argues that it followed promotions only over objection and

without waiving any rights.  Plaintiff asserts it has been damaged in the

amount of more than $210,253.17 as of October 1, 2011.  See Bruno

Aff. ¶ 7 (d/e 84-1) (attributing the loss to following the Happy Hour and

Kids Eat Free promotions).  Plaintiff also argues that attorney fees are

permitted by the Agreements and that it suffered damages in the form of

attorney fees.

This Court finds that questions of fact remain whether Plaintiff

voluntarily followed the promotions and whether Plaintiff suffered any

actual damages from doing so.  Wilma Stuller testified as follows:

> Q.    Okay.  And the, implementation of
> promotions, I guess, is a decision that you made,
> to do it not under compulsion of termination,
> correct?
>
> A.    It was made basically to show our good faith
> and willingness to cooperate.
>
> Q.  But you, you made a decision for good reason,
> or you thought a valid reason, but it wasn't
> because if you didn't do it, you would get
> terminated?
>
> A.  Probably so.
>
> Q.  But you, you knew there was an agreement not
> to terminate you, then we had an injunction
> hearing –
>
> A.  Right.
>
> Q. – and the judge ultimately ruled in your favor,

and you could do whatever you want right now with no threat of termination?  You understand that?

A.  We had already implemented the promotions and it is not a good business practice to jump in and out of– you want your customers to feel comfortable and not be changing things day-by-day.

\*   \*   \*

Q. \* \* \* but you understand that based on the current state of the litigation, you are free to not do any of that?

A.  Yes.

Q.  Okay.  And you made a –

A.  But there are, are some promotions that we consider effective.

Q.  Okay.  And you've done those?

A.  And those that we consider to be a good practice, we've always complied with.

Q.  Okay.

A. But we have had, always had the, the choice of whether it was right for our area or not.

Q.  Okay.  My question is this–you have not,

because of the fact that you chose to file the lawsuit and the developments, have not ever implemented a promotion or set a price because Steak N Shake said you had to, or you're going to lose your Franchise Agreement?

A.  Yes.  We implemented the promotions because Steak N Shake said you have to.

Q.  And when did they say that?

A.  Same time that they told us we had to comply with the price.

Q.  In June of 2010?

A.  Yes.

Q.  But you were doing these promotions, you said, before then?

A.  Some of the promotions we were doing, the ones we chose to do, not all of them.  The Kids Eat Free is absolutely ridiculous.  The kids are going to come in on weekends anyway.  If you have kids eat free, do it Tuesday and Wednesday.

Q.  So, have you implemented Kids Eat Free?

A.  Yes.

Q.  But you, and you continue to use it?

A.  We -

Q.  And you know that you don't have to under the court's order?

A.  Well, but that is under appeal, isn't it?

Q.  Well, it is.  But it's in effect.  You don't have to do it.  And if you don't do it, Steak N Shake under the current state, can't take any action against you; you're aware of that, right?

A.  Not really.

Q.  All right.

A.  I was under the impression that we had to, because of your, without our lawsuit and everything, I'm – the prices, well, we just can't live with that.

Stuller Dep., pp. 219-223 (d/e 92-54).  Wilma Stuller also testified that

some of the promotions were not implemented until after SNS sent the

default notice and that she did not understand that the Court said

Plaintiff did not have to comply with promotions.  Stuller Dep., pp. 229,

231.  This testimony makes it unclear whether Plaintiff voluntarily

followed all promotions or did so due to SNS's breach of the Agreements

by implementing a Policy purporting to require franchisees to following

pricing and promotions.

In addition, Plaintiff submitted the Affidavit of Derek Bruno,

Plaintiff's Comptroller, who stated that Plaintiff implemented all

corporate promotions over objection and without waiving any rights. See

Derek L. Bruno Aff. ¶ 6 (d/e 84-1).  Bruno also calculated the damages

from doing so at $210,253.17.  Id.

The Court finds that, taken together, this evidence creates a factual

question whether Plaintiff suffered damages as a result of the Policy.

Therefore, SNS's Motion for Summary Judgment on Count II is denied.

C.     COUNT III: Violation of the Illinois Franchise Disclosure
       Act (Alternative to Counts I and II)

Plaintiff pled Count III in the alternative to the other two Counts.

In Count III, Plaintiff alleges that if SNS can impose the Policy on

Stuller, then SNS violated the IFDA by: (1) attempting to force Stuller to

implement the Policy despite any language to that effect in the

Agreements and despite the representations in the UFOC; and (2) falsely

stating in the UFOC that franchisees could set their own prices and that

franchisees were not obligated to participate in all marketing promotions.

Plaintiff sought summary judgment on Count III in the event the

Court held that the Agreements gave SNS the right to set menu prices.

Because the Court found in favor of Plaintiff on Count I, Plaintiff's

Motion for Summary Judgment on Count III and SNS's Motion for

Summary Judgment on Count III are denied as moot and Count III is

dismissed.

## V. CONCLUSION

For the reasons stated, Plaintiff's Motion for Summary Judgment,

seeking summary judgment on Count I or, in the alternative, Count III, is

GRANTED IN PART and DENIED IN PART.  SNS's Motion for

Summary Judgment on all counts is DENIED.  Plaintiff is entitled to

judgment in its favor on Count I.  Questions of fact remain regarding

Count II.  Finally, because Count III was pled in the alternative, Count

III is dismissed.  A jury trial on Count II is set on the Court's trailing trial

calendar beginning September 4, 2012.  A final pretrial conference is set

for August 27, 2012 at 3:00 p.m. The parties are advised to read the

General Rules for Conduct of Counsel in the Courtroom and During

Trial in Proceedings before U.S. District Judge Sue Myerscough, available

at the Court's website: www.ilcd.uscourts.gov.

ENTER: July 12, 2012

FOR THE COURT:

                               <ins>       s/Sue E. Myerscough       </ins>
                                      SUE E. MYERSCOUGH
                               UNITED STATES DISTRICT JUDGE